JEFFERSON DAVIS *v*. J. H. D. BOWMAR, EXECUTOR, ET AL.

1. ADVERSE POSSESSION. *Under act of 1844.*
   Ten years' actual adverse possession of land under the act entitled "An act to amend the several acts of limitation," approved February 24, 1844, vested title in the possessor.

2. SAME. *When presumed from acts of ownership.*
   A permissive holding of land can never ripen into title, but the continued possession and uninterrupted enjoyment of it, exclusively, as owner for twenty-eight years, coupled with clearing, fencing, cultivating, building, leveeing, assessing as one's own and paying taxes as owner, with the knowledge of him in whom the legal title was vested, and his distinct recognition of the right o

the occupant to the land as its owner, raises a presumption that the occupant held the land during this time as its owner, in the absence of evidence to show the circumstances under which such possession commenced.

**3.** SAME. *Circumstances creating the presumption thereof.*

After the lapse of forty years, and in the absence of evidence that the possession of land was begun in subordination to the title of another, evidence of the open, notorious, and exclusive occupancy and enjoyment of the land as one's own, with the uninterrupted and unquestioned exercise of complete dominion as owner, from the commencement of such possession, in a manner inconsistent with the idea of title in another, for twenty-eight years, warrants the presumption that he who held so long and acted all the time in all respects as owners usually do, held as owner and adversely to all others.

**4.** TRUSTEE. *When allowed to assert individual claim to trust property.*

A trustee cannot, by virtue of his position as such, obtain an advantage for himself over his *cestui que trust;* but this does not preclude a trustee from appealing to the Court of Chancery, to which he is amenable, to adjudge his claim as an individual to an interest in the trust property not acquired after he became trustee, nor in hostility to the *cestui que trust,* but possessed before the acceptance of the trust.

**5.** SAME. *When estopped to claim trust property. Rule given.*

The doctrine as laid down in Perry on Trusts, section 433, and Lewin on Trusts and Trustees, page 325, "that under no circumstances can a trustee claim or set up a claim to the trust property adverse to the *cestui que trust,*" criticised, the authorities reviewed, and declared to not sustain the text in all its breadth of statement; and the true rule declared to be, as stated by Hill on Trustees, page 535, "that trustees shall not take advantage of their situation to obtain any personal benefit to themselves at the expense of their *cestui que trust;*" and this does not deny to one of several executors the right to resort to the Chancery Court to obtain its decree as to his individual rights to a portion of the estate claimed to have belonged to him before he became executor.

**6.** SAME. *Right existing before acceptance of the trust.*

An executor may *retain* for his own claim; and neither reason nor authority precludes him from asserting a right existing in himself, before his qualification as executor, to some part of the estate, by a proper proceeding with all the proper parties, merely because he is executor.

**7.** ADMISSIONS. *May be controverted, when.*

Acts and admissions may be controverted so long as so doing will not cause injury to some one who has been induced, on the faith of such acts or admissions, to do what otherwise he would not have done, and who will be injured by permitting such acts or admissions to be questioned.    ·

**8.** ESTOPPEL. *What constitutes.*

If there has been no alteration in the position of one and no harm done by the acts of another, such acts do not constitute an estoppel, whatever weight may attach to them as evidence. Injury to others, whose conduct has been influenced by the acts or admissions, as the result of such conduct so induced,

is a necessary element, without which an estoppel will not arise. There must be wrong coupled with an injury that is the legal result of the wrong. To constitute an estoppel by conduct, it must have been with the intention that others should act on it, or it must have been calculated to induce a reasonable man to believe it was so intended; and others must have been induced to act upon it, so that injury will result from such action thus induced, otherwise an estoppel shall not be held to arise.

9. Same. *How applied.*

Estoppels by conduct cannot be held to extend to objects which the parties cannot be reasonably supposed to have had in view.

10. Same. *Recital in a contract. How restricted.*

A recital or an assumption of a fact in a written contract will not be held to operate as an estoppel as to other matters not embraced in that contract, nor in the contemplation of the parties in making it.

11. Adverse Possession. *What constitutes. Character of entry, when presumed.*

Both occupation, actual or constructive, and claim of ownership must concur in order to acquire title to land by possession. Neither is effectual without the other. The legal presumption is that the occupant holds in subordination, and not adversely, to the true owner; and an occupant cannot convert his occupation into an adverse one except by acts which plainly show its hostile character. An entry shown to have been permissive will give character to all subsequent acts; but where the nature of the entry is not known, its character may be determined by the subsequent acts. But as the legal presumption is in favor of holding in subordination to the title, it devolves on him who asserts that his possession has been adverse to establish that fact.

12. Same. *How proven. Acts of ownership, as between strangers, between parent and child.*

Actual, open, and notorious possession may be shown to have been adverse by the acts of the occupant. Acts in reference to the possession of land are evidence of the character of the possession, and if decisive, and not shown to have commenced or continued in recognition of title in another, may establish title by limitation. They must be acts of ownership. In old and well-settled countries less decisive acts have been held sufficient. Everywhere, taking possession of wild land, reducing it to cultivation, building fences, erecting houses, draining marshes, assessing it and paying taxes in the occupant's own name, and continually occupying it as a family residence for a long series of years, are potent circumstances, and, as between strangers, in the absence of other evidence, will usually be conclusive proof of an adverse holding. Between those occupying parental and filial, or *quasi*-parental and filial, relations, these circumstances are not considered so convincing, because they may consist with a mere permissive enjoyment of a usufructuary possession; but even among such relatives such circumstances are satisfactory, if, in addition to occupation and acts of ownership, as above enumerated, there is

55 Miss.—43

evidence of a parol gift by the owner, coupled with subsequent acts by him in recognition of ownership by the occupant under such parol gift.

13. SAME. *Upon parol gift.*

A parol gift of land may ripen by actual possession into a perfect title. An assertion of ownership by the occupant in himself is, in a legal sense hostile and adverse to the paper title, though it be permissive and friendly in a popular sense, as having come by the permission of the owner.

14. LAND. *Gift by parol, how proven.*

A parol gift may be shown by parol, and resort may be had to the acts of the parties in reference to land in dispute to show their several relations to it.

15. ESTOPPEL. *What essential thereto.*

Estoppel is a preclusion to show the truth. It is essential to an estoppel that the conduct relied on to produce it should have induced some action on the part of the person pleading it which will be injurious to him if the party guilty of the conduct is permitted to show the truth.

16. SAME. *Recitals in contract — when an estoppel, when only an admission.*

The recitals, assumptions, and stipulations of a written contract are, in any suit upon that contract, operative as an estoppel upon the parties to it; but a mere statement or admission in one contract, not forming a part of the consideration of it, will not be binding in another matter with which it has no connection. Such recitals are admissible as evidence, but are not estoppels.

17. TRUSTEE. *When he may, and may not, assert claim to the trust property.*

A trustee will not be allowed to gain any advantage by his fiduciary position, nor to lay claim to any part of the trust property which has come into his possession. After entering on the trust he cannot acquire an interest in the trust property. If he takes and holds possession of the property as trustee, this is, of itself, a renunciation of a previous interest; but qualification as an executor, or any subsequent act, *without possession* taken, does not defeat a prior independent right in the trustee. It might do so where the adverse right extended to the whole subject-matter of the trust, because then nothing would remain for the trust to operate on; but where the claim is of a fractional interest in one chose in action alone, which has never come into the actual possession of the executor, the whole spirit and reason of the rule ceases, and to enforce its letter (if, indeed, there be any such letter) would work an injustice more intolerable than that which it was designed to prevent.

18. ADVERSE POSSESSION. *What constitutes. What does not constitute.*

The possession relied on to defeat the title of the real owner must be adverse. To effect this, nothing short of ouster or disseizin will serve. One relying upon possession must prove it to be adverse to the title set up. Such possession, if open and notorious, under claim and color of right, may, by lapse of time, ripen into a good legal title. To have this effect two facts must concur: first, there must be an entry under color of right, claiming title hostile to the true owner; second, continuous occupancy for the statutory period. Adverse possession is an actual appropriation of land, commenced and continued under

a claim of right, either openly avowed or constructive, arising from the acts and circumstances attending the appropriation, to hold the land against him who was seized. The intention of the possessor must be considered in determining its character. Where the entry is without claim or color of title, the law adjudges the possession as subordinate to the true owner, and no length of possession will render such holding adverse. But if there be an entry without claim of title, and no privity existed between the enterer and real owner, a subsequent acquisition of title by the enterer, which he believes to be good, at once makes his holding adverse. *Per* SIMRALL, C. J., dissenting.

19. ESTOPPEL. *Applied to trustee claiming trust property.*

A trustee is, ordinarily, owner of the legal title. The nature and quality of the estate depends on the limitations in the instrument under which he takes. An executor takes the legal title to the choses in action of his testator. His acceptance of the trust is the investiture of the title. . His position is one of trust. The law requires him, when in possession of knowledge as respects his own claim to any part of the assets, to decide whether he will discharge the trust imposed or assert his own claim. If he fails, within a reasonable time after qualification, to assert his claim, he will be conclusively held as having waived or abandoned it. Estoppel is founded in wisdom, justice, and morality. The essence of it is responsibility for one's deliberate acts and conduct. When one, by words or conduct, causes another to believe a certain state of facts, and induces him to act on that belief, so as to alter his previous position, the former is concluded from averring against the latter a different state of things as existing at the time. An executor who has accepted the trust, collected the debts, and paid off the legatees, cannot recover back from them on a title which he had when he entered upon the trust, and about which he then had full knowledge. The same principle would apply where partial payments had been made to the legatees. In either case the doctrine of estoppel would apply. Estoppel applies as fully to an executor as to a trustee created by deed. Devise is one of the common-law modes of assurance of title. Estates and trusts can be created as well by will as by deed. *Per* SIMRALL, C. J., dissenting.

20. SAME. *Rule as to trustee claiming trust property.*

The doctrine laid down by Lewin on Trusts, page 325, and Perry on Trusts, page 433, that a trustee is, under no circumstances, allowed to set up a title adverse to his *cestui que trust*, but, though he may not claim against his *cestui que trust*, he is not bound to deliver over the property to his *cestui que trust*, if he cannot safely do so by reason of notice of title in another which is paramount to the trust, is founded in reason and fully sustained by the authorities. *Per* SIMRALL, C. J., dissenting.

21. SAME. *Created by acquiescence and other conduct.*

Acquiescence is often a very strong admission, and may also be conclusive. To have such effect, it must exhibit some act of the mind and amount to voluntary demeanor or conduct. The circumstances must be such as afforded him opportunity to speak or act, and such as would naturally call for acts or a reply from men similarly situated. The appellant, by his acquiescence and

non-claim for the four years that the testator lived after the sale, by giving bond and taking oath to execute the will, by the inventory, by his collection of money arising from the sale of the lands, by his payment of the interest on the legacies charged on that fund, by his contract with the residuary legatees under the will, precluded and conclusively estopped himself from asserting his claim to any part of the trust fund, his rights being well known to him at the time of his acceptance of the trust. *Per* SIMRALL, C, J., dissenting.

22. TRUSTEE. *Having a claim against the trust estate. His duty to elect.*

Where one of several executors takes possession of the trust estate jointly with the other executors, if he has a claim against the estate, and is fully advised of his rights before taking the oath to execute the will, it is his duty to elect whether he will assert his claim or carry out the will; and the law esteems his conduct in reference thereto as conclusively manifesting his election. *Per* SIMRALL, C. J., dissenting.

APPEAL from the Chancery Court of Warren County.

Hon. EDWIN HILL, Chancellor.

On June 15, 1874, the appellant, Jefferson Davis, filed his bill against J. H. D. Bowmar and J. D. Smith, as executors of the last will and testament of Joseph E. Davis, deceased, and Joseph D. Mitchell, Mary E. Hamer, William D. Hamer, Margaret Davis, Jefferson Davis, Jr., William Davis, and Varina Davis, devisees and legatees, and B. T. Montgomery, W. T. Montgomery, and Isaiah Montgomery, purchasers of the land which is the subject of the suit. The statements of the bill are as follows :

" First. That on the 19th day of November, A. D. 1866, and for many years before that time, your orator owned and occupied a large and valuable tract of land situate in the county of Warren and state of Mississippi, containing about eight hundred and ninety acres, known as the ' Brierfield Place,' and more particularly described as sections eighteen and twenty-three in township fourteen, range one, east. That Joseph E. Davis, now deceased, was, during the same time, seized and possessed of a much larger and more valuable tract of land, containing about twenty-nine hundred and sixty acres, known as the ' Hurricane Place,' which lies contiguous to ' Brierfield Place,' above described. That said Joseph E. Davis was the elder brother of complainant, and had, for a

very long time before the nineteenth of November, A. D. 1866, aforesaid, been accustomed to act as agent for complainant, in respect of said 'Brierfield' plantation, during the complainant's absence from the state, managing and controlling said plantation, and receiving and disbursing large sums of money for your orator in relation to the same.

"Second. Your orator further shows that on or about the said 19th day of November, A. D. 1866, the said Joseph E. Davis, during a protracted absence of complainant from the said state of Mississippi, acting in his own behalf in respect of his own plantation, known as 'Hurricane Place,' contracted with the defendant Benjamin T. Montgomery for the sale of both of said places, taking security for the purchase-money thereof in his own name, on terms hereinafter more particularly set forth, and yielded possession of said 'Hurricane Place' to said Benjamin T. Montgomery, and, at the same time, authorized him to enter upon complainant's said 'Brierfield Place.' At the same time said Benjamin T. Montgomery was well aware that the complainant was the real owner of said 'Brierfield Place,' and his attention to that fact was then distinctly and expressly called by said Joseph E. Davis, and said contract of sale as to said last-mentioned place was made upon the express condition that the same should be subject to your orator's election to ratify or annul, and that if your orator should so elect, the contract as to that place should be rescinded, and possession yielded to complainant on his demand.

"Third. Your orator further shows that the terms upon which said contract of sale was made are as follows, to wit: The said Benjamin T. Montgomery agreed to pay three hundred thousand dollars, in gold coin of the United States, on the first day of January, A. D. 1876, with interest at six *per centum* per annum, payable annually, and, to secure the payment thereof, delivered to said Joseph E. Davis the bond of himself and W. T. Montgomery and Isaiah Montgomery, payable to said Joseph E. Davis, in the penal sum of six hun-

dred thousand dollars, in gold coin of the United States. Said Benjamin T. Montgomery also delivered to said Joseph E. Davis the nine written obligations of said Benjamin Montgomery, W. T. Montgomery, and Isaiah Montgomery, payable each in the sum of eighteen thousand dollars, in gold coin of the United States, on the first day of January of each of the years 1867, 1868, 1869, 1870, 1871, 1872, 1873, 1874, 1875. Said Benjamin T. Montgomery, for the purpose of further securing payments, executed at the same time a mortgage whereby he reconveyed the plantations so purchased, with power of sale on default in payment of any of said obligations.

"Fourth. Your orator further shows that on his return, when informed of the conditional sale made by his said brother, Joseph E. Davis, assuming to act for him, and being satisfied with the terms and price, he was then, and is now, willing to ratify the said act of his brother, and to receive the proper portion of the said bond and interest notes in lieu of his said land. That, accordingly, the said Joseph E. Davis collected the interest notes or obligations as they fell due during his life-time, and remitted to your orator his full share thereof out of each collection. That it was well understood between complainant and his brother, the said Joseph E. Davis, and the defendant Benjamin T. Montgomery, that so much of said bond and interest notes as bears the same proportion to the aggregate thereof as the numbers of acres in the land in said 'Brierfield Place' bears to the whole number of acres sold should be paid to complainant as collected, as and for his proportionate share of the same; which understanding was carried out in good faith during the life-time of said Joseph E. Davis, as above stated. That the proportionate share of complainant, though not definitely agreed upon, in the absence of accurate measurements and surveys, was estimated to be about seventy thousand dollars of the three hundred thousand dollars.

"Fifth. Your orator further shows that on the 18th day of

March, A. D. 1869, the said Joseph E. Davis made his last will and testament, whereby he bequeathed to be paid out of the bonds aforesaid the following legacies, to wit: To his granddaughter, Mary E. Mitchell, one hundred thousand dollars; to his grandson, Joseph D. Mitchell, fifty thousand dollars; to each of the four children of complainant, the nieces and nephews of said testator, Margaret, Jefferson, William, and Varina, twenty thousand dollars — making in the aggregate two hundred and thirty thousand dollars, the estimated interest of the said testator in said bond, and leaving the estimated interest of your orator therein, to wit, seventy thousand dollars. He further directed that the interest accruing on said bond, secured by said interest obligations, be paid to said legatees as interest on their legacies at the same rate, six *per centum* per annum, until the bond shall become due, thereby giving to each legatee the proportionate amount of interest accruing on his legacy. He further provided that a *pro-rata* deduction should be made from the legacies aforesaid in case of failure to collect the whole amount of the funds set apart for their payment. Other legacies, to be paid out of other funds, were therein bequeathed, and the grandchildren mentioned, Mary E. Mitchell and Joseph D. Mitchell, were made residuary legatees. Joseph H. D. Bowmar, Hugh R. Davis, Joseph D. Smith, and the complainant, Jefferson Davis, were appointed as executors thereof.

"Sixth. Your orator further shows that said Joseph E. Davis departed this life during the ensuing year, and that his said last will and testament was duly admitted to probate on the 21st day of September, A. D. 1870, upon proceedings for that purpose duly and properly taken and had in the Probate Court of Warren County, in the state of Mississippi, which was the proper court having jurisdiction thereof. That, at the same time, letters testamentary were thereupon issued to the defendant Joseph H. D. Bowmar, he being the only one of the persons therein nominated as executors there present and ready to qualify. That afterwards, on the 6th day of Decem-

ber, A. D. 1870, Joseph D. Smith and complainant, the said Jefferson Davis, duly qualified as executors of said last will, and letters testamentary were likewise issued to them. The said Hugh R. Davis declined to qualify as one of said executors, and has never participated in the execution of said will.

"Seventh. Your orator further shows that he has not been residing in the said state of Mississippi since his said qualification, and the task of collecting and disbursing money of said estate has, to a great extent, devolved upon his co-executors aforesaid. That, in the course of their said duties, the latter have, from time to time, collected large sums from the said Benjamin T. Montgomery on account of said interest obligations ; and have, on the other hand, made large disbursements out of such collections, the exact amount of which receipts and disbursements are not now accurately known to your orator. That no part of the money so collected has been paid to your orator on account of his interest therein, his co-executors not being cognizant of his rights in the premises except upon information, and not feeling authorized, and for that reason not having been requested by complainant, to make any such payments until your orator shall have established his said rights by the decree of a court of competent jurisdiction.

"Eighth. Your orator further shows that, on the 15th day of April, 1871, the defendants Benjamin T. Montgomery, William T. Montgomery, and Isaiah Montgomery executed and delivered to said executors a properly executed mortgage, whereby they conveyed to them a certain tract of land, or plantation, called ' Ursino,' more particularly described therein, for the purpose of better securing the payment of said bond and interest obligations.

"Ninth. Your orator further shows that the defendant Benjamin T. Montgomery is not able to make the large payments undertaken by him, as aforesaid, notwithstanding his earnest efforts to that end have been fairly and in good faith fully exerted. The disasters which have befallen his agricultural interests, and the vast depreciation in value of said lands,

have rendered such payments hopeless.  That said Benjamin T. Montgomery, as your orator is informed and believes, is therefore willing and desires to rescind all . or so much of said purchase as may be, by and with the consent of those concerned.

" Tenth.  Your orator further shows that the said Mary E. Mitchell has intermarried with William D. Hamer, with whom she now lives in Florence, Alabama.

" To the end, therefore, that said defendants may show why your orator should not have the relief hereby prayed, and may — according to the best and utmost of their respective knowledge, remembrance, information, and belief — full, true, direct, and perfect answers make to the foregoing statements and allegations ; and that your orator's rights in the premises may be ascertained and declared ; and that it may be referred to some suitable person as commissioner, to ascertain the number of acres in each of said plantations, and thereby the true proportions in which said plantations formed the consideration of said bond ; and that the executors of the last will and testament aforesaid may be decreed to hold said bond and interest obligations, and all securities for the payment thereof, in trust for the benefit of your orator, to the full extent and proportion in which it shall be found the said 'Brierfield Place' forms the consideration thereof; and that such orders and decrees may be therefore made as may be necessary to secure to your orator the benefit of his interest so ascertained, and as shall fully protect the said executors ; and that an account may be taken to ascertain how much has been received by the said executors on account of said interest obligations ; and that your orator's proportionate interest therein be declared ; and that said executors be authorized and required to pay the same over to your orator, and be allowed a proper credit therefor on their executorial account ; and that your orator and the said Benjamin T. Montgomery may be authorized to rescind the sale aforesaid, as to said 'Brierfield Place,' if they shall be able to come to an agree-

ment to that end, and, upon compliance with such terms as may for that purpose be by them agreed upon, not prejudicing or injuring the rights and interests of others, that such rescission may be decreed, and the proper abatement of said bond and interest obligations be thereupon likewise decreed. And that if your orator has in anywise mistaken his appropriate relief, or failed in any respect to ask therefor, that he may have such further, other, or different relief as to your honor shall seem meet, and as the facts of the case shall warrant.''

All of the defendants answered. But the joint answer of Joseph D. Mitchell and Mary E. Hamer contains the defenses relied upon by those resisting the bill. The statements of their answer are, in effect, as follows: Jefferson Davis was not, on November 19, 1866, or any time previous thereto, owner of the land designated in the bill as the "Brierfield Place," but Joseph E. Davis entered from the United States government the land embraced in Hurricane and Brierfield plantations, and continued to be the owner of them till the sale to Montgomery. Joseph E. Davis, at an early age, came to Mississippi and acquired a large fortune, in which was included Hurricane and Brierfield plantations. Jefferson Davis resigned his commission in the army and came to Mississippi about the year 1835. Joseph E. Davis, being very much attached to his brother, and wishing to assist him, bought a lot of slaves and placed them on the "Brierfield Place," under his control. By their labor the plantation was cleared, it being then in the woods. Joseph E. Davis permitted his brother, Jefferson, to occupy "Brierfield," and to receive and use the crop grown thereon, but never parted with his title or right to control the same. He never made any gift or conveyance of "Brierfield" to Jefferson Davis, nor did the latter ever pay anything for the land. Jefferson Davis was permitted to control and enjoy "Brierfield" as his own, except in the right and power to dispose of it. Such was the affection of Joseph E. Davis for his brother, Jefferson, that he made up his mind, many years before his death, to dispose of "Brierfield" for the benefit

of the latter, or of his family.   Jefferson Davis never claimed any right, during the life of his brother, to dispose of " Brier- field," or, if he did, the latter never knew it.   Joseph E. Davis, although regarding himself as absolute owner of " Brierfield," was willing to consult, to some extent, the feelings and wishes of his brother in disposing of it, as he did not intend to de- prive him or his family of the proceeds thereof or the equiva- lent thereto ; and, acting in this view, he may have spoken of the plantation as complainant's when there was no occasion for accuracy as to the title.   As an evidence of how Joseph E. Davis regarded the title to " Brierfield," the holographic will made by him in 1865 is referred to, in which he devises the place to the children of Jefferson Davis.   In 1866 Hurricane and Brierfield plantations were in the possession of the Freed- man's Bureau, and had been for one or two years, and by satisfying the government that the land was his (Joseph E. Davis'), it was surrendered to him.   This surrender was known to Jefferson Davis, and was never objected to.   By the sur- render thereof, Joseph E. Davis became the occupant of the land, before the sale to Montgomery.

Joseph E. Davis did not act as the agent of Jefferson in making the sale of Hurricane and Brierfield plantations, but acted for himself, and without consultation with his brother. The deed was made in the name of Joseph E. Davis, and the notes and bond for the purchase-money were taken in his . name.

It is admitted that Joseph E. Davis, in making such sale, in- tended to give to the complainant or his family, out of the proceeds thereof, what would be an equivalent to the value of " Brierfield ; " but it is denied that such intention, or any act of Joseph E. Davis in connection with the sale, was based on an admission of title in complainant.   It was the result of brotherly affection.

" Respondents are not advised, and cannot admit, whether said Joseph E. Davis remitted any collections of interest from said Montgomery to said complainant.   They think it likely

that said Joseph E. Davis may have made such remittances, but, if so, they insist and state, on belief, that they resulted from bounty and affection as aforesaid.''

More than a year after the sale, when it became highly probable, if not certain, that Montgomery would be unable to comply with his contract of purchase, and he was making suggestions for a rescission, Joseph E. Davis, for the first time, stated to Montgomery that, if the complainant wished to reside there, the sale could be rescinded as to '' Brierfield ; '' but never said then, or at any other time, that the rescission could take place without Montgomery's consent. It was never understood between complainant Montgomery and Joseph E. Davis that the complainant was owner of, and entitled to, a part of the proceeds of the sale to Montgomery. Joseph E. Davis did not die intestate as to any part of the proceeds of the sale to Montgomery. The reason for the failure to make specific bequests of more than $230,000 of such purchase-money was this: the property had greatly depreciated in value, and the ability of the Montgomerys to pay for it was very doubtful, as shown by that part of the will which directs the executors to deal liberally with them. It was extremely doubtful whether the Montgomerys could pay more than $230,000, and the specific bequests only amounted to fixing the *pro-rata* share of the legatees at whatever might be realized, with the provision that, if more than enough to pay in full, the balance should go to the residuary legatees.

Montgomery, having been recently emancipated, had no resources except the property purchased, and it had declined in value, and continued to decline rapidly, at the time Joseph E. Davis made his will. So that, in ascertaining the value of the debt from Montgomery, the value of the property had become the measure of the value of the debt.

The bequest of $80,000 was the fulfillment of the intention of the testator, as before explained, to give to Jefferson Davis, or his family, the avails of '' Brierfield.'' In the original draft of said will the legacies to complainant's children were fixed at

$15,000 each, but at the suggestion of Mary E. Hamer were made $20,000.

This will was made after the sale to Montgomery, and the will of 1865, before. In the will first made, "Brierfield" was devised to the children of complainant, and the bequests of $80,000 in the last, out of the proceeds of said sale, were in lieu of "Brierfield." Nothing occurred after the will of 1865, and before the last will, to induce Joseph E. Davis to increase his bounty to the family of Jefferson Davis.

If it should be made to appear that Jefferson Davis was ever the owner of "Brierfield," by adverse possession or otherwise, he is now estopped to set up any right or title to the same. Joseph E. Davis recovered possession of said property from the Freedman's Bureau as his own, and afterwards sold it as his own, and gave and took all the papers connected therewith in his own name, and subsequently, in his will, treated the property as his own; all of which was well known to complainant. Moreover, Joseph E. Davis bequeathed to the children of complainant legacies out of the proceeds of "Hurricane" and "Brierfield" more than equivalent to the value of "Brierfield," when, if Jefferson Davis was the owner of "Brierfield," his children had no claim upon the bounty of Joseph E. Davis, against the respondents, who are his grandchildren and legal heirs.

The complainant, who was nominated one of the executors, concurred in the probate of the will, and qualified as an executor thereof by taking the oath required by law to carry out the provisions of the will. And, afterwards, he either joined directly in the inventory made by the executors, in which the bond and notes for the purchase-money of said places were returned as assets of the estate, or, if he did not directly join in the same, he concurred in it as returned. On December 6, 1870, at the first meeting of the executors, the complainant was present, and, as it appears by a journal of the proceedings, said bonds and notes were found among the assets of the estate, were examined by all of the executors, and Bowmar,

one of the executors, was requested to make an inventory of the estate, including such notes and bonds.

It also appears in said journal that the executors discussed the will in all its provisions. They decided that the legacy to Caroline Leonard was not chargeable on the purchase-money of " Hurricane " and " Brierfield," and also that the respondents were entitled to the residuum of the proceeds of said sale, after paying the specific legacies to them and the children of Jefferson Davis, and the expenses of the administration. The executors had several other meetings, at which the principal business was negotiating with the Montgomerys in reference to said purchase-money. They made reductions in the payment of interest, expressing it to be in accordance with the will, took additional security, and afterwards released it. And in all this they treated the bonds and notes as the sole property of Joseph E. Davis. These proceedings were entered in a journal kept by the executors, and signed by them. They were all signed by the complainant, and, in several instances, drawn up by him. During all this time the complainant never intimated that he had any interest in said bonds and notes, or in " Brierfield." In pursuance of the resolution of the executors charging the expenses of the administration on the residuum of the bonds and notes, after paying the legacies of $280,000 to the respondents and his children, Jefferson Davis has drawn from said fund his annual compensation of $500 for services as executor. The whole administration of the estate has proceeded, up to the filing of the bill here, upon the basis and understanding that the whole interest in " Hurricane " and " Brierfield " belonged to Joseph E. Davis.

Soon after complainant qualified as an executor he made a demand against the estate for $10,000 or more, alleged to have been due him from Joseph E. Davis. This claim was disputed, but finally compromised between complainant and respondents. The compromise was reduced to writing, and signed by the respondents and Jefferson Davis through his attorneys. It was agreed that the debt of $10,000 should be

paid complainant out of the residuum of the estate which had been devised and bequeathed to respondents, and which included the $70,000 of the purchase-money due from the Montgomerys, not specially bequeathed to the respondents and the children of complainant; which said $70,000, as the representative of " Brierfield," the complainant now claims. It was further agreed that the interest on the debt of the Montgomerys for " Hurricane " and "Brierfield," being $18,000, should be used as follows: first, to pay taxes, general debts, and expenses of administration; second, to pay the interest on the legacies made chargeable by the will to the revenues derived from the Hurricane and Brierfield plantations; third, to pay the debt due Jefferson Davis out of any surplus which might remain after paying the above. It was also agreed that the payment of the debt to Jefferson Davis " should not impair or diminish the payment of the full amount of the several legacies made payable out of the proceeds to be derived from Hurricane and Brierfield plantations, whether derived from the payment of interest on the bond of Montgomery and sons, or the sale of said property to pay said bond."

The compromise contains a distinct and solemn admission that the $70,000 of the money due by the Montgomerys, and undisposed of specially by the will, was the property of said estate. For it is distinctly agreed that the respondents and complainant's children should receive their full interest — to wit, six per cent on $230,000 — and that only the remainder should go to Jefferson Davis, and this remainder could only arise from the interest on the $70,000. Such admission is also made by the agreement that the whole fund arising from the sale of " Hurricane " and " Brierfield," in case the Montgomerys could not pay, should first go to respondents and the children of complainant.

The said compromise was made in the adjustment of a claim, which was disputed, and is, therefore, based on a valuable consideration, and is binding on the parties thereto; and by its terms the complainant is bound to allow the respondents

legacies to be paid in full, out of the proceeds of the sale of "Hurricane" and "Brierfield," in case the Montgomerys could not pay. And the respondents insist that said agreement is not only an estoppel to complainant to maintain his bill, but they rely upon it as a valid contract, by which they are entitled, as against the complainant, to have their legacies paid in full, principal and interest, out of the "Hurricane" and "Brierfield" property. The respondents rely upon all of the foregoing facts as an estoppel, and on the agreement of compromise, as showing that the complainant never had any title to "Brierfield," or any right therein to oppose any disposition thereof which Joseph E. Davis might choose to make.

Respondents state that, in making such agreement of compromise, they acted in good faith, and had no notice that the complainant had, or claimed, any interest in "Brierfield," or in the proceeds thereof. And if he had such claim, it was his duty, as a trustee for them, to have made it known, and not to have allowed them to act and contract on the supposition that the whole interest in said plantation belonged to Joseph E. Davis.

*Pecuniary circumstances of the complainant at the time of his coming to "Hurricane."* — William Stamps, the brother-in-law of Joseph E. and Jefferson Davis, deposed: "To my knowledge, Joseph E. Davis, in 1835, was indebted to his brother, Jefferson, for his part of his interest in his father's estate; because Joseph E. had all of their father's negroes, and owed their father a considerable amount for lands he [their father] had sold him. I cannot now state the amount Joseph E. Davis would have owed Jefferson in this way, but he had the whole of their father's negroes, except one. He had them from 1824 to the end of his life. These negroes numbered six — four men, a boy, and a woman. He had provided for three of his daughters, giving each a negro, and there would have been four heirs to these negroes, viz., Joseph E., Jefferson, Isaac, and Mary's children. The six negroes

were worth not less than $3,000, besides which, as I have stated, he had the use of the negroes, except one called Jim Pemberton, from 1824.   Joseph E. owed his father $5,000 for lands his father sold him in Wilkinson County, of which he paid him $1,900, and no more, to my knowledge; which lands Joseph E. Davis afterwards sold to me for $5,000, which I paid him.   The father of Joseph E. and Jefferson Davis died possessed of no other property than the negroes I have mentioned.   Jefferson Davis was about seventeen years of age when his father died.   A few months after his father's death Jefferson Davis went to West Point, a cadet, where he remained four years, at the expiration of which time he was commissioned a lieutenant in the army, and lived· upon his pay as such.   If his brother Joseph furnished him any money while at West Point, I am not aware of it.   He did not throw up his commission till after his marriage with General Taylor's daughter, in 1834.   He had nothing but his pay and Jim Pemberton.   His wife died in 1834.   He lived with his brother Joseph at the 'Hurricane,' until he went to Congress, in 1845. Jefferson Davis took no property with him to Warren County but Jim Pemberton, worth $1,000.''

Mrs. Anna Farish, a niece of Joseph E. and Jefferson Davis, deposed : '' I never knew of anything but Jim Pemberton that Uncle Jeff got from his father's estate.   When he was a lieutenant in the army he had nothing but his pay and the servant before mentioned.   He lived for several years in his brother Joseph's family as one of the family, but I do not believe that board and support were to be charged to him by Uncle Joe.''

*Relations existing between Joseph E. and Jefferson Davis.* — William Stamps deposed :   '' Joseph E. Davis stated to me that he had given ' Brierfield ' to Jefferson in consideration of his giving up his commission and leaving the army ; that he wanted him near him, for he looked upon him more as a son than a brother.''

J. U. Payne, a merchant with whom Joseph E. and Jefferson Davis both traded, deposed : '' Joseph E. Davis was a devoted

55 MISS.—44.

brother, and apparently solicitous for Jefferson's advancement. Joseph E. Davis was rich and a large planter, but Jefferson Davis was much less wealthy, and planted on a much smaller scale. But I always thought Jefferson Davis paid his own way.''

Mrs. Varina B. Davis, wife of Jefferson Davis, deposed: " While my husband was in Mexico, Mr. Joseph E. Davis stated to me that my husband stood in the place of a son to him. In 1861 Mr. Joseph E. Davis and I went together to Bayou Sara. We were alone, and he introduced the subject of our estrangement, at intervals, of thirteen years past. He seemed much chagrined at our differences, and alluded feelingly to Mr. Davis' love for him, and his filial relations towards him since childhood. He said that he did not desire that my children should be raised to think him an enemy. He said that the naming of our Joseph after him had obliterated all memories of any bitterness between us. I replied that the naming of the child was not my act, but a concession to the wishes of Mr. Davis. I added that I knew Mr. Davis dearly loved him, and felt that he owed him much gratitude for his fostering care in youth.''

Mrs. Florida D. Laughlin, a daughter of Joseph E. Davis, deposed: " In 1850 there had been a difference between my father, Joseph E. Davis, and Mr. Jefferson Davis. They were not on cordial terms. The interruption in their cordial relations occurred, I think, about 1850, and the coolness continued until 1853 or 1854. I endeavored to bring my father and uncle together, but had no success. Their friendly relations were totally interrupted. A favor would have been neither offered nor received.''

*Occupancy and improvement of " Brierfield.''* — William Stamps deposed: " Jefferson Davis cleared, opened, and improved Brierfield plantation, commencing, as well as I remember, in the fall of 1836. He occupied ' Brierfield,' by clearing, etc., as early as 1836. He built and occupied his house as early as 1850, at least, after his return from Mexico. When

he went to Mexico, he put a trusty negro, Jim Pemberton, in charge of the place, as driver or overseer. While he was in the United States Senate, Jim had charge of the place; after Jim's death, in 1852, he had an overseer named Highland. Jefferson Davis occupied and cultivated ' Brierfield ' with overseers, after Highland, until the Federal troops took possession of it, in 1862 or 1863. Joseph E. had not commenced opening or clearing ' Brierfield ' before Jefferson went to Warren County to live. He might have assisted him with negroes and means in clearing and opening the place, but not in the building that commenced afterwards. I was on the place in 1836, and afterwards during the clearing and planting. I saw negroes clearing there, and supposed they were Jefferson's. Before ' Brierfield ' was cleared I did not think it worth more than five dollars per acre. I would not have given more for it."

Mrs. Anna Farish deposed: " Uncle Jeff cleared, opened, and cultivated ' Brierfield,' and commenced it about 1836, from my own recollection. He occupied and cultivated it from 1836 to the time it was seized by the Federals."

J. U. Payne deposed: " The ' Brierfield ' was cleared and improved by Jefferson Davis. When I first visited him, he was engaged in clearing up and planting new land. There was some land which had been cleared and planted before I saw it; I cannot say how much he had got fenced up and in cultivation, but it was a new place. I think that all of the improvements were put on by Jefferson Davis. I cannot state what labor and expense was requisite to reduce said lands to cultivation, but all was done and paid by Jefferson Davis, to the best of my knowledge. The improvements were ginhouse, quarters, dwelling-house, and other buildings, besides clearing up the land. I cannot say what the labor and expense of the same cost. A frame dwelling-house was erected by Jefferson, but I cannot state the cost of it."

E. C. Laughlin, commission merchant of Joseph E. and Jefferson Davis, deposed: " As to the improvements on

'Brierfield,' as far as I know, Jefferson Davis built a dwelling-house. At the time the house was being built we purchased some articles necessary in building, and charged them to his private account. There was a fine gin on the place — horse-power. It was built before I knew anything about the place. The plantation was fenced. I can't say who fenced it. The house was a very nice, comfortable house, having six or eight rooms. I do not know the value of the improvements on 'Brierfield.' I presume it was fifteen or twenty thousand dollars. It might be that uncleared land in that neighborhood would sell for from three to six dollars per acre in 1846. Wild land could be bought at a dollar and a-quarter per acre from the government. I was frequently on 'Brierfield' from 1846 to the beginning of the war, and, so far as I know, Jefferson Davis occupied the place during that time."

W. H. Zeigler deposed : "In 1848, and a portion of 1849, I was on Brierfield plantation, working as an apprentice at the carpenter's trade, with Zeigler & Marcy, who were building a residence for Mr. Jefferson Davis. It was rather a costly residence ; I do not recollect, but it cost either $5,000 or $6,000. Zeigler & Marcy contracted with Mr. Jefferson Davis, and it was built under his directions. Zeigler & Marcy furnished the materials. Some of the timbers were gotten on the place. The house has eight rooms, besides two small ones on the back gallery. It has four galleries. We erected the out-houses. It was only one. In 1848 Jefferson Davis resided at 'Brierfield' when he was at home, though he was absent most of the time. From that time till he became president of the Confederacy his residence was on 'Brierfield,' though he was in Washington a greater part of the time. I was fourteen years old in 1848. I was not present when the contract to build the residence was made, and do not know who was present, or whether it was in writing or not. I know nothing personally about the contract — only what I was told. I saw Jefferson Davis pay and cancel a note he had given Zeigler & Marcy of $2,500, in part payment for building the house."

P. J. Kennedy deposed: "In the years 1859 and 1860 I built a front levee to protect the Hurricane, Palmyra, Brierfield, and Ursino plantations, and contracted therefor with Henry Turner, Joseph Davis, Jefferson Davis, and R. Y. Wood. Henry Turner paid me one-half of the expense, Joseph E. Davis one fourth, and Jefferson Davis and R. Y. Wood each one-eighth. All the conversation I had with Joseph E. Davis was that each one had to pay *pro rata* for the work."

Mrs. Varina Banks Davis deposed: "I was married to Mr. Davis February 26, 1845. We resided at 'Brierfield' except during the sessions of Congress. During Mr. Davis' absence at Washington my home was at 'Brierfield.' The four years that Mr. Davis served in Mr. Pierce's Cabinet, we sojourned in Washington, but returned in the spring of the year. My husband occupied the 'Brierfield,' to my knowledge, from the beginning of my acquaintance with him, in 1844, continuously and uninterruptedly, as owner, until the Federal forces occupied it in 1863. In the years 1847 and 1848 Mr. Davis, on account of his sister, Mrs. Bradford, not being content at 'Hurricane,' and because my health did not permit me to travel to and from Washington, determined to plan a house large enough for his sister to live in one end and we in the other. He made a contract with Messrs. Marcy & Zeigler for a ten-thousand-dollar house, the heavy timbers to be cut on our own swamp land. A part, if not all, of the frame-work came from Cincinnati and Vicksburg, I believe. This contract covered all except the filling up of the library and the purchase of marble mantel-pieces for the house. Mr. Davis paid for the house by drafts upon his commission merchants, Messrs. Laughlin & Co., many of which I have seen. I probably did not see all of them, for there were many as the work went on; but I saw several of the drafts, without at this time being able to state the amount of any of them. The house was finished in 1849 or 1850. Mrs. Bradford and I mutually declined to live together, neither of us being willing to be subordinate in

household jurisdiction, which resulted in Mr. Davis and my taking possession of our house alone. In a conversation which occurred before my marriage, in 1844, Mr. Joseph E. Davis expressed the pride he felt in the manner in which Mr. Davis had improved the land he had given to him. He said Mr. Davis had made 'Brierfield' lucrative by self-denial and industry; that he had entered it while it was uncultivated land; that he had given it to Mr. Davis in that state; that his success had surprised him, because his army training had not led him to expect such a result as Mr. Davis had achieved. He said that the 'Brierfield' was not much of a gift until Mr. Davis improved it. He said he had assisted him to stock the plantation. We spared no expense in the buildings, and adornment of our grounds, even to the planting of forest trees from many countries, at great expense."

Florida D. Laughlin, deposed: " Mr. Jefferson Davis first cleared 'Brierfield,' and brought it into cultivation. The houses erected on the plantation were gin, quarters, and dwelling-house. They were built at Mr. Jefferson Davis' expense. My father said the erection of the house on 'Brierfield' was an absurd extravagance on my uncle's part, because of his staying there so little. Mr. and Mrs. Jefferson Davis planned the house."

O. B. Cox, formerly overseer on Hurricane Place, deposed: " It would cost about $75 per acre to clear and put in cultivation an acre of land in the Mississippi swamp. Jefferson Davis occupied and cultivated the Brierfield Place."

Frank McKinney, formerly a slave of Joseph E. Davis, deposed: " I do know who first cleared, or begun to clear, 'Brierfield.' I think Joe Davis had us at work there; I know he did. I was the foreman, and carried all of the hands; there were some thirty or forty hands. We had commenced work at 'Brierfield' before I saw Mr. Jefferson Davis at 'Hurricane ' to know him. I 'hope ' make a crop there before I ever saw Mr. Jeff Davis to know him; we made the crop under the direction of Joe Davis. All the hands he had

goes there and work; at night they come home to 'Hurri-
cane.' Old man Jerry Taylor and me put up the first cabin at
'Brierfield;' Mr. Joe Davis sent me there, and I received
directions from him; we cleared up the land. Jeff Davis had
a man by the name of Pemberton, who was driver on 'Brier-
field;' Jim Pemberton was driver when we commenced clear-
ing; he belonged to Jeff Davis; the 'onlyest' one I knew
that did belong to him.''

Hagar Allen, formerly a slave of Jefferson Davis, deposed:
'' When we were taken to 'Brierfield,' none of it had been
cleared. When Mr. Jefferson Davis commenced clearing
'Brierfield,' he had myself, Sam Charleton, Bob, Rinah, Big
Hagar, Patty, Fanny, Solomon, Jeffrey, Moses, Betsy,
Phœbe, William, Jack, Romeo, and Charley. Mr. Jefferson
Davis bought me at Natchez from Mr. Wyley. All these I
have named were bought at the same time, but I can't tell
who bought them. I was told by Mr. Wyley that Mr. Jeff
Davis bought us. Both Mr. Jeff and Mr. Joe Davis came
after us. From the time I left Natchez I lived with Mr. Jeff
Davis, and obeyed him as my master. Mr. Jefferson Davis
was present when the clearing on 'Brierfield' commenced;
Jim Pemberton superintended the work; Sam Charleton and
Jerry Taylor cut the first tree on 'Brierfield;' as well as I
can recollect, when we commenced to clear 'Brierfield' the
hands from 'Hurricane' came down and gave us several days'
assistance in cutting cane. We [the hands bought at Natchez]
stayed a little while at Mr. Joe Davis', picking cotton, until
a little opening was cleared on 'Brierfield,' and a double cabin
was put there; then we went there to live; we were picking
cotton about a month when the men got the house up; several
of the hands from 'Hurricane' were there helping to raise the
cabins.''

Sam Charleton, formerly a slave of Jefferson Davis, de-
posed: '' When they had us up in a row at Natchez, Mas Joe
said, 'I didn't buy you; he (pointing to Mas Jeff) bought
you, and he is your master.' Mas Jeff bring me at the

' Hurricane ' and put me to work there; none of ' Brierfield ' was cleared up till I cleared it; I worked at ' Hurricane ' about half a year; when we had been there two, three weeks, Mas Jeff sent Jim Pemberton and me to ' Brierfield ' to find a high ridge on which to build a cabin; we cut down a pecan tree and made blocks for the first cabin; Jerry Taylor cut a board tree, and we then put up the cabin. Mas Jeff, at the same time he bought me, bought old Uncle Robert, Aunt Rhina, Rhina No. 2, William, Jack, Francis, Charley, Old Charley, Solomon, Betsy, Fanny, Moses, Jeffrey, Young Hagar, Kizzah, and Old Hagar. The slaves of Mr. Joe Davis helped us work on ' Brierfield,' but I can't tell how many; some of them helped us build the first log houses.''

Edward L. Miles deposed: '' During my visit to the ' Hurricane,' in 1848, Zeigler & Marcy came there and spent nearly, or quite, a day, making a settlement with Joseph E. Davis; I was in the room several times while they were making the settlement; I have an indistinct recollection, but nothing positive, that at that time Joseph E. Davis conveyed the title to a plantation in Madison Parish, La., known as the Bayou Place, and the impression was made upon my mind — I cannot now say how — that a part of the consideration for said title was their bill for the building of the residence at ' Brierfield.' ''

David Lanmaster deposed: '' I commenced working for Zeigler & Marcy in 1837, and worked for them as a journeyman until 1851, or thereabouts, and then became a partner. ' Brierfield ' had no gin-house on it until Zeigler & Marcy built one on it; this gin-house was built for Joseph E. Davis, who contracted for its erection with Zeigler & Marcy; they received payment from him in checks on commission merchants in New Orleans. Joseph E. Davis had the dwelling-house on ' Brierfield ' built; he contracted with Zeigler and Marcy for the carpenter's work and materials, plastering, painting, glazing, and everything else except the frame timber, and that was cut on the place. Zeigler, Marcy, William Lanmaster (my brother), and Lewis Jones, worked on the building while I was

working on it. Zeigler & Marcy took the Bradford place in payment for their work and materials. They got a deed to it from Joseph E. Davis about the time the house was finished; they got possession of it, I think, before it was finished. Whether they had to pay a balance to Davis I cannot state, but I saw the deed in their possession. I lived on 'Brierfield' up to 1855, that being my home except when out at work. It was currently reported, and so understood, that the house at 'Brierfield' was built by Joseph E. Davis, for the joint occupancy of Jefferson Davis and Mrs. Bradford, his sister, who was then a widow. Zeigler & Marcy built new quarters on 'Brierfield.' I assisted in the work on the dwelling and some of the out-houses. There were two kitchens put to the house, for the reason that it was intended to be occupied by two families. The Bradford place conveyed to Zeigler & Marcy was in Madison Parish, Louisiana. The other work (not on the dwelling) was paid for by Joseph E. Davis, by drafts on his commission merchants in New Orleans, and I saw and handled some of them."

Elizabeth P. White, a niece of Joseph E. and Jefferson Davis, deposed: "I do not know who paid for the house on 'Brierfield;' but I remember at that time seeing lumber sawed and hauled to 'Brierfield' from 'Hurricane' saw-mill, and believe it was used in the building."

Edwin G. Cook deposed: "When Colonel H. Moore and myself, commissioners of the Union Bank, rode over the land of Joseph E. Davis, and extended our trip to and through the tract afterwards called 'Brierfield,' it was an old burn, with stumps of trees, some cane, and many briers; so that I afterwards thought the place was well named 'Brierfield.' I passed 'Brierfield' ten or twelve years afterwards. The place was then well improved."

*Nature of Jefferson Davis' possession of "Brierfield."*— J. U. Payne deposed: "I first became acquainted with Joseph E. Davis about 1834 or 1835, and with Jefferson Davis a few years later. I visited Joseph E. Davis frequently up to the

summer of 1840, and sometimes spent a week or two there. I almost daily rode over the 'Hurricane' with Joseph E. Davis, and 'Brierfield' with Jefferson Davis. Jefferson Davis was the reputed and generally recognized owner of 'Brierfield' since my first knowledge of it. I never heard of anybody else making any pretense as its owner. Joseph E. Davis always spoke to me of the 'Brierfield' as his brother Jefferson's place. Both the brothers, when together and separately, always spoke to me of it as Jefferson's place. In all the dealings had by my several firms with the Brierfield Place, we dealt with and recognized Jefferson Davis as its owner. I never heard of the title or written papers for the land. I know that Joseph E. Davis sold 'Brierfield' and his place to the Montgomery negroes, and have heard, as well as know, that he recovered possession of it from the United States government; but whether with or without the consent of Jefferson Davis I know not. This I heard from Joseph E. Davis."

James E. Dunham deposed : "I was book-keeper and cashier for Wm. Laughlin & Co., cotton factors in New Orleans. Jefferson Davis shipped to this firm all the cotton raised on 'Brierfield' from 1845 to 1851, and the proceeds were placed to his credit, and paid to him in person or on his drafts. He was recognized and dealt with as the owner of 'Brierfield.' "

Mrs. Mary Stamps, niece by marriage of Joseph E. and Jefferson Davis, deposed : "Since 1856, when I first visited 'Brierfield,' I have always understood and heard that Jefferson Davis was the owner of 'Brierfield;' and it was spoken of to me by Joseph E. Davis as Uncle Jeff's place. The repute of such ownership was general, both in and out of the Davis family. In the fall of 1866, when I was about to start for Fortress Monroe for the purpose of visiting Jefferson Davis, I was charged with a message to him from Joseph E. Davis. Joseph E. Davis told me to tell his brother, Jefferson Davis, that, the duration of his imprisonment being so uncertain, he (Joseph E. Davis) had acted for him in the sale of the Brierfield Place for what he considered his best interests ; that the

sale was made subject to his (Jefferson's) approval; and he expressed an earnest desire that his brother should communicate with him on this subject. He was then a prisoner at Fortress Monroe, Va. The message was delivered, and I believe that I was intrusted with a letter that was an answer, and the same was received by Joseph E. Davis. It was understood among the family that, while Jefferson Davis was the real owner of 'Brierfield,' the title was nominally in Joseph E. Davis. The reason of this was understood to be a peculiarity of Joseph E. Davis, which was spoken of by the family as a desire to be looked up to as the head of the family, and have apparent control of the family's property interests."

William Stamps deposed: "I had several conversations with Joseph E. Davis relative to 'Brierfield.' In 1835, in answer to a question of mine as to whether he would sell me some land in the Hurricane Bend (Brierfield), he replied that he had given it to Jefferson, and had no more land then to dispose of. In 1833 I proposed to Jefferson Davis to purchase McNeill's plantation. I offered to make the first payment, $10,000. Jefferson was anxious to go into this, but when he named it to his brother Joe, in my presence, after we had agreed to purchase together, Joseph E. said he could do a great deal better for Jefferson than that. In speaking of 'Brierfield' brother Joe always spoke of it as Jefferson's place. In 1835 Joseph E. stated to me that he had given the land, afterwards 'Brierfield,' to Jefferson, in consideration of his giving up his commission and leaving the army; that he wanted him near him, for he looked upon him more as a son than a brother. In 1853, in answer to a question why he did not turn off a certain overseer on 'Brierfield,' Joseph E. Davis replied it was a responsibility he could not take upon himself; that Jefferson had put him there, and he (Joseph E.) had no right to turn him off. I am confident that Joseph E. Davis never made any grant, in writing, of 'Brierfield' to Jefferson. He had the peculiarity of rarely, or never, giving deeds when he gave or sold lands to his relations. It was known in the family that

he withheld the title, but that he had given the place to Jefferson absolutely. Joseph E. Davis studied and practiced the legal profession in early life. He was considered a lawyer of ability, and was successful.''

Mrs. Anna Farish deposed: "I never heard Uncle Joe speak of 'Brierfield' in any other way than as Uncle Jeff's place, and this I have heard him do repeatedly. I never heard any of Uncle Joe's family speak of 'Brierfield' as anything else than Uncle Jeff's place. From 1836 to 1866 Uncle Jeff was the reputed owner of 'Brierfield.' I never knew Uncle Joe to make title to land given or sold to any of the family, with one exception, viz., cousin Carrie Leonard. The family knew he had made Uncle Jeff no title, and also knew that he had given him the place to have as his own property.''

George E. Payne deposed: "I was a member of the firm of Oakey, Payne & Hawkins, who were cotton-factors for Jefferson Davis from 1838 to 1844. All the cotton we ever received from Jefferson Davis we immediately marked 'Brierfield,' 'J. D.' The cotton was sold for his account, the proceeds put to his credit, and paid to him or his order. We were satisfied that he was the owner of 'Brierfield.' I heard Joseph E. Davis mention the Brierfield plantation as his brother Jefferson's place, at his own house, in presence of Jefferson Davis, and at the office of Oakey, Payne & Hawkins, in the presence of my partners.''

E. C. Laughlin deposed: "I was a member of the house of Wm. Laughlin & Co. from 1846 to 1849. We were commission merchants for Joseph E. and Jefferson Davis. The orders for supplies for 'Brierfield' were given by Jefferson Davis when he was at home; in his absence they were given by Joseph E. Davis. The orders were paid by Jefferson Davis. The cotton raised on 'Brierfield' was shipped to the account of Jefferson Davis. We knew it was from 'Brierfield' because it was marked 'Brierfield.' So far as I know, in the absence of Jefferson Davis, Joseph E. Davis acted as his agent in regard to 'Brierfield.' So far as I know, Jefferson Davis was

the reputed owner, and controlled it as his own place. I don't know how he held the place. He might have held it as a tenant, and have kept a separate or private account with us. Joseph E. Davis did not sign his name as agent in ordering supplies for 'Brierfield.' He directed us to charge them to the account of Jefferson Davis.''

William H. Zeigler deposed: '' Mr. Jefferson Davis was the reputed owner of 'Brierfield.' I never heard of any other owner. He gave directions as to the management of the place and the building of the house, and I always heard him spoken of as the owner of the place.''

T. J. Coe deposed: '' Jefferson Davis employed me to over-see for him on 'Brierfield.' I was in his employ about four months in 1850, and all of the years 1858 and 1859. In the absence of Jefferson Davis my authority over the place seemed to be entire, no other person having any authority over me. During those years I ordered supplies for 'Brierfield,' and drew drafts upon Payne & Harrison, and they were charged to Jeff Davis. He authorized me to draw drafts for the general wants of the Brierfield Place. I sent the cotton crops to Payne & Harrison, for the account of Jefferson Davis. The place was called Jefferson Davis.' Joseph E. Davis spoke of it as such. Joseph E. Davis never exercised any acts of owner-ship, and never spoke of it as his in my presence, or to me.''

Nicholas G. Barnes deposed: ''I took charge of 'Brierfield' as overseer the last of November or the 1st of December, 1860, and continued until December, 1862. Joseph E. Davis undertook to control me as overseer, but he failed. I asserted 'Brierfield' to be Jefferson Davis' place. He said, 'Well, yes; it's Jefferson's'. I said, 'If it is, as I was employed by him, I shall attend to it to the best of my ability.' He based his claim to control me on the ground that he was Jefferson's brother. According to the general understanding, 'Brierfield' was Jefferson Davis'. (On cross-examination.) I never heard anybody but Joseph E. Davis speak of the ownership of

'Brierfield.' (On reëxamination.) I heard Dr. McElrath, R. Y. Wood, and others say it was Jefferson Davis' place."

H. S. Utz, Charles S. Compton, and Jacob Seale deposed that Nicholas G. Barnes had a general reputation for falsehood, but they could not say that he would tell a lie in preference to the truth in a matter in which he had no interest.

P. J. Kennedy deposed: " I always heard that the Brierfield plantation belonged to Jefferson Davis. There seemed to be no question as to his ownership of the place."

G. W. Folkes deposed: " I was the assessor of Warren County from 1851 to 1857. The lands known as 'Brierfield' were assessed to Jefferson Davis. They were given in by Joseph E. Davis. Jefferson Davis was the reputed owner of 'Brierfield' during that time, but I do not remember to have heard any person in the neighborhood speak of the ownership of 'Brierfield.' "

G. W. McElrath deposed: " Ever since I knew the Brierfield Place, which was in 1840, Mr. Jefferson Davis controlled it, continuously and uninterruptedly, up to the time Joseph E. Davis sold it. During all those years Jefferson Davis was the reputed owner of 'Brierfield.' "

Mrs. Varina Davis deposed: " Before my marriage Mr. Joseph E. Davis, in the spring of 1844, gave me a sketch of Mr. Jefferson Davis' life, and told me that he had given Mr. Davis a part of a tract of land owned by him, and that he had cultivated it with success, which, from Mr. Davis' army training, Mr. Joseph E. Davis had not been led to expect. The year after my marriage, and while my husband was in Mexico, I was wounded by remarks made in the family, alleging my husband's dependence upon his brother, and went to Mr. Joseph E. Davis to put to him the direct question, Is my husband the owner of 'Brierfield,' or is he dependent upon you? Do you, or does he, own 'Brierfield?' To which Mr. Joseph E. Davis responded that he had given my husband the land, and assisted him in the beginning of its settlement, and that I

must not mind such ill-natured and wild remarks as led to my inquiry; that my husband stood in the place of a son to him. Mr. Joseph E. Davis wrote to my husband in 1852, stating that he had understood that my husband intended to sell ' Brier-field;' that he desired him to put a price upon it, in order that he might buy it. The letter is either destroyed or lost. My husband replied, in effect, that he did not desire to sell the place, and had not contemplated doing so. My husband made a will in 1847. It was destroyed in 1852, after the birth of our first son. Mr. Jefferson Davis conferred with Mr. Joseph E. Davis when the will was made, and had his assistance to put it into legal form. That will directed the ' Brierfield ' to be kept during my life; for that time I was to receive either one-fourth or one-fifth of the income arising from it, which, I cannot now clearly rembember; and my husband's three sisters and the children of a deceased sister each an equal share of the remainder thereof. In the event of my declining to live there, the place was to be sold, and the proceeds divided between the five heirs before mentioned. In 1866 Mr. Joseph E. Davis asked me if I was willing to sell ' Brierfield;' said that he thought of selling it to Ben Montgomery; that he did not see how I could live there alone; and he feared my husband would never be released. I answered that I proposed retaining it in any event, but that I had permission to visit my husband, and expected to see him soon, and then would ascertain his wishes. He then told me that, if I should be permitted to see my husband, he wished me to explain the case to him, and let him (Mr. Joseph E. Davis) know my husband's wishes in the matter. I know that my husband, by his agents, made contracts, bought negroes and plantation supplies, built houses, and performed such other acts as belonged to the undisputed ownership, and that interference with his authority by Mr. Joseph E. Davis, in denial of the right of Mr. Jefferson Davis to govern the place and assert ownership, was never heard of by me. In 1861 Mr. Joseph E. Davis, in a conversation with me,

said he gave Jefferson 'Brierfield;' had helped him to stock it, had done all he could for him, and was proud of him. We had no occasion to converse with him about the title in the presence or absence of third persons. I heard Mr. Joseph E. Davis speak of his annoyance by the levee commissioners, and of the lawsuit resulting from it, affecting both my husband's interest and his own. This was when, my husband was in Mexico. I heard my husband speak of the suit at a subsequent time. As it was not unusual for the brothers to act for each other, it would never have impressed either my husband or myself as at all extraordinary, or in the least degree an assumption of ownership, that Mr. Joseph E. Davis should have instituted the suit to protect his brother, as well as himself, without his brother's previous cognizance. In a conversation which occurred with Mr. Joseph E. Davis in 1861, I remarked to him, 'I owe you nothing, and perfectly appreciate your hostility to me.' Upon his disclaiming the entertainment of this feeling toward me, I cited, in support of my opinion, the will made, under his advice, by my husband. He answered, with some heat, that he had nothing to do with the will except putting it into legal form; that 'Brierfield' was not his, but Jefferson's; and that I did him injustice. My relations with Mr. Joseph E. Davis varied, differing in degree and kind at different times. At no time did I fail to speak to him when we met. I thought him hostile to me, but, when I told him so, he emphatically denied it."

Florida D. Laughlin deposed: "Mr. Jefferson Davis was the reputed owner of 'Brierfield.' The apparent character of his occupancy was that of proprietor. From the time Mr. Jefferson Davis cleared 'Brierfield' up to 1859, when my intercourse with my father's family became less frequent, I never heard my father (Joseph E. Davis) speak of it as his property; he always called it his brother's."

O. B. Cox deposed: "Joseph E. Davis always spoke of the Brierfield Place as belonging to Jefferson Davis. I knew

nothing to the contrary.    All I know about the title was from
rumor that Jefferson Davis did not have any title to the Brier-
field Place.''

Mary E. Hamer, granddaughter of Joseph E. Davis, de-
posed :  '' I was in the habit of writing at my grandfather's
dictation for many years previous to his death.   I wrote, from
his dictation, the will which has been probated since his death.
First he prepared a rough copy, and I copied it off.   There
were some important changes made.   In the first draft he
bequeathed to me $150,000, instead of $100,000 ; to each of
my uncle Jefferson's children, $15,000.   I think, in the first
draft, he left $10,000 to my cousin Joseph Davis Nicholson,
and afterwards reduced it to $5,000, and finally his name was
left out altogether.   I asked him if he intended the $60,000 to
uncle Jefferson's children in lieu of ' Brierfield' (I had always
thought he intended to give ' Brierfield' to my uncle or his
children), and if $60,000 was the whole value of ' Brierfield.'
He said yes, it was the valuation he placed on ' Brierfield,' and
it was for that reason he put it at $60,000.   I then told him I
wished he would increase the amount, and give uncle Jeffer-
son's children more than $60,000 ; and he replied that he did
not see how he could well do so.   I then told him, as he had
made me the largest legatee, that he could take from my share
as much as he chose.   He at first objected, and said he did
not like to do it, but finally consented to take $50,000 ; and I
supposed at the time that he would give it all to uncle Jeffer-
son's children, but he told me to add only $5,000 to each.
He explained to me that he gave the $60,000 to uncle Jeffer-
son's children because he wanted them to receive the value of
' Brierfield.'   I asked my grandfather why he had made no
special disposition of $70,000 of the proceeds of ' Hurricane '
and ' Brierfield,' and he replied that it was specially disposed
of ; that he had left it to my brother and myself as residuary
legatees.   When I seemed to be still dissatisfied, he said we
might, at some future time, desire to make some different
arrangement with the Montgomerys, who might not be able

to pay the full amount, and he wanted each of us to receive at least the amount of our special legacies, and we might consider the $70,000 as the amount to which we might feel inclined to release Benjamin Montgomery. But he said if the whole amount was paid, the $70,000 would be mine and my brother's.''

Edward L. Miles deposed : '' My understanding has always been that the Brierfield plantation was given to Jefferson Davis by his brother, Joseph E. Davis, but that Joseph E. Davis had never made to his brother, Jefferson, a deed of any kind to the place. This information was gained by general conversations in the family on the subject.''

John Perkins deposed : '' I knew Joseph E. Davis from my early childhood, between the years 1825 and 1830, up to 1864. In the spring of 1844 he first mentioned to me the fact of his ownership of both the place on which he resided and that which his brother cultivated. At the time I resided with my father, but cultivated a plantation he had assigned me, but to which he had given me no title. It was in speaking of this fact that Mr. Davis remarked that his brother Jefferson's condition was the same. Early in the winter of 1855, when I had ceased to be a member of the United States Congress, and was visiting with my father, Mr. Davis sent over his boat for me, and requested that I would visit him. He stated that he had presumed on my friendship to name me one of his executors. In this connection he spoke freely of his property, and his wishes in regard to its disposition, and mentioned that he had never given his brother any title to ' Brierfield.' Mr. Davis expressed much affection for his brother, but was very decided that, in the event of his own death or that of his brother, no portion of the ' Hurricane ' estate, or of ' Brierfield,' should come under the control of his brother's wife or any member of her family. I have no recollection of ever having conversed with any member of Mr. Davis' family, except Mrs. Davis, regarding the ownership of ' Brierfield.' In ordinary conversation she would speak of ' Brierfield ' as ' brother Jeff's place ;' but

would often explain, both in and out of the presence of her husband, that Mr. Davis had never given his brother any title to it. I have no recollection of Mr. Joseph E. Davis as a lawyer. I have understood that he ranked high in the profession. I protest against the necessity of any testimony to establish Mr. Davis' character as a man of veracity. I have never met a man who had a more sincere regard for truth, or who looked upon a lie or a liar with greater abhorrence. ' He who will tell a lie,' he was in the habit of saying, ' is worse than a robber; he exhibits all the baseness of a robber, without his courage.' ''

David Lanmaster deposed : '' It was currently reported and understood that the ' Brierfield ' originally was part of the ' Hurricane,' and Joseph E. Davis owned the whole of it; but that, he being rich and Jefferson poor, Joseph divided his place and cut off ' Brierfield ' for the occupancy of his brother. This I heard on both places, and in the neighborhood, from some of the Davis family and from others. No one ever said that Jefferson ever bought ' Brierfield,' or got it from Joseph as a gift, but that Joseph owned both plantations.''

Elizabeth P. White deposed: '' ' Brierfield ' was always spoken of as Jefferson Davis' place, but known in the family as the property of Joseph E. Davis. I remember, about the year 1852, Mrs. Joseph E. Davis, in my presence, asking her husband (Joseph E. Davis), who was very ill at that time, to give Jefferson Davis a title to ' Brierfield,' which he refused. Uncle Jefferson never, to my knowledge, claimed to be the owner of ' Brierfield.' I met uncle Jefferson Davis in the spring of 1870, in New Orleans, and expressed to him great anxiety about my uncle Joseph E. Davis' affairs, lest, by the sale of ' Hurricane ' and ' Brierfield,' in not receiving fair dealings in payment, there might be nothing left at Uncle Joe's death for either Lize [Mary E. Hamer] or himself. He said he had no fear for Lize — she would certainly be provided for. I then begged him to go to his brother and ask for a title to ' Brierfield.' He answered he felt a delicacy in

speaking of such matters to his brother. I received a letter this winter in which he regretted not taking my advice to arrange his affairs with his brother. The letter was destroyed.''

E. G. Cook deposed : '' I projected a map of Warren County to show the names of all owners of lands, and asked Joseph E. Davis about the lands to which he had title and others he seemed to own — as, those of Jeff Davis, Lucinda Davis, R. H. Davis, and Mrs. Carey. He did not seem to be pleased with the question, and said something about the records, and not maps, showing ownership. The conversation did not proceed further. Jefferson Davis was the reputed owner of ' Brierfield.' Few persons, except myself and the parties themselves, knew that Jefferson Davis had no deed to the land.''

J. H. D. Bowmar, one of the executors, deposed : '' I was called on by Joseph E. Davis to present to General Wood his application for the restoration of Hurricane and Brierfield plantations, and was afterwards employed to go to Washington to see President Johnson about the restoration of the property. When Joseph E. Davis first made application to General Wood, I asked him about ' Brierfield.' He simply answered, ' The title is in me.' I had told him that it would be necessary to show title. He said that the title was in him; that he had never conveyed it. I said nothing more about it. I supposed that all he wanted was to get possession of the land. My impression was that he wanted to protect his brother from loss by confiscation. There was reason to conceal from the Federals any right that Jefferson Davis had to the land. Mr. Davis was in prison, and it was generally believed that his property would be confiscated, if nothing worse happened. Joseph E. Davis claimed and received ' Brierfield ' as his own. He claimed and received rents from the date of his pardon, 28th March, 1866. General Howard first sent his adjutant to let me know that he was not satisfied with the evidence of title as to 'Brierfield.' He thought that Jefferson Davis owned that place. I told the adjutant that I had certificates from the clerk of the court that there was no rec-

ord of any conveyance from Joseph E. Davis of any property, and that, if required, I would go to the land-office and show him that patents had issued to Joseph E. Davis for lands including those of ‘Brierfield.’ Joseph E. Davis said nothing about his brother’s property being confiscated, or about protecting him from loss by confiscation; it was my own impression that Joseph E. Davis wanted to protect his brother — not from anything that he said, except his answering, ‘The title is in me.’ When I first showed Jefferson Davis his brother’s will, I suggested to him that the legacies to his children were in compensation for ‘Brierfield.’ I remember that he was dissatisfied with the will, and perhaps with my suggestion; but I have no recollection what his reply was.” The witness was asked: “State whether he did, or did not, reply that he did not like for another to be generous with his property, or at his expense.” The answer was: “Well, I expect that was his answer, but I don’t recollect.”

*Complainant’s assertion of his claim.*— J. H. D. Bowmar deposed: “I first heard of the complainant’s claim to a portion of the proceeds of the sale of ‘Hurricane’ and ‘Brierfield’ about the 1st of January, 1873. I do not think Mr. Davis ever, to me, claimed any interest in the bond and notes, except by his suit, and they have always been treated as the property of the estate — I mean no formal claim. There was no formal claim to the executors. About January 1st, 1873, at a meeting of the executors, Mr. Jefferson Davis asked Ben if his old master had not told him that he must convey title to ‘Brierfield’ to him; or give up the place to him if he should require it. Ben answered that the condition was merely verbal.

“Six of the Montgomery notes, and a part of the seventh, have been collected by the executors. Seven notes of $18,-000 each came into our hands. On the notes due January 1st, 1869, there was a credit of $13,860 paid to the testator. Four [five] of these notes have been collected, together with the balance due on that of 1869, except the sums remitted.

Mr. Jefferson Davis received for his children their distributive shares, except for the last year, which has not been paid in full. He has received his commissions as executor for two years, 1871 and 1872, $525 April 16, 1873, and in January, 1874, $250 ; this is all.

"If Jefferson Davis is entitled to the proceeds of 'Brierfield,'.the estate of Joseph E. Davis will have gained by his having delayed to prosecute his claim, and by allowing the estate to use the interest on the collections. No portion of the $10,000 claim of Jefferson Davis against the estate of. Joseph E. Davis, which was compromised with J. D. Mitchell and Mary E. Hamer, has been paid. This was a claim which Mr. Davis had against the estate of Joseph. E. Davis, which he proved by the book-keeper of William Laughlin & Co., of New Orleans, who had failed ; and at the time of this failure, or when it was imminent, they owed Jefferson Davis $10,000, and Joseph E. Davis was indebted to them in more than that amount. The $10,000 due Jefferson was passed to the credit of Joseph E. Davis."

*Written Declarations, and other Documentary Evidence.*— Joseph E. Davis' last will :

"Be it known that I, Joseph Emory Davis, of the state of Mississippi, county of Warren, now in my eighty-fifth year, do make this my last will and testament:

"1st.   I give, bequeath, and devise to my grandchildren, Joseph D. Mitchell and Mary Elizabeth Mitchell, all the estate, real, personal, and mixed, as well as all rights and credits, with which I may die seized and possessed, subject to the legacies,and bequests hereinafter mentioned, to be controlled by my executors in the manner hereinafter directed."

2d.   The testator gives to Mrs. Laughlin, his daughter, the Diamond Place for and during her natural life.

3d.   The testator gives the reversion in the Diamond Place to said Joseph D. Mitchell ; and if he should die before Mrs. Laughlin, and should die without issue, then the reversion was given to his nephew, Joseph E. Davis.

4th.   The testator gives to Mrs. Leonard (his daughter) a planta-

tion in Louisiana, in fee, and gives her, also, "from the proceeds of the property sold, as hereafter recited, or from the debts collected, $1,000 during life."

"5th. It is my will and desire, and I so direct my executors, out of money due from the sale of the Hurricane and Brierfield plantations, amounting to three hundred thousand ($300,000) dollars, secured by the joint obligations of Benjamin T. Montgomery, Wm. Thornton Montgomery, and Isaiah Montgomery, payable on the first day of January, 1876, and bearing date of 19th day of November, in the year of our Lord 1866, and secured by mortgage on the land sold of even date with said bond, and also their joint and several obligations for the payment of six per cent interest annually, payable, in the gold coin of the United States, from the first day of January, 1868, for eight years following; on the maturity or falling due of the said bond for three hundred thousand dollars, it is my will and desire that my executors set apart and secure to my granddaughter, Mary Elizabeth Mitchell, the sum of one hundred thousand dollars ($100,000), and to my grandson, Joseph D. Mitchell, the sum of ($50,000) fifty thousand dollars; to Margaret Davis, Jefferson Davis, William Davis, and Varina Davis ($20,000) twenty thousand dollars each; and, until the said sums become due and payable, they shall be entitled to receive interest at the rate of six per cent per annum, as secured by said interest obligations; and it is further my will and desire that the money which shall accrue to, and become payable to, my granddaughter, Mary Elizabeth Mitchell, and to my grandson, Joseph D. Mitchell, shall be vested in some safe stocks, or so much thereof as in the opinion of my executors shall be advisable or necessary, but not to be less than one-half, and be held in trust for them by my executors, the interest only to be paid to them, for the space of twenty years; that my executors be empowered to remove such stock when, in their opinion, it is unsafe or unproductive, and to reinvest the same in more safe institutions.

"I further desire my executors to pay the interest on the sums bequeathed to my nieces, Margaret and Varina Davis, and my nephews, Jefferson and William Davis, to their duly constituted guardians until they severally become of age, when they will be entitled to receive the full amount of the sums bequeathed to them.

"It is my will and desire that my executors should extend a liberal indulgence to B. T. Montgomery, Wm. Thornton Montgomery,

and Isaiah Montgomery, or their survivors, the purchasers of the Hurricane and Brierfield plantations, by extending the time for the payment, so long as they pay the interest thereon, or show a disposition to act fairly, by making the proper exertions to meet their engagements; or to remit such portion of the interest as in their judgment may appear proper (but not exceeding one-half); and that the legacies herein directed to be paid from the proceeds of such sale shall be a lien on, and held by such legatees, with all the rights and privilege of the mortgagee.

"It is my will, and I so direct my executors, that B. T. Montgomery be credited with ($200) two hundred dollars annually, for the benefit of the aged and infirm on the plantation.

"It is my will, and I hereby authorize my executors, to compromise any of the said debts that may be due me, and to sell any lands of which I may die seized and possessed." [The will then designates his lands, and debts due him.]

"It is further my will and desire that my executors pay, from the proceeds of the sale of lands and collection of debts, the following legacies, to wit: To my sisters — Amanda Smith, $2,000; Amanda Bradford, $2,000; Lucinda Stamps, $2,000. To my nieces — Lucy Boyle, $1,000; Lucy Mitchell, $1,000; Mary M. Davis, $1,000; Lucy and Mary, daughters of my nephew, Isaac Stamps, $1,000 each. To Mrs. Martha Harris, $1,000. To my nephews — J. Davis Broadhead, $1,000; Joseph E. Davis, $1,000; Joseph Davis Smith, Jr., $1,000; Robert Anderson, $1,000; T. Mitchell, $1,000.

"I hereby devise and bequest to my two grandchildren, Joseph D. Mitchell and Mary Elizabeth Mitchell, all the rest and residue of my estate, wherever situated, after the devises and bequests herein mentioned.

"In case of the failure to collect the whole amount of the funds set apart for the payment of the legacies to my grandson, Joseph D. Mitchell, my granddaughter, Mary Elizabeth Mitchell, my nieces, Margaret and Varina Davis, and my nephews, Jefferson and William Davis, I desire that my executors shall make a *pro-rata* distribution" [deduction?] from the several legacies mentioned.

"In the payment of the smaller legacies, I desire my executors not to interfere with the funds arising from the sale of the Hurricane and Brierfield plantations, which were set apart for the legacies to my grandson, Joseph D. Mitchell, my granddaughter, Mary Eliza-

beth Mitchell, my nieces, Margaret and Varina Davis, my nephews, Jefferson and William Davis.

"I further give to my granddaughter, Mary E. Mitchell, my carriage and mules, my gold watch, and direct that the amount of ready money I may leave be divided between my two grandchildren, J. D. Mitchell and Mary E. Mitchell, who will defray my burial expenses.

"I bequeath to my faithful servant, Jack Bailey, one hundred dollars, and recommend my granddaughter, Mary E. Mitchell, to keep him in her service, at a salary of $250, as long as it is satisfactory for her to do so.

"I further direct that all acts of my executors shall require a concurrence of a majority of those who qualify to render such acts valid.

"I hereby appoint my brother, Jefferson Davis, of Warren County, Mississippi; J. H. D. Bowmar, of Vicksburg, Mississippi; Hugh R. Davis, of Wilkinson County, Mississippi; Jos. D. Smith, of Louisiana, executors of this my last will and testament, and direct that the court shall not require them to give security on qualifying as such.

"In testimony of which I have hereunto set my hand and seal, this 18th day of March, in the year of our Lord one thousand eight hundred and sixty-nine.

"J. E. DAVIS. [Seal.]"

The foregoing will was probated on September 21, 1870, and soon thereafter J. H. D. Bowmar, Jefferson Davis, and J. D. Smith qualified as executors, taking the statutory oath.

The following is one of eight drafts drawn by Joseph E. Davis, during the years 1855, 1857, 1858, and 1860, as agent of Jefferson Davis, on Payne & Harrison, and made exhibits to the deposition of J. U. Payne:

"$180. BRIERFIELD, Mar. 12th, 1860.
"Messrs. Payne & Harrison, New Orleans:

"Pay to Messrs. Sparks & Gallagher one hundred and eighty dollars, and place to account of

Your ob't s'v't,
"JEFFERSON DAVIS,
"By J. E. D."

The other seven are of the same style and tenor.

The following is one of three drafts drawn in 1855, 1858,. and 1860, respectively, on account of Jefferson Davis' taxes :

"$215.60.                        VICKSBURG, *May 17th, 1858.*

"Pay to the order of Wirt Adams & Co. two hundred and fifteen $\frac{60}{100}$ dollars, and charge the same to the account of Col. Jefferson Davis, for taxes on his land.

"H. J. HARRIS."

"Messrs. Payne & Harrison, }
    *New Orleans, La.*    }

The following is one of thirty-nine letters by Joseph E. Davis, during the years 1854 to 1861, inclusive, in regard to the business of Jefferson Davis :

"HURRICANE, *May 1st, 1860.*
"*Messrs. Payne & Harrison :*

"GENTS : I have this day drawn on you for one thousand and ten dollars in favor of P. J. Kennedy, and on account of my brother for five hundred and five $\frac{32}{100}$ dollars, in favor of the same.

"Your friend,

"J. E. DAVIS."

The others are notices of drafts drawn, or orders for supplies, on account of Jefferson Davis, or are in reference to the shipment and sale of cotton belonging to him. There are also attached to the deposition of J. U. Payne four letters from Jefferson Davis, written in 1855, 1857, and 1858, authorizing Payne & Harrison to pay drafts drawn by the overseers on "Brierfield," giving instructions in regard to the sale of his cotton, and as to the buying of negroes for him.

A copy of the assessment-roll shows that the land embraced in "Brierfield" was assessed to Jefferson Davis for all the years from 1846 to 1866, inclusive. In 1870 and 1871 it was assessed to the heirs of Joseph E. Davis.

On February 3, 1847, Joseph E. Davis exhibited his bill of complaint, sworn to by him, against Rice C. Ballard *et al.*, for the purpose of perpetually enjoining the levy and collection . of a special levee tax which had been assessed against parts of "Hurricane" and "Brierfield" plantations. A supplemental

bill was filed by Joseph E. Davis on January 8, 1851. The complainant represented himself as the owner of the lands mentioned in his bills of complaint. A final decree in that cause was rendered on July 4, 1853. An exhibit to the bill showed that the tax on "Brierfield" was assessed to Jefferson Davis.

The holographic will of Joseph E. Davis, made September 26, 1865, contains the following :

"First. I give and bequeath to my two grandchildren all my estate, real, personal, and mixed, as well as rights and credits, with the exceptions hereinafter mentioned, to be controlled by my executors hereinafter mentioned, and disposed of by them in manner hereinafter directed. The plantation known as the ' Hurricane,' containing four thousand acres, I give and bequeath to my granddaughter, Mary Elizabeth Mitchell, with all the slaves and other property remaining thereon, to be held and cultivated for the benefit of my said granddaughter, with the desire that she will annually pay to her brother, J. D. Mitchell, one-fourth of the net proceeds, until he shall get possession of the estate hereinafter mentioned as the Diamond Place."

The second and third clauses gave Diamond plantation to Mrs. Laughlin for life, and remainder to J. D. Mitchell.

"Fourth. I give to the children of my brother, Jefferson Davis, to wit, Margaret, Jefferson, William, and one other, the name unknown, the plantation known as the ' Brierfield,' in said county of Warren, state of Mississippi, on which he lately resided, and all the slaves and other property remaining thereon."

In the seventh clause he enumerates the lands owned by him, as follows :

"The lands owned by me are the following : The Hurricane plantation, of about four thousand acres, in T. 14, R. 1 E., in said county of Warren, state aforesaid, about eight hundred acres of which is the ' Brierfield ' property, mentioned as given to my brother Jefferson's children.

"Lands in Monroe, Jackson County, Arkansas,. on Cash River. These lands were purchased in the joint names of J. E. Davis, O. B. Cox, and Jefferson Davis; J. E. Davis advancing eight thousand dollars, Jefferson Davis four thousand, the said Cox putting in no money, but attending to the purchase of the land, with the understanding that at the proper time said lands should be sold, and the proceeds of the sale, after returning the money advanced, the profits to be divided equally."

No patents from the United States, for the land embraced in "Hurricane" and "Brierfield," had been issued up to September 26, 1865, as appears by a part of this will not quoted above.

On September 22, 1865, Joseph E. Davis made an application to Andrew Johnson, president of the United States, for the restoration of his property, which had been seized by the United States government, in which he stated :

"I am advised that, to have my home and property restored, it will be necessary for me to apply to the president of the United States, and to get some person of influence at Washington to present my claim. I have no friends in Washington to whom I could apply, nor the means of making such. I must, therefore, rely upon the justice of my claim. In the year 1818 I purchased of the United States some lands on the Mississippi River, below the Walnut Hills, now Vicksburg; upon the land I fixed my residence and occupied it forty years."

The application was sworn to.

On September 8, 1866, Joseph E. Davis made an application to General Wood, commanding the Department of Mississippi, and assistant commissioner of the Freedman's Bureau, in which he stated :

"I would respectfully ask to be placed in possession of my plantations, known as 'Hurricane' and 'Brierfield,' situated in Warren County, Miss."

To which applications were attached the certificates of A. H. Arthur, cashier of the National Bank of Vicksburg; M.

Shannon, sheriff of Warren County; F. A. Steele, a former assessor; and J. C. Chappell, clerk of the Probate Court, that Joseph E. Davis was the owner, and had been the occupant, of the land mentioned in his application.

Marshall & Miller, attorneys, wrote to Joseph E. Davis December 5, 1867, stating that they had for collection an account against him, in favor of N. E. Barnes, for wages as overseer on the Brierfield Place; in answer to which Joseph E. Davis, amongst other things, said:

"He (Barnes) never was employed by me, or rendered any service for me. I remember that he was on the Brierfield plantation, as overseer for my brother, but for how long I do not recollect. I advised his removal, and nothing but feelings of compassion for him by my brother would have permitted him to remain."

The recorder of Madison Parish, Louisiana, gave a certificate to the effect that there was no record in his office of any deed from Jefferson Davis to Marcy & Zeigler, or any other person or persons; but that the records showed a deed of conveyance from Joseph E. Davis to Marcy & Zeigler, in consideration of $2,500 cash in hand. This deed is dated January 18, 1852, and is witnessed by E. L. Miles.

The following is an extract from a letter written by Jefferson Davis, October 20, 1865, to his wife, concerning which it is agreed by the solicitors in this cause that it was written with the intention that Mrs. Davis should communicate the same to Joseph E. Davis:

"Brother Joe should not, I think, return to the river place. All is changed. He will be troubled beyond his strength by the confusion that must exist. An agent will suit the new *regime* much better than the old one. If he goes back, why not take the Brierfield house? He can claim possession as owner of the land. But my decided opinion is, in the existing condition, neither he nor Lize should stay there."

The following in a memorandum made by Jefferson Davis,

and sent, by the hand of Mrs. Mary Stamps, to Joseph E. Davis:

"In default of being permitted to correspond, I requested Varina to inform you that any arrangements which you made with Ben would, of course, be agreeable to me. This I supposed you would anticipate; but as you had expressed a wish to that effect, the announcement was made as above. It will, no doubt, occur to you that, the proceeding having been made public, it will be advisable to close it soon, and tightly, lest the desire for plunder and the active malignity towards you, as my brother, should prompt to some congressional movement to interfere with it. Unless the negroes exceed my expectations, they will never complete the payments. Then it may be that a better state of affairs will render the property valuable to your heirs."

It is dated December 17, 1866.

On December 26, 1868, Jefferson Davis wrote to Joseph E. Davis as follows:

"The proposition of Ben and his sons to abandon their contract was preposterous, after having had all its benefits, without having met its obligations. At the time you let them have the land I suppose other purchasers would have been easily found who had capital, at least sufficient to have insured a forfeit to enable them to fulfill their contract. It is no doubt true that the property is too large for the administrative capacity of a negro. It is also within his ability to see that he had better retire with the means he has acquired by the possession of your property, and engage in small trade. It was this course which I expected him in due time to adopt, but supposed it would be done secretly, by covert agents, rather than by direct proposition."

The following is an extract from a letter written by Jefferson Davis, at London, April 5, 1869, to Joseph E. Davis:

"I often see statements in the newspapers to the effect that there is an increasing prosperity in the South, and the large amount for which the present small cotton crop will sell would seem to render

these statements probable.  I have thought of it as bearing on your prospects at the ' Hurricane.'  If Montgomery and sons will not, or can not, comply with their contract, could not some one with capital be found to take the lands, and secure to you a revenue free from any vexatious attention on your part?''

The following are extracts from the journal of the proceedings of the executors:

'' This day, 6th of Dec., 1870, Jefferson Davis, J. H. D. Bowmar, and Joseph D. Smith, executors of the last will and testament of Joseph E. Davis, deceased, each having been duly qualified according to law, met and proceeded to the performance of their joint duties as executors.

'' B. T. Montgomery and his son Thornton appeared to present their claim to the consideration of the executors, for mitigation of the terms of their contract for the purchase of the Hurricane and Brierfield plantations,'' etc.  '' Upon the promise to pay the note of 1870 before the 1st of Jan'y, 1871, the executors agreed to postpone the collection of the note due on the 1st of Jan'y, 1871, and generally gave assurance of the purpose to execute the intent of the testator, that they would exercise all proper clemency towards the purchasers, upon proof of their continued and faithful effort to discharge the obligations they had assumed, and endeavored to relieve the impression that they would be treated more harshly by the executors than by the testator.

'' The executors made an examination of papers in the tin box, and found six promissory notes '' of the Montgomerys payable to the order of J. E. Davis, each for $18,000, and the bond of the same parties for $300,000.  On December 7, 1870, the '' executors met and proceeded to the consideration of the will by its provisions *seriatim.*''  Amongst other things, it was decided: '' 5th. That the funds arising from the sale of Hurricane and Brierfield plantations, after satisfying the claims of legatees specially provided for from that source, are available for the payment of debts due by the estate, and current expenses in the administration thereof; the balance shall be considered a part of the residuary legacy.''  And they decided: '' 7th. That J. H. D. Bowmar be charged with furnishing an inventory of the personal property belonging to the estate.''

" April, 1871. — The executors met and visited the Hurricane and Brierfield plantations, for the purpose of taking a mortgage on the Ursino plantation, purchased by Montgomery and sons from Robert Y. Wood, at $100,000. The mortgage was given by the Montgomerys with reluctance.

" Dec. 27, 1873. — Present: J. H. D. Bowmar, Jefferson Davis, and Joseph D. Smith. It was finally decided that, instead of $18,000.00 to be paid in 1874, the Montgomerys should pay the executors, between the 1st of Octo. and the 31st of Dec., 1874, the sum of $14,500.00, and should pay the tax on the bond of the Montgomerys to J. E. Davis in the purchase of the plantations, provided said tax did not exceed $1,000.00. The clearly-expressed wish of J. E. Davis was to encourage the purchasers by indulgence as should be needful to a continuous effort to retain the Davis negroes on their old homes; and it has been the purpose of the executors to carry out the wish of the testator in the concessions made at this and former meetings."

On March 20, 1871, J. H. D. Bowmar, one of the executors, returned, under oath, an inventory of personal property belonging to the estate of Joseph E. Davis, which included, amongst other things, the bond of the Montgomerys for $300,000, and their six promissory notes, each for the sum of $18,000 in gold, being the interest on said bond. On April 15, 1871, Jefferson Davis, J. D. Smith, and J. H. D. Bowmar, as executors of the last will and testament of Joseph E. Davis, took a mortgage from the Montgomerys on their Ursino plantation, to secure the debt due Joseph E. Davis for " Hurricane " and " Brierfield." January 14, 1873, the executors, in consideration of the promise of the Montgomerys to pay, without indulgence or abatement, their notes falling due annually for the interest on their debt, released the mortgage on the Ursino plantation.

The following is the agreement of compromise in regard to the $10,000 claim of Jefferson Davis:

" Memorandum of an agreement made and entered into this 21st day of December, 1872, by and between Mary Elizabeth Mitchell and Joseph D. Mitchell, legatees under the last will and testament of

Joseph E. Davis, deceased, of the first part, and Jefferson Davis, of the second part, witnesseth : That, for the purpose of adjusting a claim held by the party of the second part, and in compromise thereof, it is hereby agreed between the parties, in consideration of the premises, that in full satisfaction of said claim the party of the second part shall receive the sum of ten thousand dollars ($10,000), to be paid out of the residuary fund mentioned in the will of said testator. It is also agreed by the said Mary Elizabeth Mitchell that one-half of said claim, to wit, five thousand dollars ($5,000), which is to be paid out of her portion of the residuary fund, shall bear interest at the rate of six per cent per annum from the date of this agreement; but it is understood and agreed between the said Joseph D. Mitchell and the said Jefferson Davis that the other half of said claim, to wit, five thousand dollars ($5,000), which is to be paid out of his portion of said residuary fund, is to be paid without interest; that the interest due annually by Ben T. Montgomery and sons shall be used as follows : first, to pay the taxes, general debts, and necessary expenses in the administration of said estate ; second, to pay the interest on the respective legacies made chargeable by the will on the revenues derived from the Hurricane and Brierfield plantations ; third, to pay the debt due to Jefferson Davis, as per this agreement, out of any surplus which may remain after discharging the above preferred obligations. And it is understood and agreed that said debt shall not be sued upon, but shall be paid from time to time by the executors of said estate out of the fund named ; and it is further agreed that the said payments to Jefferson Davis shall not impair or diminish the payment of the full amount of the several legacies made payable out of the proceeds to be derived from the Hurricane and Brierfield plantations, whether derived from the payment of the interest or the bond of Montgomery and sons, or the sale of said property to pay said bond ; and that, with the limitations and exceptions herein recited, said debt shall be regarded in all respects as other debts of the estate.

"In testimony whereof, said parties have hereunto set their hands and seals on the day and year first above written.

"J. D. MITCHELL.   [*Seal.*]
"M. E. MITCHELL.   [*Seal.*]
"JEFFERSON DAVIS.   [*Seal.*]
"*By* MILLER & BOOTH, *Attorneys.*"

On December 26, 1873, B. T. Montgomery and sons made the following written declaration :

" For the information of all concerned, we deem it necessary to state that, in the agreement between Mr. Joseph E. Davis and ourselves for the purchase of the plantations known as ' Hurricane ' and ' Brierfield,' in 1866, it was with the definite though private understanding that Mr. Jefferson Davis should have possession of that portion called ' Brierfield ' at any time he desired."

The original answer of the Montgomerys contains this statement :

" Joseph E. Davis, at the time of the sale of the Hurricane and Brierfield plantations, stated to respondent B. T. Montgomery that, so far as ' Brierfield ' was concerned, the trade was subject to the approval of Mr. Jefferson Davis upon his return ; and said respondent, at that time, agreed with Mr. Joseph E. Davis that if, at any time after the return of Mr. Jefferson Davis, he, Jefferson Davis, should desire to rescind the sale as to ' Brierfield,' he, respondent, would deliver up ' Brierfield ' to Jefferson Davis."

It was sworn to by B. T. Montgomery on June 29, 1874.

B. T. Montgomery filed an amended answer on October 17, 1874, which was sworn to by him, containing the following statements :

" Respondent does not admit that at the time of the compact of sale, as stated by complainant in his bill, there was any agreement or understanding as to rescinding the contract as to ' Brierfield,' or any condition, verbal or written, that the sale as to ' Brierfield ' was dependent upon the approval or assent of Jefferson Davis ; but said sale was absolute, without any condition or agreement to rescind the same in any contingency. Respondent, however, states that in Nov. or Dec., 1867, owing to the unfavorable result of his planting enterprise, he, in an interview with Joseph E. Davis, expressed his fears that he would not be able to pay for the property, and his desire to rescind the sale altogether ; and Joseph E. Davis, after an effort to encourage the respondent to persevere, stated that, should Jefferson

Davis return to Mississippi to live, it might be desirable to rescind the sale as to ' Brierfield.'   And it was then agreed, for the first and only time, between Joseph E. Davis and respondent, that should Jefferson Davis desire to possess ' Brierfield,' respondent would deliver possession to him.   Respondent states that although, in Dec., 1873, at complainant's instance, he signed a declaration in writing, in which it was stated that the agreement to rescind the sale as to ' Brierfield ' was made at the time of the sale, respondent's attention was not called to the matter of date, but to the fact that such agreement was at some time made, respondent supposing that the object of asking him to sign such declaration was chiefly, if not altogether, to obtain evidence that such agreement had been made with Joseph E. Davis at some time ; and respondent's recollection, being refreshed by recalling incidents and circumstances, is clear that there was no agreement as to the rescission of the sale as to ' Brierfield,' until near the space of one year after the sale, and under the circumstances stated."

The following is an extract from a letter written by B. T. Montgomery, dated Hurricane, December 5, 1867, to Joseph E. Davis :

" If you think it at all probable that Mass Jeff will return to ' Brierfield ' the ensuing year, I should be glad to know, so as to avoid any conflict of arrangements.   Billy Mick is the only one of the ' Brierfield ' people that will make anything ; and whatever arrangement is made with parties working on either place, I wish to be able to guarantee their undisturbed possession for the year.

" Your ob't serv't,

" BEN."

The foregoing statement of the case is intended to contain, substantially, the important parts of the pleadings and evidence.

*Pittman & Pittman,* for the appellant.

The ownership of appellant is established by a mass of testimony, the most important of which may be briefly stated as follows :

1. The actual possession since 1835.

2. The clearing, improving, cultivating, ditching, leveeing, and erecting permanent and costly buildings on it, and other acts of ownership, including almost every conceivable act of exclusive ownership and dominion, all established by a large number of independent witnesses.

3. His reputed ownership, coupled with his possession from the first, established by the testimony of a multitude of witnesses, among whom are the nearest relatives of Joseph E. Davis, his daughter, his brother-in-law, his son-in-law, his overseers and those of Mr. Jefferson Davis, and, indeed, nearly all the witnesses who have testified in behalf of defendants as well as complainant.

4. The entry of Mr. Jefferson Davis, under a parol gift, established by proof of the admissions of Joseph E. Davis repeatedly made, sometimes casually, sometimes expressly and in response to inquiry, and sometimes in the course of solemn business transactions.

5. The fact that, in addition to the promptings of fraternal affection, there were other considerations rendering it obligatory upon Joseph E. Davis to compensate his younger brother for property and money justly and legally due to him from Joseph E. Davis.

6. The significant fact that Joseph E. Davis prepared a will for his brother, Mr. Jefferson Davis, which the latter executed, by which he devised the property in question.

7. The no less significant fact that on one occasion he made a formal offer, in writing, to purchase the property from Mr. Jefferson Davis, which the latter refused.

8. The fact that, when Joseph E. Davis sold the property, he sent a message to Mr. Jefferson Davis "that he had acted for *him*, in the sale of the Brierfield Place, for what he considered his best interest," on account of the uncertainty of the duration of his imprisonment.

9. The fact that, in the agreement with Montgomery, he reserved the right of canceling the sale as to "Brierfield," if Mr. Jefferson Davis should desire it.

10. The peculiar provisions of the will of Joseph E. Davis, whereby he carefully protects from appropriation under his bequest a part of the purchase-money, corresponding with the value of " Brierfield," and at the same time preserves the relative proportion between the two funds so as to exactly adjust the equities between himself and brother, whatsoever might be the amount ultimately collected.

The title which we claim for appellant passed to him by a parol gift, which matured into a perfect title under the act of February 24, 1844 (Hutch. Code, 829), which provides that ten years' actual adverse possession shall vest in the possessor " a full and complete right and title." *Ellis* v. *Murray*, 28 Miss. 129 ; *Ford* v. *Willson*, 35 Miss. 504.

We cite the following as applicable to the effect of the entry under the parol gift and the adverse occupancy thereafter : *Waldo Commins* v. *Josiah Commins*, 21 Conn. 413 ; Tyler on Eject. 864 ; *Hunbert* v. *Trinity Church*, 24 Wend. 581 ; *Smith* v. *Teller*, 1 Johns. 180 ; *Jackson* v. *Ellis*, 13 Johns. 118 ; *McGee* v. *McGee*, 37 Miss. 138 ; *Grafton* v. *Grafton*, 8 Smed. & M. 77 ; *Cray* v. *Goodman*, 22 N. Y. 174 ; *McKinney* v. *McKinney*, 1 A. K. Marsh. 460 ; *Hale* v. *Glidden*, 10 N. H.

The ownership of Mr. Jefferson Davis would affix a trust for his benefit, independently even of the evidence that the trust was expressly assumed and acknowledged by Joseph E. Davis.

*W. B. Pittman* and *A. B. Pittman*, counsel for the appellant, also argued the case orally.

*Harris & George*, for the appellees.

The pleadings and evidence present two questions :

1. Whether Jefferson Davis, without any deed or conveyance from Joseph E. Davis, in whom the title existed from the beginning, acquired title to " Brierfield " as against the latter by adverse possession.

2. Whether, under the circumstances, Jefferson Davis is in a position to assert such title as he may have to any part of the subject of the trust which he accepted and acted on against the legatees, who are his *cestuis que trust*.

It is not disputed that, at the beginning, Joseph E. Davis had the title from the government; and there is no pretense that he ever parted with that title, by any conveyance, until the sale to the Montgomerys. He knew perfectly well what was necessary to convey title to real estate; and when he placed his brother on a portion of his land without making any deed to the land, the obvious conclusion is that he did not intend to part with the title, and his brother knew that he entered on the lands without a title, and necessarily by the permission, and in subordination to the title, of the real owner, Joseph E. Davis. Such were the relations of the parties, at the beginning, as to each other and to the property; and the evidence discloses no change in these relations in the long period the possession continued.

It cannot be affirmed here that Joseph E. Davis was ever out of possession. At the beginning he entered with his slaves to clear the ground; for the greater part of the time he managed the property; and it appears singular, but it is true, that a material part of the occupation, and many of the acts said to denote ownership, were by him; and it seems that he was for years engaged in building up a title hostile to his own, on the theory of complainant.

It is to be observed that, if we suppose the case of a father dealing with a son, or one on whom he intends ultimately to bestow part of his estate, and that the purpose is to give full enjoyment of the products of the soil, but with a reservation of title, with a view to ulterior and final arrangements, we would expect to find all the acts relating to building, fencing, and levees, and the payment of taxes, and the shipment of cotton and the receipt of the proceeds, which we see here. Common observation teaches that in such case the farm would be called the farm of the occupier, etc. These provisional family arrangements are common. One is mentioned in the testimony of John Perkins. We had a case of the kind before this court lately. *Pipes* v. *Buckner.* The head of the family, a large land-owner, settles his children on farms without mak-

ing them a title.   He gives independent management and the income, but retains the title in order to meet the exigencies of the future.   In these cases we find all the features of this. This is a common family scheme.

William Stamps, a witness for the complainant, points out three ways in which Jefferson Davis came to be the owner. By two of these he undertakes to prove that Joseph E. Davis ought to have given to Jefferson Davis a title.   One reason is that Joseph E. induced Jefferson to resign his commission in the army, and about this he hints there was a bargain. Another reason is that Joseph E. Davis owed Jefferson for part of the very small estate of their father.   If there was any real bargain about the commission in the army or the estate of their ancestor, it is tolerably evident from the characters of the men that there would be traces of it ; but there are none. The witness then says Joseph E. Davis said he had given "Brierfield," or the land which was afterwards so called, to his brother Jefferson, as a father would give to his son.   Whatever was given was a gratuity ; but it is manifest that Joseph E. Davis gave his brother no title, but reserved the power of disposition in himself.   He gave the use of the land in as full a manner as it could be given, but he gave no more ; and this must be considered his meaning when he spoke of giving.

If Jefferson Davis had obtained a promise that a deed was to be made to him, it is hardly credible that he should never have demanded it.   It is perfectly manifest that Jefferson Davis understood from the outset that his brother retained the power of disposition ; but he had implicit confidence that it would never be abused to disappoint his just expectations, and that he would enjoy the place as a home during his life, and that his immediate family would be provided for out of it. The evidence shows clearly that Jefferson Davis at no time asserted a title to the land, and there is no evidence that he ever attempted to sell it.   Joseph E. Davis, on the other hand, in every instance in which the land was imperiled, asserted his title in a manner both persistent and notorious, and this asser-

tion of title was plainly with the knowledge and assent of Jefferson Davis. He was in Warren County when the suit about the levee tax was pending, in 1847. He certainly knew that his brother had asserted title in opposition to his, to the government and in the sale to the Montgomerys; and he acquiesced in this assertion. These acts of notorious and public assertion of title, without question, are proper to be shown to rebut presumptions arising from mere possession. Matthews' Pres. Ev. 199, 200; *Barley's Case*, 5 Modern, 519.

The letter from Fortress Monroe shows that the writer was conscious that the property could not have been restored as his property, and he speaks of it as property which is to go to the heirs of Joseph E. Davis. He knew he had no title to the lands; but the letter shows that he had absolute confidence that his brother would not disappoint his expectations, but would carry out his own design in providing for his (Jefferson's) family — a design which existed from the beginning. It is manifest that Jefferson Davis knew that no property of his would be surrendered by the government, and that it had been surrendered on the claim and on the evidence that Joseph E. Davis held the title. He assented to this public proclamation of title in Joseph E. Davis.

There is nothing more conspicuous, in all the testimony by members of the Davis family and the family connections, than the general consciousness that no title had been made to Jefferson Davis. It even crops out in the elaborate statement of Mrs. Jefferson Davis. The rich man's dealings with his property are watched by his relatives. They are much talked of. In this instance there was much buzzing, gossip — doubtless much speculation. There is a good deal of testimony from these sources. It is to be noted, however, that conversations between the brothers are not given. It is apparent from all this testimony that Jefferson Davis had no title. He indirectly, but most significantly, admitted his brother's power over "Brierfield" to Mrs. White, who urged him to obtain a title — saying he felt a delicacy in asking it. Mrs. White proves

that Mrs. Joseph E. Davis besought Joseph E. Davis to make a title to Jefferson, and he refused. This was just before Joseph E. Davis' death.

Mrs. Jefferson Davis speaks of two facts deemed to be of much value on the matter of title ; but, when scanned, they leave a serious doubt upon the mind. She speaks of a lost letter in which Joseph E. stated to Jefferson that he had heard he wanted to sell " Brierfield, " and, expressing a disinclination to see it go into strangers' hands, proposed to buy it. With the purpose of Joseph E. Davis, which is admitted by the answer to have existed, a proposal to give Jefferson the price of " Brierfield, " if he desired to abandon it as a home, is entirely consistent with the view we take of the state of the title. She speaks of a will made, and it seems apparent, from all she says, that this will was dictated by Joseph E. Davis. If Jefferson Davis had been the owner of " Brierfield," such a will could only be explained by supposing that he had no affection for his wife. It is to be observed that all the slaves were to be kept on " Brierfield," and out of the net income she was to be paid one-fourth or one-fifth of this income during her life, and she was required to reside on the place. The remainder was given to the sisters of Jefferson Davis. The witness speaks indignantly of this will, and charged Joseph E. Davis with being the author of it. The fact that such a will was made by men who had a knowledge of the liberal provisions of our laws in favor of the widow, that Jefferson submitted to execute it, and that there seems to have been no expectation that she would object to it or renounce it, shows that Joseph E. Davis held such power over the property that he could constrain her acceptance of it. Jefferson Davis had title, doubtless, to some of the slaves. He had a desire not to die and leave his wife unprovided for ; but such provision as was made was a stinted concession by the elder brother, to which the younger felt bound to accede.

The conduct of the brothers, in all that is exposed of what they did and said to each other about " Brierfield," impresses

us with a clear conviction that they both perfectly understood that Joseph E. Davis, from the beginning, purposely retained the title and power of disposition, and that Jefferson, with perfect confidence in his brother's intentions respecting himself and family, acquiesced in this retention of title, and was content to hold " Brierfield " in subordination to it. It was a permissive possession, on which time has no effect whatever. There was no title ever given, nor was there any claim of title ever asserted by Jefferson Davis, or " claim of right." The acts of ownership are equivocal, because just such acts as are common to cases where merely permissive possession alone exists.

Speaking of the value of long possession in raising a presumption of a conveyance, Matthews says : " But, in order to sustain the presumption of a conveyance in cases of this kind, the possession on which that presumption rests must not have been a possession merely for twenty years, but an adverse possession for that period. If the enjoyment can be accounted for on grounds consistent with the former proprietor's title, inferences drawn from that enjoyment alone will necessarily · fail." Matthews on Pres. Ev. 199.

If the statute of limitations is to be invoked, the question arises, When did the right of action accrue? When did the adverse possession begin? Angell says (Ang. on Lim., sec. 384) : " The law deems every person to be in the legal seizin and possession of lands to which he has a complete and perfect title ; and this seizin and possession is co-extensive with his right, and continues until he is ousted thereof by an actual possession in another under a claim of right." The Supreme Court of the United States, in *United States* v. *Aredondo*, 6 Pet. 691–743, says : " The law deems every man to be in the legal seizin and possession of the land to which he has a complete and perfect title. This seizin and possession is co-extensive with his right, and continues until he is ousted thereof by an actual adverse possession. This is the settled doctrine of the common law, recognized and adopted by this court in

*Green* v. *Liter*, 8 Cranch, 229, 230, *Barr* v. *Gratz*, 4 Wheat. 213, 233, *Propagation Society* v. *Parolett*, 4 Pet. 480, 504, 506, *Clarke* v. *Courtney*, 5 Pet. 354, 355, and it is not now to be questioned.  *  *  *  Possession does not imply occupation or residence." To the same point is *Alexander* v. *Polk*, 10 Geo. 737 ; also *Huntington* v. *Whaley*, 29 Conn. 398.

Angell says (Ang. on Lim., sec. 390) : " The clearest and most comprehensive definition of a disseizin and adverse holding, perhaps, is an actual, visible, and exclusive appropriation of land commenced and continued under a claim of right — either under an openly avowed claim, or under a constructive claim arising under acts and circumstances attending the appropriation — to hold the land against him who was seized." To the same point, *Magee* v. *Magee*, 8 Geo. 138.

" When the possession at first was permissive, it will be so treated throughout, until the possessor shall give notice to the owner of his design to claim title." *Moore* v. *Johnston*, 2 Spears, 291.

" A defendant relying on the statute of limitations must show at what time he took possession, and how long he held it ; and when a tenant (or one whose original entry was permissive) claims to hold adversely, he must show when that intention was made known to the landlord ; otherwise, he might acquire title by an evasive or secret abuse of trust." *Whaley* v. *Whaley*, 1 Spears, 22 — a case closely resembling the one at bar.

" Possession of land is presumed to be in subordination to the true owner, and it only devolves upon him who sets up an adverse possession to show it, by showing that the owner had notice of his adverse claim and possession, or that his occupancy and use were open, notorious, and inconsistent with the rights of the true owner, as these facts raise a presumption of such knowledge on the owner's part." *Alexander* v. *Polk*, 39 Miss. 736.

From the foregoing it is established :

1. That possession of land that is vacant is presumed to be in the owner, and really and legally in him.

2. That when land is occupied, it matters not by whom, the possession is presumed to be in subordination to the title, in whomsoever that title may reside.

3. If the contrary is asserted, then it is incumbent on the adverse possessor to show it, and he must show all the facts necessary to make out the possession adverse.

4. To constitute possession adverse, it must be shown that the occupation commenced, and has been continued, under a claim of right, and that it is an exclusive appropriation of the land, so injurious to the owner's rights as to deprive him, without his consent, of the ownership for the time being; and the claim of right adverse to the owner must be communicated to him, or it must be accompanied by such acts of use and ownership as to raise the presumption that he has knowledge of the adverse claim. When the possession was at first permissive merely, it may, in some instances, be converted into an adverse possession.

5. When the attempt is made to convert a permissive into an adverse possession, then it must at least appear that the tenant communicated his intention to the owner, and that communication must embrace the idea that the tenant from thenceforth denied the owner's title and claimed title in himself.

6. That possession is not adverse merely because the possessor refuses to recognize the true owner as such, and holds the land in defiance of his rights. The possessor must assert title in himself. The mere refusal or denial of the title of the owner will not serve, without a claim or color of title in the possessor.

The condition of the title, taken in connection with the acts of Joseph E. Davis in asserting title in himself, all of which it is quite certain was in the knowledge of the complainant when the will was shown to him, coupled with the suggestion, at the time of exhibiting the will, of his co-executor, Bowmar, that

the legacies to his children were in lieu of "Brierfield," presented a case in which he was bound to exercise his election either to decline the trust and assert his rights or to yield to the plain design of the testator, to substitute his children for him, and accept the trust and execute it; and it must, from the nature of the case, be assumed that he determined to yield to the scheme of the testator, and to surrender whatever rights he might have, rather than to thwart the scheme; and, having made his election deliberately, he must be held to have waived his rights to the trust property.

While it is not a case in which the court, if the complainant had stood aloof from the trust, would have forced him to make his election between the legacy to his children and his claim to "Brierfield," however certain it might be, morally, that the testator so intended, nevertheless we are constrained to the conclusion that the conviction urged him to elect to acquiesce in the testator's scheme, and determined him at the beginning to carry it out. His action as executor, in treating the fund as assets and dealing with it as disposed of, must have convinced him that the duty of executing the trusts of the will and the assertion of claim to part of the fund were totally inconsistent. The first step he was called on to take brought into strong light the essential conflict, as did every subsequent step he took respecting this fund. So that it may be affirmed that, with his knowledge and convictions, each of these steps was a disavowal of his claim.

He cannot now appeal to this court to reverse his own deliberate decision. In the language of the English Court of Chancery, "We must assume that he had determined to surrender his claim." *Stone* v. *Godfrey* 5 De G. M. & G. 86.

The integrity of the administration of trusts demands the application of the rule, so often affirmed, that one who accepts a trust and enters upon the execution of it cannot obtain the aid of a court of chancery, whether he appears before it as a defendant resisting the claims of the beneficiary to the subject of the trust, or as a complainant seeking to establish his title to

the whole or any part of the subject of the trust. A party who accepts a trust with full knowledge of its character and of his own rights, where the assertion of these rights must defeat the trust, is, under the rule above stated, conclusively presumed to have waived his right.

Lewin, in his valuable work on Trusts, closes his chapter on the general duties and office of trustees with this remark: " We may conclude with the general proposition that a trustee is, under no circumstances, allowed to set up title adverse to his *cestui que trust.* But though he may not claim against his own *cestui que. trust,* yet he is not bound to deliver over the property to his *cestui que trust* if he cannot safely do so by reason of title in another which is paramount to the trust." Lewin on Tr. 325, margin. Perry, in his recent work on the same subject, uses language equally explicit : " Under no circumstances will a trustee be allowed to set up a title adverse to that of the *cestui que trust.*" "And this rule," he observes, " is applicable to executors, guardians, and all who sustain a fiduciary character." Perry on Tr. 392, sec. 483 ; pp. 783–785, sec. 863. Numerous authorities are cited by these writers in support of these propositions. We cite one which illustrates the doctrine — *Stone* v. *Godfrey, supra* — where the father, by accepting and acting under a trust for the benefit of his daughter, was held to have waived his right as a tenant by the curtesy of the lands held in trust. 5 De G. M. & G. 86.

The Court of Chancery permits no double dealing. No one can be permitted to enter the castle as a defender, and then capture it and hold it for himself. There are circumstances under which a party is bound to elect to assert a right or to abandon it. It is due to those whose claims and expectations depend on his decision that he should decide, and, having decided, that he should be held to the decision.

In this case, for several years the legatees were paid as though they were entitled to the whole fund arising from the sale of the property, and this executor had made an announce-

ment that the whole $300,000 was disposed of by the will;
and this contained the avowal that they would not only get
the specific sums allotted to them, but that they would take
the residuum after the specific legacies were paid.   More than
this, they reaped the benefit of this announcement in the con-
cession that they owned the $70,000 as residuary legatees,
and he had the important advantage of charging upon it his
stale demand for $10,000.   The executor made a contract
with them — that is, the residuary legatees — in which they
are recognized as entitled to the residue of the fund arising
from the sale to the Montgomerys.   More than this, the court
was induced, by the election made by the complainant, to
administer, or to sanction the administration of, the estate on
the basis that the whole of this special fund was disposed of
by the will; and the minutes of that court exhibit the strange
anomaly of two proceedings — one by the executor, asserting
that the will bequeathed the whole fund, and that the residue
of the special fund is disposed of to the residuary legatees,
and another proceeding in which the same executor declares
that it was not disposed of, and belongs to him.

Many cases taken from the American reports sustain the
doctrine announced by the text-writers.   See *Hanson* v. *Mock*,
10 Ala. (N. S.) 194, 195 ; *Rogers* v. *Rogers*, Hopk. Ch. 523 ;
*Henderson* v. *Legard*, 28 Ala. 357 ; *Goodman* v. *Young*, 22
Ala. 553 ; *McLane* v. *Spence*, 6 Ala. 894 ; *Irby* v. *Kittrell*,
42 Ala. 443 ; *Manigault* v. *Deas*, 1 Barb. 289 ; *McLaren* v.
*Melvin*, 3 Jones Eq. 195 ; *Duncan* v. *Bryan*, 11 Ga. 63 ;
*Jones* v. *Butler*, 30 Barb. 641 ; *The State* v. *Merrill*, 1 Chand.
258 ; *White* v. *Swann*, 3 Pick. 365.

These authorities are conclusive.   But how much stronger
does the principle apply when, as in our state, an executor, on
accepting the trust, is required to swear that he " will truly
execute the will according to its tenor."   Code, sec. 1109.
The will requires the proceeds of the sale of " Brierfield "
and " Hurricane " to be paid to certain legatees named.   The
complainant was appointed executor to carry out this last will

of the testator.  He accepted the trust, and swears that he will execute it.  He now claims to defeat the will, upon an adverse title.  He makes no complaint of mistake, ignorance, or error.  The facts are such that he was bound to know his title, if he had any.

It is manifest from the will itself that the testator did not intend to die intestate as to any property he owned, or supposed he owned, or thought he had power to dispose of.  A general and comprehensive residuary clause is introduced, at the beginning of the will, in favor of the most favored objects of his bounty — his two grandchildren.  He bequeaths to them " all my estate, real and personal, and mixed, as well as all rights and credits with which I may die seized or possessed, subject to the legacies and bequests hereinafter mentioned."  In the after part of the will the testator repeats this bequest in terms equally comprehensive.

On the point whether the testator thought he had power to deal with the whole fund arising from the sale of " Hurricane " and " Brierfield," it is manifest from the will itself that he did assume to deal with the whole.  If we take the will alone, and seek no external evidence, the conclusion is inevitable that he disposed of the whole, and designed to do so.  Looking to the will, we find that he recognized, in several ways, the whole fund as under his absolute control.  He directs his executors to indulge the Montgomerys on the debt, if they see fit, to the limit of abating interest, on the whole, one-half.  Clearly, he would not assume to abate the interest on the part which he did not think he had power to deal with at all, not being his.

We find also in the will, although it is but imperfectly expressed, what we construe to be a pledge of the whole fund to make up the legacies bequeathed out of it : "And the legacies herein described to be paid from the proceeds of such sale shall be a lien on, and held by, such legatees, with all the rights and privileges of the mortgagee."  This direction follows that in which the executors are required to indulge the pur-

chasers by abatement.   It is obvious that they were not to be mortgagees each on the parts given to the others, and it is quite as obvious that the testator did not mean that each should be a mortgagee of his own part.   What appears manifest is that the specific legacies should be a charge on the whole fund.

This view is supported by another clause, in which the testator guards " the fund arising from the sale" from the claims of minor legacies; and, moreover, he makes the aged and infirm of both "Brierfield" and "Hurricane" the object of his bounty, devoting $200 per annum for their maintenance.

Again, there is a provision respecting the failure to collect enough of this fund to pay the legacies granted out of it, that these legacies shall, in that event, abate *pro rata*.   There is, however, no direction that the principal of the $70,000 supposed to be omitted shall abate.   If we suppose, therefore, that this sum is to stand unaffected by the residuary clause, no abatement of it being provided for, it would result that any loss from the insolvency of the Montgomerys, and the depreciation of the value of the property, would fall exclusively on the specific legacies — that is to say, all such losses must be made up to the omitted part out of the specific legacies; and it might so happen — and, indeed, it has happened — that the value of the whole debt would not exceed $70,000, so the specific legatees would get nothing out of the principal of their legacies.

Such a result would be monstrous.   The testator, admonished of the extreme probability of the failure of the Montgomerys, by the letter which the complainant wrote from Fortress Monroe, and by the general tendency of all values to deteriorate in the South, would not have made a will by which his favored legatees might be left penniless.   The moment, however, we assume that the part supposed to have been omitted from the operation of the will is, and was, designed as a residuum — and this assumption is necessary to any rational

conception of the testator's intention — then, as the established rule is, the residuum will feed the specific legacies, and not the legacies the residuum.

It is only by the uncertain light of external circumstances that the complainant reads and construes the will, and, on the point of the testator's views of his right and power, what he did and said is legitimate evidence. We may properly read the intelligent testimony of Mrs. Hamer (Mary E. Mitchell) and the will of 1865; the sworn bill in equity; the public claim of title made to the government, and the sale to Montgomery; and all other acts and declarations evincing a consciousness of right and power to deal with "Brierfield." However specious the fancied coincidences, there is no solid foundation for the conjecture that the testator left $70,000 undisposed of.

In order to mark the extent to which the complainant committed himself to the obvious scheme of the testator, we state, from the deposition of his co-executor, that he consented to the distribution of $76,000 of the fund, deducting the expenses of the administration, amongst the legatees of the fund, receiving for his own children nearly $20,000, and paying the balance to the other legatees — in other words, the entire accrued interest on the whole debt of the Montgomerys, or nearly that.

The defense which the legatees make rests on the fundamental law of trusts. The principle is as old as the system of equity, and comes down to us through many generations, sanctioned and enforced by a long line of illustrious judges. To disregard it would not be error only — it would be a judicial revolution. It is peculiar to the administration of trusts, but it is supported by analogies found in every branch of our jurisprudence. Whether with or without title or right, an assertion of title by a trustee, or the appropriation by him of part of the subject of the trust, is held to be a breach of trust.

If we place it on the grounds of equitable estoppel, we find the constituents of estoppel in it. There is concealment of his claim and of his design. There is cruel misleading of the

legatees into unwonted expenditures, an imposition on the court in which he had taken an oath to carry out the will faithfully.

It is not the case of an application to correct an inventory returned in ignorance of his rights, and made in due season after the discovery of the error. It was not a mistake. He took the step deliberately, and with full knowledge. It seems apparent that, even without the suggestions of Dr. Bowmar, he must have concluded that his brother, believing he was doing the best thing possible for his family, had bestowed large legacies on his children in compensation for expectations he had as to " Brierfield," and, so believing, he determined to acquiesce in it. The apprehensions his brother entertained from the hostility of the government doubtless induced him not to bestow property on the complainant, and it so appeared to complainant at first, and it seems probable that he thought the apprehension reasonable, judging from his letter written in prison. It began to appear, however, that this apprehension was not well founded, by the light of subsequent events ; and it then appeared to him as a mistake which seemed more and more injurious, as the inconvenience of being the mere manager of a fund of which he had every reason to believe that, but for these apprehensions, he would have been the owner, began to be felt.

However this may be, the court cannot escape the conviction that the testator's gift to the complainant's children was in lieu of his expectations as to " Brierfield," and that the defeating of the trust, by the successful assertion of title to " Brierfield " by the trustee, will disconcert the scheme of the testator, and will withdraw from the objects of his bounty what was plainly designed for them. Under this inevitable conviction the court will be less reluctant to enforce a principle of the law of trusts sanctioned by time and a great weight of authority.

Our own reports furnish no case precisely analogous to this ; but the recognition of the fundamental principles of the law

of the administration of trusts, the enforced abnegation of self by the trustee, on which the authorities cited by us rest, has been fully recognized and enforced. The trustee is held to strict fidelity in defending the trust against the claims of others ; he is not permitted to make a profit out of trust funds. If he purchases an outstanding title or incumbrance, it inures to the benefit of the *cestui que trust*. He can lend no aid to others in subjecting the trust property to claims, though well founded. *Joor* v. *Williams*, 39 Miss. 546. Administrators, guardians, and executors are, by repeated decisions of this court, held to be trustees of express trusts, and the law of trusts has been applied to them. *Jordan* v. *McKenzie*, 30 Miss. 32.

Indeed, there could be no reason founded in political changes, nor in a change in the laws of property, for altering a law, or for denying, or even mitigating, the rigorous rule which relates to the integrity of the administration of trusts. We are certainly not more enlightened on this subject than were the founders of the system of equity. There is no case to be found where a chancellor has aided a trustee, who has accepted and entered on the administration of a trust, to assail or appropriate the trust fund, or any part of it, unless he has accepted without the knowledge of his rights, and the absence of the means the diligent use of which would have enabled him to ascertain them.

We bring to the attention of the court the case of *Magee* v. *Keegan*, 35 Miss. 244, which is significant because, although the trustee had resigned his trust before he claimed the trust property, his conduct while a trustee was made the " single point " in the opinion, as it affected his title. Among the earlier cases are those in which the doctrine has been applied to executors and administrators. *Pomfret* v. *Windsor*, 2 Ves. 482.

The trustee enters as the protector of the property embraced in the trust against all the world, and he is not allowed to make spoil of it. He is in possession ; he has access to the

muniments of title and other advantages which strangers have not, and hence the court protects the property against him by a stringent rule, founded in a wise policy. It says to a man having claims upon the property, "Decline the trust; you cannot serve two masters."

The acquiescence in the disposition of the property by Joseph E. Davis is conclusive, under the circumstances of the case; and while the acceptance of the executorship under the will has this weight as evidence on the character of the possession, the insecurity of any claim he might have, the dubious nature of a claim without a conveyance, the assertion of title openly by his brother, who had obviously, for reasons of his own, retained it, tend powerfully to show that that acceptance was the result of a determination to yield to his brother's title, and to surrender any claim he might have.

*T. A. Marshall* and *W. P. Harris*, of counsel for the appellees, argued the case orally.

CAMPBELL, J., delivered the opinion of the court.

The actual possession of the land called "Brierfield" by appellant commenced in 1835 or 1836, and continued uninterruptedly to 1863, in the open and notorious and exclusive exercise by appellant of the completest acts of ownership and control of which the land could be the subject, and in a manner inconsistent with the right of any other person, with the knowledge of Joseph E. Davis, who repeatedly, and by the most unequivocal acts, *recognized the ownership of said land by appellant*, warrants the declaration that there was vested in appellant a full and complete title to it by virtue of the act entitled "An act to amend the several acts of limitations," approved February 24, 1844. Hutch. Code, 829. Although Joseph E. Davis sold "Hurricane" and "Brierfield" to Montgomery, and took security for the purchase-money payable to himself, he distinctly recognized and declared appellant's right to "Brierfield," and subsequently remitted to him the interest accruing on that part of the purchase-money

representing "Brierfield." It would be difficult ever to establish title to land by occupancy under claim of ownership, if the facts of this case are not held to do it. *Ford* v. *Wilson*, 35 Miss. 490; *Alexander* v. *Polk*, 39 Miss. 736; *Gladney* et al. v. *Barton* et al., 51 Miss. 216; *Magee* v. *Magee*, 37 Miss. 138; Tyler on Eject. & Adv. Pos. 864.

The precise circumstances under which appellant's possession of the land commenced are obscured by the lapse of forty years, and the light of contemporaneous facts is dimmed by the great distance of time from which we are called on to view them; but it is certain that appellant took possession, under some sort of right in himself, of a wilderness, felled the forest, cleared the jungle, erected fences and buildings, made the place his home, cultivated it, protected it by levees, had it assessed as his own, paid taxes on it, and enjoyed exclusive possession and control of it as his own from 1836 to 1863; and, in the uncertainty, if any, from the imperfect knowledge we have as to exactly how the possession began, appellant is entitled to the benefit of the just presumption that he was holding as owner, from having *acted so long*, and, *from the beginning, as owners do*, and so inconsistently with the idea of title in any other than himself. If the evidence negatived the idea that appellant first took possession in any other character than that of owner, the case would be different. Prior to the ratification by appellant of the sale by Joseph E. Davis to Montgomery, he was invested with a full and complete title to "Brierfield;" and after his assent to that sale, he had a valid claim against Joseph E. Davis for that part of the obligation given by Montgomery representing the purchase-money of "Brierfield."

Was appellant precluded from asserting this claim by the mere fact that he qualified as one of the executors of the will of Joseph E. Davis, assuming that the will disposes of all of the obligation of Montgomery? At common law an executor could *retain* the assets coming into his hands for his debt, and because he could do this he lost his claim if he had the oppor-

tunity to *retain* and did not.   By our law an executor is not
allowed to retain for his claim, but must probate it and stand
on the footing of other creditors.   If Joseph E. Davis had
received the purchase-money for "Brierfield," and died holding
it, he would have been debtor to appellant for money had and
received, and appellant would have been entitled to probate
his claim against the estate.

But Joseph E. Davis had not collected the purchase-money,
and at his death held the obligation he had taken for it.

It is established law that a trustee cannot avail of his posi-
tion to acquire title to the trust property adversely to his
*cestui que trust;* and cannot, by virtue of his position, obtain
any advantage for himself over his *cestui que trust;* and
cannot make profit for himself out of the trust estate;
and that his possession is that of the beneficiary, and
for his advantage and benefit; and that a trustee, having
obtained possession of trust property by virtue of his trust
character, shall not retain that possession against the claim of
the beneficiary when properly called on to surrender it.   But
no case in England or America has been found to hold that a
trustee may not appeal to the Chancery Court, to which he is
subject as a trustee, to adjudge his rights as an individual to
an interest in the trust property, not acquired since he became
trustee, nor in hostility to the *cestui que trust*, but had before
his acceptance of the trust.

Perry on Trusts, section 433, has the following, viz. :   "Un-
der no circumstances can a trustee claim, or set up a claim to,
the trust property adverse to the *cestui que trust.*   Nor can he
deny his title.   If a trustee desires to set up a title to the
trust property in himself, he should refuse to accept the trust."
All of the cases cited in support of this language accessible to
us have been carefully examined, and they do not sustain the
expression of the text in its full extent.   *Stone* v. *Godfrey*, 5
De G. M. & G. 76, decides that one may be estopped by his
conduct from maintaining a suit, and that possession obtained
in the character of trustee cannot be retained as one adverse

to the *cestui que trust* after the legal estate under which the possession was taken has determined. In the leading opinion the Lord Justice Knight Bruce assumed that Stone might have, "at any time between the majority and marriage of his daughter, filed a bill against her for the purpose of obtaining substantially the same relief as he is now asking, and upon the same ground," and that "he would have been entitled to succeed in his suit." This is a distinct admission of Stone's right to have sued his *cestui que trust*, and to have asserted his individual claim to the subject of the trust, although he had treated it as her property. But, as he had acquired possession of the land as trustee, he was disabled from saying that possession was for himself; and having slept on his rights from 1824 to 1852, and so acted as to induce the belief that his daughter's title was perfect, on the faith of which the position of others was altered so that it would have been great injustice to permit him to assert his claim, on well-settled principles he was held to be estopped from asserting his title.

*Pomfret* v. *Windsor*, 2 Ves. 476, *Kennedy* v. *Daly*, 1 Sch. & Lef. 381, *Conry* v. *Caulfield*, 2 Brod. & B. 272, *Shields* v. *Atkins*, 3 Atk. 560, and *Longley* v. *Fisher*, 9 Beav. 90, announce the doctrine that "fine and non-claim" will not bar a trust, on the principle that the trustee, having gained possession by means of the trust, shall not, *by means of that possession*, defeat the title of the person for whom he had the possession. In other words, that a trustee shall not take advantage of his possession — which is the *cestui que trust's* — and control of the trust estate, to cut off and bar the claim of the *cestui que trust* by alienation.

*Newsome* v. *Flowers*, 30 Beav. 461, declares that trustees, when sued by their *cestuis que trust*, cannot set up against them the adverse title of third persons. *Benjamin* v. *Gill*, 45 Ga. 110, is "put solely on the question of possession." The ancestor of defendants had "got possession of this land by virtue of his office as executor," and, when sued by his successor in the administration, they were not allowed to defeat the re-

covery of the possession by an adverse title. *Harrison, Admr.*, v. *Mock* et al., 10 Ala. (N. S.) 185, decides that a judgment-creditor, by accepting the position of trustee in a deed conveying to him slaves for the payment of creditors generally, including himself, waived the lien of his judgment so far as to preclude him from selling under his judgment; and to this effect are *Hawley* v. *Mancius*, 7 Johns. Ch. 184, and *Rogers* v. *Rogers*, Hopk. Ch. 523. The reason is that he has accepted a substitute for his right to proceed under his judgment, and must look to the substitute. *Godwin* et al. v. *Yonge*, 22 Ala. 553, holds that "it did not lay in the mouth of Godwin, who was a trustee, and had taken upon himself the trust, to allege fraud in the making of the deed as a defense to the relief sought as to him, which was only the reformation of the deed and the appointment of another trustee." It was a matter that did not concern him. *Henderson* v. *Segars* et al., 28 Ala. 352, decides that a trustee could not dispose of the trust property by sale, in direct opposition to the provisions of the instrument creating the trust, and refuse to account when called on. *Irby, Admr.*, v. *Kitchell, Admr.*, 42 Ala. 438, decides that an administrator who finds property among the assets of the estate and takes possession of it as such, having no claim to it himself, cannot refuse to account for it on the ground of an adverse title never asserted against him. *McLaren* v. *Spence, Admr.*, 6 Ala. 894, holds that one who was administrator of two estates was estopped from asserting, against one who had acted on his conduct, that certain property which he had treated as the estate of one of his intestates belonged to the other. *Manigault* v. *Deas*, 1 Bailey Eq. 283, decided that neither an executor nor his representatives could deny the title of his testator to property in his possession as executor, as against creditors of the testator, and could not acquire a title adverse to his by operation of law, and that the possession of an executor is not adverse to the estate so as to mature a title under the statute of limitations. *McLeran* v. *Melvin*, 3 Jones Eq. 195, holds that one who accepted the position of

trustee, under a deed settling property to the use of a married woman, could not afterwards subject that property to his ·demand against her husband, *subsequently accrued.* *Duncan* v. *Bryan*, 11 Ga. 63, announces that one who has accepted the office of trustee shall not, when called on by his *cestui que trust* to account, repudiate the trust. *Jones* v. *Butler*, 30 Barb. 641, holds that a trustee receiving property under a deed of trust cannot, when called on in equity to account, make objection that the deed was void, and on that ground retain the trust property to his own use. *The State* v. *Merrill*, 1 Chand. 258, decides that one who acquires possession of property as an agent cannot compel his principal and a third person to implead to determine their rights to it while he retains possession. *White* v. *Swain*, 3 Pick. 365, decides that an administratrix who received money as damages for an injury to the rights of her intestate, in virtue of her claim as administratrix was estopped to deny that it was the estate of her intestate.

Lewin on Trusts and Trustees, page 325, asserts " the general proposition that a trustee is under no circumstances allowed to set up a title adverse to his *cestuis que trust*," and refers to the same English cases cited by Perry, and to no others, which, as shown above, do not sustain the general proposition in all its comprehensiveness of statement. The review of cases cited from English and American reports shows that the broad assertions of Perry and Lewin must be qualified by the principles deducible from the cases they cite. No such doctrine is stated by Hill on Trustees, who puts it correctly, thus, viz. : " It is one of the settled principles of courts of equity that trustees shall not take advantage of their situation to obtain any personal benefit to themselves at the expense of their *cestuis que trust.*"

Perry on Trusts, in section 863, repeats the assertion that " no trustee, while occupying a place of trust and confidence, should be allowed to set up an adverse title," and proceeds at once, in the next section, to state a modification of the rule

to be " that if a trustee repudiates the trust by clear and unequivocal acts or words, and claims thenceforth to hold the estate as his own, not subject to any trust, and such repu- diation and claim are brought to the notice or knowledge of the *cestui que trust* in such manner that he is called upon to assert his equitable rights, the statute [of limitations] will begin to run," etc.; and this is well sustained by adjudged cases. If it be true that a trustee, by his own act, brought home to the *cestui que trust*, can, by lapse of time and opera- tion of law, bar and defeat the beneficiary, and hold the estate to himself thereby, on what just principle can it be denied to a trustee to resort to chancery, prefer his claim, summon the *cestuis que trust* and co-trustees to meet him on equal terms in this forum, and obtain the decree of the court as to his rights as an individual and his duties as a trustee, especially where, as in this case, it is by no means clear that the instrument creating the trust has made any disposition of the subject- matter of the claim of the trustee? The right of an executor to do as appellant did in this case has been expressly affirmed in *Saunders* v. *Saunders*, 2 Litt. 315, and it has been dis- tinctly recognized by this court in *Mc Willie* v. *Van Vaeter and Wife*, 35 Miss. 428, in which McWillie, who was executor, and had proved the will, creating him in express terms the trustee of certain slaves, when called on to deliver them to the legatee and *cestui que trust*, in accordance with the will, set up a claim of title in himself to the slaves, by virtue of a deed made to him by the testator before the making of the will; and his right to propound his claim was not questioned by counsel or court, although the case was very much consid- ered. Have the acts of appellant estopped him to maintain this bill? The acts relied on to do this are the recognition by him of the inventory of the assets of the testator, containing, among other things, the obligation of Montgomery and sons to Joseph E. Davis for the $300,000; that at a meeting of the executors, participated in by appellant, the whole $300,000 was recognized by him as having been disposed of by the will;

that he received commissions as executor; that he received interest arising from the whole fund, as guardian, for his children, and, as executor, paid interest arising from the whole fund to the other legatees; that he concurred in a resolution of the executors by which the whole fund is treated as assets, and which charges that fund with the expenses of the trust, and rendered accounts to the court in which the fund is thus treated, and took his commissions out of it; and he contracted in writing with the residuary legatees to accept payment of a demand in his own favor, against the testator, out of the residuary fund; and, in making this contract, recognized the residuary legatees as entitled to said excess.

These acts, severally and combined, fall short of being an estoppel, because no one was led thereby to act to his hurt in any matter differently from what he otherwise would have done. A man may controvert his admissions and his acts, so long as doing so will not cause injury to some one who has been induced, *on the faith of such admissions or acts*, to do what otherwise he would not have done, and who will be injured by permitting such admissions and acts to be questioned.

If there has been no alteration in the position of another, and no harm done by the acts of one, such acts do not constitute an estoppel, whatever weight may attach to them as evidence.

Injury to others, whose conduct has been influenced by the act or admission, as the result of such conduct so induced, is a necessary element, without which an estoppel will not arise. Herman on Estop., sec. 323 *et seq.*

There must be wrong, coupled with an injury that is the legal result of the wrong. *Ib.*, sec. 325.

Unless the act or admission has been the inducement to a course of action which would result in a loss if appellant were permitted to change his position and enforce the right which he seemed virtually to waive by his acts as enumerated, they do not amount to an estoppel. *Ib.*, sec. 327; *Turner* v. *Waldo*, 40 Vt. 57; *Hunley* v. *Hunley*, 15 Ala. 91; *Carter* v.

*Darby*, 15 Ala. 696 ; *Whitaker* v. *Williams*, 20 Conn. 98 ; *Wallis* v. *Truesdell*, 6 Pick. 455 ; 1 Greenl. on Ev., sec. 209.

It may be affirmed with confidence that no injury has resulted, or can result, to any one from any course of action induced by any act of appellant. The inventorying the obligation of Montgomery and sons, the recognition that the whole fund was disposed of by the will, the receipt of commissions, the receipt and payment of interest on legacies, treating the whole fund as assets, charging it with expenses and rendering accounts, are all acts quite independent of the legatees, and wanting in that essential element of an estoppel that the conduct must have been with the *intention* that others should act on it, or calculated to induce a reasonable man to believe it was so meant (Big. on Estop. 480), as well as in that other equally necessary element that others must have been induced *to act upon it*, and that injury will result from such action thus superinduced, if an estoppel shall not be held to arise. There was no *intention* that any one should act upon any of these things, nor does it appear that any one did so act. The inventory was required by law, and properly embraced the obligation of Montgomery and sons which was payable to Joseph E. Davis. The declaration of the executors that the whole fund was disposed of by the will was but an opinion; and the resolution to charge debts and expenses on the excess of the fund after payment of legacies was but the utterance of an intention to pay these things from this particular source.

The receipt of commissions, and the receipt of interest as guardian of his children, and the payment of interest to other legatees, were but in accordance with law, and possess none of the elements of an estoppel; and so of rendering accounts to the court.

These things did not induce any course of conduct as their legal result which requires that appellant shall be held to the waiver of his rights in order to prevent injury to those thus pursuing such course of conduct. There has not been an alteration of the position of any one to his injury in conse-

quence of these acts of appellant. If none of these things had occurred, the rights and the position of all concerned, as to the subject of this controversy, would have been the same they are now.

The contract made by appellant with the residuary legatees lacks an essential element of estoppel in that it in no way injured the legatees in reference to the subject of this suit. This contract amounted to an agreement by the residuary legatees to recognize appellant's claim so far as to consent for it to be paid out of the residuary fund after payment of taxes, general debts, expenses of administration, and interest on the legacies chargeable on the bond of Montgomery and sons; and on the part of appellant it was an agreement to accept payment of his $10,000 demand if there was anything left. This contract had no reference to anything but the $10,000 claim; nothing else was in the contemplation of the parties. Appellant has not received anything under it. Undoubtedly there is much in the conduct of appellant, before exhibiting his bill, which is inconsistent with his present attitude as a complainant; but we fail to find in it an estoppel to maintain his suit. It is not for us to find an explanation of the reasons for the course of appellant in withholding his assertion of his rights as he did, and proceeding with his duties as executor in a manner to signify that he waived his individual rights. As his conduct does not amount to an estoppel, it is to be considered only as evidence against the claim set up in his bill; but, as we have seen, the evidence of the right of appellant to claim that part of the obligation of Montgomery and sons representing the value of "Brierfield" is entirely satisfactory, and far outweighs the negative testimony arising from the passiveness of appellant as to his claim, and his acts in dealing with the estate.

It is evident that appellant hesitated to assert his claim, remained silent about it, and so acted as to negative the idea that he had any; but because of this alone he is not precluded from changing his purpose. *Langdon* v. *Doud*, 10 Allen, 433.

It is probable that appellant had deliberately resolved to submit in silence to the dispositions of the will, and to surrender his own claim, from considerations of delicacy or prudence; but a *locus pœnitentiæ* existed so long as he could change his course without being charged with having misled any one concerned to his prejudice by such former course.

The decree dismissing the bill is reversed, and the cause remanded, to be proceeded with in the Chancery Court in accordance with this opinion.

Upon the application of *Harris & George*, of counsel for the appellees, a reargument of the case was granted.

*Pittman & Pittman*, for the appellant.

Adverse counsel have a chapter in their printed argument headed " The Argument as to the Entry." When it is considered that the only evidence relating to the entry, that is — the beginning of the occupancy — as distinguished from the rest of it is that it was the result of an absolute gift, their boldness becomes admirable (?). Their argument is that the law presumes entry in subordination to title, and, therefore, the parol gift being ineffectual to convey title, Mr. Davis' entry and subsequent occupancy was permissive. This is known in logic as the fallacy of "*petitio principii*." It is no answer to this criticism to reply that the *onus* is on us to show that the entry was, in its inception, under a claim of ownership. We have conceded it. We have assumed that *onus*. We have borne it. We have shown that it was so understood by both the parties. We have shown that its occupancy, in its inception, was accompanied by unequivocal acts of ownership. There is no distinction between his occupancy at first and afterwards. His claim of ownership was coincident with his entry. His entry was in consequence of his having acquired a claim of ownership, and was the act of appropriation. By such an argument as we are criticising every adverse possession could be converted into a permissive one. When resort is had to adverse possession, it is because the party is without the means

of showing, by proof *aliunde*, that he had a legal right to make the entry. The entry and the continuous occupancy are not separate things, either in law or fact. They constitute, in law and in fact, one continuous act. The entry is but the beginning of the occupancy. The attempt to separate them into two distinct acts and facts is the purest sophistry. To say that " the character of the occupancy must be interpreted by the character of the entry, and the latter not by the former," is an ingenious and plausible, but specious, manner of saying that an occupancy must not be judged of by its own visible character when it begins, but that there must be proof *aliunde* to show why and how it begun. We say that, like all other facts, it may be shown either way. If we show a parol gift first, we thereby show the nature of the entry, and thus determine the character of the occupancy begun in pursuance of it. If we show an occupancy bearing in its inception all the characteristics of ownership, we then show its character, including the entry, which is but the beginning of it, by its own visible, inherent, and inseparable properties. The latter is the direct proof, the former is the showing cause of the entry; and, judging of it as an effect by the character of the cause, both modes are equally admissible and equally effectual. We have resorted to both, and our proof is compounded of the multiplied strength of these factors.

In replying to the arguments in support of the estoppel invoked against Mr. Davis, we will premise the following principles :

*I. Estoppels by Writing.* — 1. If the admission was itself the subject-matter of the contract so that it was the consideration given by one of the parties, then the estoppel is complete. ·

2. If the admission was not the subject-matter of the contract, though assumed either expressly or implied, it is conclusive for the purpose of the contract only, and then only so far as necessary to maintain its validity and enforce its obligation.

3. The acceptance of a mortgage or deed conveying one's own property is not an admission of right in the grantor, and, so far as it works any estoppel, it is limited to the purposes and objects of the instrument.

4. If a deception were used to obtain an executory contract, it would constitute an infirmity in the contract rather than an estoppel.

5. If such a contract should have been executed, the fraudulent deception would entitle the injured one to affirmative relief and reimbursement.

6. The alleged deception must have actually deceived.

7. It must, also, either have been actually intended to deceive, or the circumstances must have been such that the intention will be presumed.

8. The deception must have been the proximate cause of the contract.

*II. Estoppel by Matter in Pais.* — 1. The admission must have been made with a full knowledge of the right alleged to be precluded.

2. There must have been an intention to deceive and defraud, or there must have been an obligation to inform and prevent deception.

3. The party invoking the doctrine must have been in fact deceived.

4. The party deceived must, in consequence of the deception operating as a proximate cause, have been induced to a course of action which must result injuriously to his interest unless the estoppel is enforced.

5. The injury must be the immediate effect of the course of conduct to which the party was induced.

6. The admission must relate to a fact. If it is inferential, therefore, and may as well be referred to the intention to waive a right as to an admission of its non-existence, estoppel will not result.

7. "The injury must be co-extensive with the estoppel." See *Hawes* et al. v. *Marchant*, 1 Curt. 114.

8. And if it is not, the estoppel will be limited so as to compensate the injury if already sustained.

9. It is always a shield — never a sword; it is a fundamental rule that it operates to protect from loss — never to acquire a gain.

These principles and limitations furnish a complete answer to the arguments founded on estoppel, by whatever name it may be called. In the argument at the bar, our learned adversary, being pressed to point out the essential elements of estoppel in this case, denied that he rested his defense on the principles of estoppel, but said that it was founded in the doctrine of trusts. We are not particular about the name which is given to the defense, but we deem it proper to premise that a change of name is not an answer to an argument directed against an attempted misapplication of unchanging principles to unchangeable facts. These facts, whereby one may be precluded from showing the truth or asserting a right, must be such as to comprise in their relation certain elements essential to what is usually termed the doctrine of estoppel *in pais*, or equitable estoppels. Whether it be an estoppel by waiver, by election, by acquiescence, by ratification, by silence when one ought to speak — whatever form it may assume in the infinite variety of transactions and relations between men, the principle by which the estoppel is enforced is, in substance, the same. It is not the result of a statute, nor of precedents, nor of ancient maxims of the law, nor of inexorable rules of any kind. It had its origin in truth and justice, and has been sustained in its growth by a strong instinctive tendency in just judges to so administer the law that justice shall be attained in the particular case.

Joseph E. Davis sold the property of his absent and imprisoned brother, and took security in his own name, in a note given for that and some of his own property. He assumed to be acting in trust for Jefferson, and on that ground sought and obtained his ratification. Thus Jefferson Davis could never again recover his own property from the purchaser. He

could look alone to the fulfillment of this voluntarily assumed trust. Here were, indeed, all the elements of estoppel. *Collins* v. *Tillon*, 26 Conn. 374. Now, because Jefferson Davis accepted the office of executor, in compliance with the dying request of his brother, his legatees — mere volunteers and objects of bounty, benefited and not injured by the acceptance — repudiate the most sacred of trusts, assumed and recognized by their benefactor up to the last moment of his existence, claim to be released from an estoppel of the very highest dignity in law and in morals, and are, at the same time, clamoring about "fidelity to trusts." It is not attempted to show that there exists any just consideration for the confiscation of complainant's property, nor any for its donation to the defendants. He has done them no injury, by silence, waiver, acquiescence, or acceptance of trusts, for which he is called upon to compensate or indemnify them. He has not beguiled them into any act against the injurious effect whereof he is called upon to guard them, by transferring his own fortune to their use. He has not acquired an advantage over them so that they cannot defend against his claims if they are in any respect unjust or unconscionable. None of these things, which, as we have seen and are able to understand, sometimes justly preclude rights, are, or can be, asserted against him. The argument is that "the integrity of the whole round of fiduciary relations demands the application of the rule." It is called a "wise, conservative doctrine, venerable, nay, almost sacred, as it stands in the body of our jurisprudence." It is said to rest upon "broad principles," and its enforcement is a "great preventive and conservative remedy, founded in an elevated and enlightened judicial policy."

These are mere figures of speech, embodying sufficient beauty to attract, and sufficient force to impress, but not sufficient plausibility, it is hoped, to impose upon this high and learned court. The "purity and integrity of judicial administration" is a good thing, and "fidelity to trusts" ought to be enforced, in the interests of justice and morality, with an unfaltering

hand; but parties ought not to be heard in any court, seeking to make a conquest of another's property, on the pretense of upholding the "purity of judicial administration," or of enforcing "fidelity to trusts." This would be to "steal the livery of Heaven to serve the devil in," and would be enforcing "fidelity" after the manner of the natives of India, who threw the living body of the widow on the burning funeral pile of her dead husband. The application attempted to be made of this "doctrine of trusts" in this case is itself a refutation of it as contended for by defendants. The result of its application to this case reduces it to the *argumentum ad absurdum*. If any such "venerable doctrine" had come "down to us through many generations and a long line of decisions," we should confidently ask the court to lay it aside among the venerable rubbish of the past.

But the real doctrine, which is sought to be misapplied to suit the purposes of the defense, is just and reasonable. We desire no relaxation of the strictest rules, but rather a close adherence to every rule and to every doctrine which will insure a just judgment according to the very right of this cause. It has long been the greatest reproach to the common law that judges have acknowledged themselves so hampered by some of its rules of procedure and of administration that they were unable to give just judgments. Never before has a similar charge been made against our system of equity jurisprudence. The highest boast of its learned chancellors has been its unlimited power to do absolute justice. In this forum the shackles which unjustly impede one at law are dissolved, and fall to the ground. The hands of the weak are here strengthened, that they may wage a just cause in equal combat with the strong. Here the *feme covert*, the lunatic, the infant of the tenderest years, may be sued, and their rights may be adjudicated. Controversies between trustees and their *cestuis que trust* have been part of its original and peculiar jurisdiction from time immemorial. Its powers are adequate to do justice between all parties, whatsoever may be their re-

lations.    Misfortunes of mistake, error, and ignorance are
not beyond its power to relieve ; and the ingenuity of fraud
can invent no device which it may not strike down.   Its forms
and modes of procedure, and its rules and doctrines, are all
of its own creation, made to facilitate, not to impede or pre-
vent, the administration of justice.

The foundation of this argument, on what is called the
" doctrine of trusts," is a passage found in Lewin on Trust-
ees, page 325, to the effect " that a trustee is under no cir-
cumstances allowed to set up a title adverse to his *cestui que
trust.*"   This is Lewin's own saying, and is contradicted in
his next sentence.   In our argument before the court we
made a critical analysis of all the cases cited in support of
this observation, and we do not fear to assert that not one of
them sustains the text, if it is to be understood as meaning
broadly what it says.   From an examination of the cases
cited, we conclude that the text is to be construed as referring
to an attempt on the part of the trustee to set up a posses-
sion acquired as trustee as adverse, by claiming that his pos-
session was in his own right.   That, at most, is the extent to
which his citations go.   All of the cases cited in Lewin, and
all of those added by counsel, belong to one or the other of
the following classes :

1. Cases where the trustee undertook to set up his posses-
sion as adverse.

2. Cases where there existed the other essential elements of
an estoppel *in pais.*

3. Cases where the trustee sought to invoke statutes of
limitation and non-claim, on account of the duration of his
possession.

In all such cases the trustee is rightly estopped from claim-
ing the title to the property, for the purpose of showing that
his possession is to be referred to his claim of ownership, in
order to set up the bar of statutes, and thus actually acquire a
title.

The remedies afforded in the enforcement of rights are

themselves valuable rights, protected, in many instances, by the organic law. Hence it is no misnomer to speak of these remedies as rights. Where, however, it becomes important, as it now is, to distinguish the right from the remedy, the mental process necessary to accomplish it is so simple as to render any reasoning unnecessary, if not impossible. Keeping this distinction steadily in view, we assert with confidence that whenever an adjudication has been made by any court of respectable authority which seems to have declared the right of the trustee lost, waived, or forfeited by becoming a trustee, it has reference to a right to a remedy, and not a right as distinguished from a remedy.

The case of *Saunders' Heirs* v. *Saunders' Executors*, 2 Litt. 315, is a forcible illustration of the distinction which we take, and is a complete refutation of the idea that the trustee loses his property, and the *cestui que trust* is permitted to win it, by this novel " doctrine of trusts." This case, while denying the executor's right to sue his co-executors for property which had come to him as one of the executors, on the ground that his right of action was extinguished, and while denying his right to bring to his aid his long possession, with assertion of his individual claim, decided that he might maintain " a suit in equity to which the devisees, as well as the other executors, might be made parties, and obtain a decree quieting the claim, exempting the executor claiming from holding the estate in his fiduciary character, or accounting for the profits."

That the trustee yields his remedies merely, and no part of his rights, by becoming trustee, is illustrated by several of the cases cited by adverse counsel. The case of *Manigault* v. *Deas*, Bailey Eq. 283, illustrates three of the propositions of law and equity jurisprudence which we have contended for. The three head-notes marked " 2," " 3," and " 7 " contain a statement of them. The one marked " 2 " is simply based on the doctrine that the executor can make no profit. It is precisely analogous to the case cited in *Irby, Admr.*, v. *Kitchell, Admr.*, 42 Ala. 447. The syllabus marked " 3 " is on the question

of adverse possession, when an executor seeks to set it up. The case above cited from Kentucky elucidates the question fully. No executor can, of course, obtain title by length of possession. The possession follows the right, and will be referred to the character in which he holds it. . The syllabus marked " 7 " is a most emphatic refutation of the proposition of the defendants. An executrix was there allowed to insist upon, and establish, her own claim to the property against her testator. The. foregoing case of *Saunders' Heirs* v. *Saunders' Executors* is pertinent to other questions which have already been discussed. It discusses the following propositions :

1. The possession will be referred to the person in his character as executor or as an individual, as the right of the matter may appear. There can be no adverse possession, and neither the executor nor the estate can be barred by lapse of time.

2. The right to prosecute an action against the estate of a testator is extinguished by assuming executorship; and, therefore —

3. "If one of the executors claims in his own right part of the property of the testator which is in his hands as executor, his remedy is by bill in equity against his co-executors and the devisees;" and —

4. "An executor may retain as his own any article of his own property which comes to his hands as executor."

The cases of *Harrison, Admr.*, v. *Mock et al.*, 10 Ala. 185, *Hawley* v. *Mancius*, 7 Johns. Ch. 184, *Rogers* v. *Rogers*, Hopk. Ch. 523 — all citations of appellees — show that there is no loss of a right, but a waiver of a remedy. Justice and equity are still administered, and the trustee is permitted to have and retain whatever he may be entitled to, according to the very right of the matter.

For the purpose of torturing the compromise of the $10,000 claim into an estoppel, it is said by counsel for appellees that one of the considerations of the argument given by appellant was " the concession, as the basis on which the con-

tract was made, that all the debt of the Montgomerys belonged
to the estate, and that, at all events, the defendants should re-
ceive their specific legacies in full.'' Let us see what founda-
tion there is in the agreement or the record for such a state-
ment. Mitchell and Hamer, defendants, in their answer,
under oath, say that, at the time this contract was made, '' they
had no notice or suspicion that Jefferson Davis had, or claimed
to have, any interest in ' Brierfield,' or its proceeds.''

Now, in what sense can an admission on a subject of which
the parties to the contract now claiming the benefit thereof
were totally ignorant, be called a part of the consideration of
the contract, or a concession made for value? Yet upon this
fallacy rests most of the argument of the learned counsel on
this branch. According to their view, defendants were induced
to enter into a contract by a concession as to a claim of which
they had no suspicion, and that concession made after they
had signed an agreement not containing it.

Under a reasonable and proper construction of said contract
there is no agreement that the interest due by B. T. Mont-
gomery and sons shall be used to pay taxes, general debts, and
necessary expenses of the estate, and the interest on the re-
spective legacies made chargeable by the will upon the funds
arising from Brierfield and Hurricane plantations; but only
that these shall, out of the interest of the fund, have a pref-
erence of payment over the claim of the complainant then
being adjusted.

The fact that appellees '' had no notice or suspicion that
Jefferson Davis had, or claimed to have, any interest in the
' Brierfield,' or its proceeds,'' is not only conclusive against
the construction attempted to be put upon the agreement, but
the '' concession made for value '' becomes a physical and
moral impossibility. Such a pretense should justly draw sus-
picion on their complaints of being misled. Now, if it had
been true that this implied admission was the consideration of
the contract, if they had agreed to pay $10,000 in settlement
of the present claim of Mr. Davis, if his rights to the pro-

ceeds of " Brierfield " had been within the contemplation of
the parties, the subject-matter of this contract, the thing
settled and compromised, the argument would be good.   But
if it is argued, further, that although it is not true that this
implied admission was part of the consideration, yet that the
contract was made on the basis of the assumption that the
appellees owned all the proceeds of the land, this argument
proceeds upon a false theory of the law.   Its major premise
is not true.   Let us state it : Every fact treated as true in
a contract, though not of its essence or subject-matter, is for-
ever afterwards held to be conclusively true between the same
parties in controversies foreign to the subject-matter of the
contract.   We challenge the proposition as unsound in reason,
and as distinctly negatived by the text-writers and judicial
decisions.   The proposition will be true if you strike out the
words after " parties," and in lieu thereof insert the qualify-
ing words, " for the purposes of said contract — that is, to main-
tain its validity and enforce its obligation."

In Bigelow on Estoppel, page 286, it is said :  " The effect
of the estoppel, further, is limited to questions concerning the
deed.   That this limitation prevails, preventing the estoppel
from having a collateral effect, appears from many cases."
*Carpenter* v. *Butler*, 8 Mee. & W. 209 ; *Southeastern Ry. Co.*
v. *Warton*, 6 H. & N. 520 ; *Norris* v. *Norton*, 19 Ark. 319 ;
*Reed* v. *McCourt*, 41 N. Y. 439 ; Herman on Estop. 267, sec.
246 ; *Hays* v. *Askew*, 5 Jones L. 63.   In the last case Judge
Pearson said that, to render a recital an estoppel, even in a con-
troversy about the subject-matter of the deed, it must show
that the object of the parties was to make the matter a " fixed
fact," as the basis of their action.   In *Reed* v. *McCourt*, *supra*,
speaking of the same limitation, it is said that if the rule were
otherwise the term " odious "  " would but feebly express the
contempt which ought to exist against the rule."

Let it be answered, then, whether this estoppel has such
potency as to take the $70,000 away from Mr. Jefferson Davis

without compensation, and give it to the defendants without consideration. It becomes a question, then, whether this estoppel has such properties that it may impoverish one man to enrich another. We have always been taught to understand that estoppel never has bettered any man's condition; that it never has armed one with a sword with which to make conquests, but only with a shield with which to defend that which is already his. Where a third person has made off with money or goods or property, it settles who shall sustain the loss between the two others, in a proper case; but never, under any circumstances, where no loss is necessary, does it take from one and give to the other. If this effect results from an attempted application, it is a waste of time to reason, to consult authorities, to consider arguments. If the compass should point to the rising sun, no one would give credence to its indication. It is impossible to conceive a case where one could be tricked out of his estate by estoppel, so that it would go to another as a clear gain. The one might well lose it by negligence or fraud, or attempted fraud, but never by an estoppel set up against him by a person thus seeking to add it as an acquisition and accretion to his own estate.

From the inception of this case complainant has been confronted at every step by this hydra-headed monster, estoppel — professing to hold only a shield, but always wielding a sword; pretending to protect only, but always reaching out to grasp; now seeking, under the guise of a rigid executioner of the law, to capture and appropriate, by reason of its inexorable rules; again, proclaiming itself the minister of pure morality and justice, asking to be made rich at appellant's expense, to vindicate the principles of abstract right; now asking for his property the better to maintain the fidelity of trusts and the pure administration of the law.

In whatsoever guise he has appeared, bristling with the keenest weapons of offense concealed beneath his armor-plates, talking of reason and logic, yet ever seeking to delude by fallacy

and sophistry, he is always striving — now boldly, now insidiously — to acquire appellant's property, by every effort which ingenuity can devise, and with every argument which can be suggested by the exigencies of a relentless purpose.

So surely as we may know a tree by its fruits, so surely do we know this is no estoppel.

*W. B. Pittman* and *A. B. Pittman,* counsel for the appellant, again argued the case orally.

*Harris & George,* for the appellees, filed a brief too elaborate to be condensed into suitable space for publication.

*Marshall & Barclay,* on the same side, also filed an elaborate brief.

*J. Z. George* and *T. A. Marshall,* of counsel for the appellees, argued the case orally.

CHALMERS, J., delivered the opinion of the court.

On November 19, 1866, Joseph E. Davis sold to Montgomery and sons two contiguous plantations, in Warren County, known respectively as " Hurricane " and " Brierfield," for the sum of $300,000, due in ten years, with six per cent interest from date, the interest payable annually. The bond of the purchasers was taken for the principal sum, and nine notes of $18,000 each, due at the expiration of each year, were delivered for the interest; and, to secure payment of the whole, a mortgage was executed on the property conveyed. The bond remains wholly, and the notes partially, unpaid, and Jefferson Davis brings this bill against Montgomery and sons, and the personal representatives and 'legatees of Joseph E. Davis (now deceased), seeking to recover in his own behalf such portion of the sum due as represents the value of " Brierfield," alleging that he was, and that Joseph E. Davis was not, the owner of that plantation.

He is himself one of the executors of the last will and testament of Joseph E. Davis, by the terms of which the whole of these notes are supposed to have been devised to the spe-

cial and residuary legatees named in the will. Was Jefferson Davis the legal owner of " Brierfield? " If so, he is entitled to the relief prayed, unless his conduct has been such as to estop him from claiming his own, or unless his position as executor forbids the assertion of his legal rights. Three questions, then, are presented by the record : First, was Jefferson Davis the owner of " Brierfield? " Second, has his conduct been such as to estop him from claiming its proceeds ? Third, Does his position as executor debar him from asserting his rights? Each of these questions depends upon facts and principles distinct from, and independent of, those which control the others ; and nothing but confusion can result from mingling them together.

We will address ourselves, first, to the question of ownership, as being the primary and fundamental one in the case.

It is admitted on one hand that Jefferson Davis held actual possession of " Brierfield " for nearly thirty years. It is admitted on the other that he had no deed nor any written obligation to convey the title, but that the record or paper title was always in Joseph E. The claim on his behalf is that he entered under a parol gift from Joseph E., which was either wholly gratuitous, or partly gratuitous and partly in liquidation of an indebtedness due him from Joseph E., and that the possession taken under this parol gift ripened, by lapse of time, into a perfect title. The claim on the other hand is that he entered and held by permission of Joseph E., in subordination to his title, with an express or implied understanding that he was to enjoy the possession and usufruct as long as he chose, but without claim of ownership; or any pretense of right adverse to the record-title. It is conceded on one side that, if he entered as tenant, his long possession gave him no title. It cannot be denied on the other that, if he entered as owner, his title became perfect and indefeasible by virtue of the act of 1844. Hutch. Code, 829. Our predecessors have twice declared that that statute was something more than

a statute of limitations ; that, by its terms, " ten years' actual adverse possession by any person claiming to be owner" gave a perfect title, which could be asserted after the possession had been lost, in any court, or in any proceeding whatever. *Ellis* v. *Murray*, 28 Miss. 129 ; *Ford* v. *Wilson*, 35 Miss. 504. There must, however, be " an actual adverse possession," " by a person claiming to be owner ; " and the rules of law which determine the meaning of these words have not been altered by the statute.   Before entering upon an investigation of the facts it will be well to glance, for a moment, at such of those rules as bear upon the present controversy.

To acquire a title by possession two things must concur, to wit, an occupation, actual or constructive, and a claim of ownership.   Neither is effectual without the other.   No continuance of occupation, no matter how long protracted, will avail unless accompanied by claim of title ; and every presumption of law is that the occupant holds in subordination, and not adversely, to the true owner.   Not only does the law presume that he who has entered without title has done so in recognition of, and subordination to, the title of the owner, but, having affixed this *prima-facie* presumption to his entry, it will not allow him to convert it into an adverse one except by acts which plainly demonstrate its hostile character. Where the entry is shown to have been permissive, its origin will give tone and character to all subsequent acts ; but where the nature of the entry is unknown, its character may be determined by the subsequent acts, the legal presumption always being in favor of a subordinate entry and holding.

It devolves, therefore, upon him who claims that his possession has been adverse to establish that fact to the satisfaction of the court or jury.   This he may do in many ways. Where his occupation has been constructive only, it is usually necessary to show an entry under some documentary muniment or color of title, though it need not be perfect or valid. But where his occupation has been actual, open, and noto-

rious, it may be shown to have been adverse by his acts, or even by his declarations, where these so connect themselves with his possession as to amount to verbal acts.

The acts and declarations do not, of themselves, constitute adverse possession, nor can they change a permissive into a hostile occupancy, but they are evidence of the character of the possession ; and if sufficiently decisive, and not shown to have been commenced or continued in recognition of the true title, they may afford sufficient proof to establish a title by limitation.   Tyler on Eject. 864 ; *Humbert* v. *Trinity Church*, 24 Wend. 587 ; *Smith* v. *Teller*, 1 Johns. 180 ; *Ford* v. *Wilson*, 35 Miss. 505 ; *La Frombois* v. *Smith*, 8 Cow. 587.

What acts will suffice to evince an adverse holding must depend on the circumstances of each case.   They must be such as indicate title rather than tenantry, ownership rather than dependence.

In old and well-settled countries the cutting of timber, the digging of turf, and the like have been held sufficient.   *Stanley* v. *White*, 1 East, 332.

Everywhere it will be agreed that entering upon wild land, reducing it to cultivation, building fences, erecting houses, draining marshes, assessing it and paying taxes in the occupant's own name, and continuously occupying it as a family residence for a long series of years, are potent circumstances, and, as between strangers, in the absence of other evidence, will usually be accepted as conclusive proofs of an adverse holding.   Ang. on Lim., sec. 391, and note ; *Overfield* v. *Christie*, 7 Serg. & R. 177 ; *Lessee of Payne* v. *Skinner*, 8 Ohio, 159 ; *Bowman* v. *Grubbs*, 26 Ind. 419 ; *Kent* v. *Harcourt*, 33 Barb. 491 ; *Ford* v. *Wilson*, 35 Miss. 505.

Among relatives, and especially between those occupying parental and filial, or *quasi*-parental and filial, relations, these circumstances would not be deemed so convincing, because they may be consistent with a mere permissive enjoyment of a usufructuary possession.   But if to acts like these, upon the

part of the occupant, there be added evidence of a parol ·gift by the owner, coupled with subsequent acts on his part in recognition of ownership in the occupant, no reason can be perceived why these circumstances should not be held as satisfactory between relatives as between strangers.

No principle is better settled than that a parol gift of land may ripen, by actual possession, into a perfect title.   An entry under such a gift, though permissive and friendly in the popular sense, is hostile and adverse to the paper title in a legal sense — that is to say, it is an assertion of ownership in the occupant.   *Sumner* v. *Stephens*, 6 Metc. 337 ; *Syler* v. *Eckhart*, 1 Binn. 378 ; *School District* v. *Blakeslee*, 13 Conn. 227 ; *Moore* v. *Webb*, 2 B. Mon. 282 ; *Comins* v. *Comins*, 21 Conn. 413 ; *McGee* v. *McGee*, 37 Miss. 138 ; *La Frombois* v. *Jackson*, 8 Cow. 589 ; *McCall* v. *Neely*, 3 Watts, 72 ; *Ashley* v. *Ashley*, 4 Gray, 197.

Undoubtedly, a parol gift of land, as affording the basis of a title made perfect by lapse of time, may be shown by parol. Undoubtedly, if the death of the donor, and the legally imposed silence of the donee, render it impossible, with absolute certainty, to demonstrate the gift by showing the exact time, place, and words at which and by which it was made, we may resort to the acts of the parties, and to their declarations where adverse to their interest, or where so made as to become a part of the *res gestæ*.

Let us apply these principles to the facts of the case, with a view of determining whether Jefferson Davis entered upon, and held, " Brierfield " as owner, or as tenant at will of his brother, addressing ourselves first to a consideration of the facts up to the time when the property fell into the hands of the United States government, and then to those thereafter transpiring.

Joseph E. and Jefferson Davis were brothers.   The former was twenty years the senior of the latter, and, in many respects, stood *in loco parentis* to him.   He was already a middle-aged man, of large wealth, a retired lawyer, living at " Hurricane,'"

when, in 1833, Jefferson, who had resigned a commission as lieutenant in the United States army, came to reside here. Jefferson was possessed of no visible property save one negro man, but he had an unsettled claim against his brother for his interest in the paternal estate, which had been appropriated by Joseph E. The amount of this claim is not known, but it was not large. "Hurricane" at that time consisted of 4,000 acres. In 1835–6 Jefferson took possession of that portion which, from that period, received and bore the name "Brierfield." It embraced 800 or 900 acres, and, from its first occupation by him, was segregated from "Hurricane" by boundaries distinctly marked and frequently pointed out by the two brothers to various persons. When Jefferson took possession, it was a wilderness and a jungle. He held it by the *possessio pedis* for twenty-seven years, and converted it into one of the most highly improved and productive plantations in the state.

In favor of the theory that his occupation was in subordination to the paramount title of his brother, the following facts are relied on:

1. No written evidence of title was ever delivered, though both the brothers were men of high intelligence, and must have known the necessity of such a writing.

2. The *quasi*-parental and filial relations that existed between the brothers is eminently suggestive of a permissive enjoyment of the possession and usufruct only, and is consistent, it is said, with all the subsequent acts of the parties.

3. Joseph's slaves assisted largely in the early clearing of the land and building of houses. He aided, also, with his money in the erection of the more costly residence that was afterwards built; and this house, as originally planned, was intended to form a double tenement, so as to afford a home for a widowed sister of the two brothers. This scheme was abandoned during the erection of the house, and the sister never resided there.

4. Though Joseph usually spoke of "Brierfield" as the property of Jefferson, he told his friend Hon. John Perkins, in a private conversation in 1855, that he had never conveyed the title, and that he, and not Jefferson, was the owner of the property. He expressed a repugnance to its ever falling into the hands of Mrs. Jefferson Davis, or any member of her family. The brothers were not friendly at this time, on account of a misunderstanding originating through Jefferson's wife.

5. Mrs. White, a niece of the two brothers, testifies that, though the place was usually spoken of as Jefferson's, it was well known in the family to be the property of Joseph.

In 1852 she heard the wife of Joseph, at a time when he was quite ill, urge him to make a deed to Jefferson, which he refused to do. Neither Jefferson nor any member of his family was present, and there existed at the time an entire, though temporary, alienation between the brothers.

This witness also testifies that in 1870, a short time before the death of Joseph E., she urged Jefferson to apply to him for a deed, which he declined to do, through motives of delicacy, as he said; but after his brother's death he expressed to her his regret that he had not acted on her advice.

6. In 1847 Joseph E. filed, under oath, a bill in the Chancery Court of Warren County, enjoining the collection of a levee tax which had been assessed against "Hurricane" and "Brierfield," in which he set forth the lands composing both as being his property. Jefferson was at the time in Mexico, though he returned before the conclusion of the suit. Joseph was acting, during his absence, as his general agent, and there was annexed to the bill an exhibit showing that the tax on "Brierfield" was assessed against Jefferson. The suit progressed after Jefferson's return without interference or intervention by him.

These, we believe, comprise all the facts occurring previous to the seizure of "Brierfield" by the Federal authorities

which tend to show continued ownership in Joseph. It is at once apparent that several of them, however pertinent to other questions in the case, are not admissible on an issue of title, since nothing is better settled than that title cannot be affected by the acts or declarations of a party not in possession, where uttered and done in his own interests, and not in the presence of the adverse party.

All testimony in relation to them was, on this ground, objected to in the lower court.

The facts which indicate that Jefferson held in his own right, and not as tenant of his brother, are as follows:

1. During his long occupation he had no other home. The land, when received, was wholly wild, subject to inundation, and differing in no respect from government lands, to be procured readily at $1.25 per acre. It constituted, as Joseph E. said, many years afterwards, "a gift of but little value until improved by Jefferson." He devoted the best years of his manhood, and expended twenty times the value of the land, in clearing, and fencing, and draining, and leveeing, and building upon it. He assessed and paid taxes on it as his own, and always so spoke of it, both to Joseph E. and to others. By a will prepared in 1846 he devised it. Indeed, no act of ownership higher than those habitually exercised by him can be conceived of, save a sale of it, and his right to do this seems to have been conceded by his brother, as will be hereafter seen.

2. Nineteen witnesses testify to the general repute, within and without the family, that he was owner, and to the fact that he was always so spoken of by Joseph E. and by the world at large. These witnesses embrace former slaves of both brothers, the overseers, commission merchants, and mutual friends of both, a daughter and son-in-law of Joseph E., a brother-in-law, and four nephews and nieces. Outside the family it was not known that no deed had been made. Within the family a knowledge of this fact does not seem to have

affected the general understanding that Jefferson was owner. Mrs. Stamps (a niece by marriage of the two brothers) expresses what seems to have been the general understanding in the family. After stating that Jefferson held as owner, and not as tenant, she says: " My answers are derived from my connection with the Davis family, among all of whom it was a matter of common repute, universally conceded, that Mr. Jefferson Davis was the owner of ' Brierfield,' and I never heard that fact called in question or doubted by any one ; so that I may say the repute of such ownership was general, both in and out of the family.   *   *   *   It was understood and reputed among the family that Jefferson Davis was the real and actual owner of ' Brierfield,' though the title was nominally in Joseph E. Davis." The testimony of the other relatives, except Mrs. White, is substantially the same.

3. Joseph E. Davis habitually spoke of " Brierfield " as " Jefferson's place," both in ordinary conversation and upon occasions calling for accurate language. During Jefferson's frequent and protracted absences in the public service, Joseph sometimes acted as agent for his brother, and at other times the agency was devolved upon others. While acting as agent, his letters, drafts, and orders relative to " Brierfield " were always signed "Jefferson Davis, by J. E. Davis." Many such are in the record. He gave it in to the tax-assessor as Jefferson's property, and paid taxes on it in Jefferson's name. When other persons were acting as agents, he explicitly refused to interfere in any manner with the plantation. Soon after Jefferson's marriage (which occurred in 1845), and while he was in Mexico, one of the daughters of Joseph E. twitted Mrs. Jefferson Davis with the taunt that her husband owned nothing, and was dependent on his brother. Stung by the remark, Mrs. Davis sought her brother-in-law and demanded to know, explicitly and distinctly, whether he or her husband was the owner of " Brierfield." He assured her that Jefferson was owner, saying that he had given it to him. He prepared the

will, in 1846, by which Jefferson devised " Brierfield." Many years after this will had been destroyed, Mrs. Jefferson Davis, who regarded it as unjust towards herself, taxed her brother-in-law with having instigated it. He resented the charge with warmth, declared that he had only put it in legal shape at his brother's request, and said that it was most unjust that he should be held responsible for the disposition that Jefferson had seen fit to make of his own property. In 1852, during a temporary alienation between the brothers, Joseph E. made a written proposition to purchase " Brierfield " from Jefferson, which the latter, in writing, declined.

4. Besides the habitual declarations of Joseph to the effect that he had given " Brierfield " to Jefferson, he so stated with great particularity to William Stamps, who had married a sister of the two brothers. When Jefferson left the army, in 1833, Stamps, who was a man of wealth, proposed to advance him $10,000 with which to buy a plantation. Joseph E. objected, and broke off the negotiation, saying that " he intended to do better by Jefferson than that." Two years afterwards Jefferson took possession of " Brierfield." A little later Stamps applied to purchase a portion of " Hurricane." Joseph E. replied that, having given " Brierfield " to Jefferson, he had no land to spare. He said that he had given " Brierfield " in consideration that Jefferson would leave the army and settle near him, because he loved him as a son. This witness also establishes the fact that Joseph E. was, before the gift, indebted to Jefferson, but does not fix the amount.

It seems impossible to resist the conclusion, from this testimony, that Jefferson Davis held " Brierfield " in his own right, and acquired a perfect title by limitation. Not so to conclude would seem equivalent to declaring that no possession could give title without a writing.

Stress is laid by appellees upon the fact that Joseph E. Davis assisted to build the residence, and that it was designed

to give shelter to a widowed sister.    It is proven that this
arrangement was proposed because of the fact that Jefferson
had, at the time, no children, and was much away from home.
The plan did not originate with Joseph E., nor was he con-
sulted when it was abandoned at the mutual instance of the
sister and of Mrs. Jefferson Davis.    It is said that Jefferson
should have intervened in the suit for the injunction of taxes
assessed against "Brierfield," and should have asserted his
own title.    It is impossible to see what principle sanctions
such an idea.    The suit did not involve title, and could be as
well prosecuted by his brother as by himself.    That his brother
chose to state the title as shown by the records, rather than as
it really existed between the brothers, could not possibly affect
Jefferson's rights.

It is urged, with much more force, that it is incredible that
men so intelligent should have undertaken to convey title to
land by parol.    The suggestion loses, perhaps, some of its
strength from a consideration of the fact that, though Joseph
E. Davis had entered the land as early as 1812, he himself
obtained no patent for it until after the close of the Civil War,
in 1865.    This shows, at least, great carelessness and indiffer-
ence about paper evidences of title.    But, apart from this, the
books abound with cases of parol gifts of land ripened into
perfect titles by occupation, in all of which written convey-
ances had, by negligence or otherwise, failed to be delivered ;
and we have seen no case that strikes us as more satisfactory
upon the facts than this.

If Jefferson Davis had remained poor and dependent upon
his brother, we could perhaps understand a willingness upon
his part to remain a pensioner upon that brother's bounty or
caprice.    But the record shows that he rose as rapidly in fortune
as in fame.    While successively a colonel in the Mexican War,
member of Congress, United States senator, and secretary of
war, and filling all of these high places with distinguished abil-
ity, his increase in wealth was not less marked.    In 1860 there

were largely more than a hundred slaves on "Brierfield," which, with other personal property there, must have been worth $100,000. The annual cotton crop was from 400 to 450 bales, worth more than $20,000 per annum. Many years before this he had been able, at one time, to allow his brother the use of $10,000 of surplus cash lying in the hands of his commission merchant. The residence at "Brierfield" was expensive, and fitted up with marble mantels — a thing unusual in country houses in this state. The grounds were adorned with shrubs and trees imported from foreign lands. That such a man should have created and lived in such a home for more than a quarter of a century without claim of right, and wholly at the mercy of a brother with whom, despite a mutual affection unusually devoted and tender, there were not wanting more than one period of coldness and estrangement, seems to us far more remarkable than the carelessness which omitted to have the parol gift evidenced by a deed.

We pass to a consideration of the facts occurring after the seizure of "Brierfield" by the Federal government. In 1863 both "Brierfield" and "Hurricane" were taken possession of by the officers of the Freedman's Bureau, Jefferson Davis being at the time in Virginia, as president of the Confederate States, and Joseph E. a refugee in Alabama. Both plantations remained in the occupation of the Bureau during the war.

On October 20, 1865, Jefferson Davis — then confined, on a charge of treason, in Fortress Monroe — wrote a letter to his wife strongly advising against the return of Joseph E. (who was still in Alabama) to "the river place." He says: "All is changed. He [Joseph] will be troubled beyond his strength by the confusion which must exist. An agent will suit the new *régime* much better than the old one. If he goes back, why not take the Brierfield house? He can claim possession as the owner of the land. But my decided opinion is that, in the existing condition of things, neither he nor Lize [his granddaughter] should stay there."

Why Jefferson suggested that Joseph E. should occupy "Brierfield" rather than "Hurricane" does not appear. Whether he meant by Joseph "claiming possession of 'Brierfield' as owner of the land," that he was entitled to possession as owner against himself, or only that he could assert the claim in order to obtain possession from the Federal government, is left to conjecture.    It is shown that this, like all his other letters while in prison, was subject to the inspection and strictest scrutiny of his captors.    Mrs. Davis forwarded a copy of the letter to Joseph E.    No action was at the time taken by him in relation to the suggestion contained in it, for the reason that he was then unpardoned for his own participation in the Rebellion.    Not until September 8, 1866, did he receive his pardon, and on the same day he made application, in writing, for the restoration to himself, as owner, of all the lands embraced both in "Hurricane" and "Brierfield."    The application was carried to Washington and laid before President Johnson by appellee Bowmar, as the agent of Joseph E. Davis.    While the application was being prepared, Dr. Bowmar said to Joseph E. Davis, "How about 'Brierfield?'" Bowmar thus details what followed:    "He simply answered, 'The title is in me.'    I had told him that it would be necessary to show title.    He said that the title was in him; that he had never conveyed it.    I said nothing more about it.    I supposed that all that he wanted was to get possession of the land. *   *   *    There was reason to conceal from the Federals any right that Jefferson Davis had to the land.    Mr. Davis was in prison, and it was generally believed that his property would be confiscated, if nothing worse happened.    *   *   * My impression was that he [Joseph E. Davis] wanted to protect his brother from loss."    Being asked if he meant loss by confiscation, the witness answered, "Yes."

We think that Dr. Bowmar's theory was the true one, and that Joseph E. Davis simply took advantage of the outstanding record-title in himself to recover the land for his brother.

It is insisted, with an earnestness that excites surprise, that such a suggestion is dishonorable to the parties concerned, and is inconsistent with the lofty integrity that the record establishes for Joseph E. Davis, and which history attests for Jefferson. We have no right to assume that Dr. Bowmar's sense of honor was less acute than that of his friend and testator. He was the active agent in carrying out the scheme, and he tells us quite distinctly what he supposed its object was. The truth, doubtless, is that in the eyes of Joseph E. Davis and Dr. Bowmar, as in those of millions of their countrymen, Jefferson Davis' person and property were alike held in custody for the commission of deeds which lacked nothing save success to crown his name with immortality ; and, if so, they probably thought it no more dishonorable to save his property than it would have been to rescue his person.

Fictitious claims and conveyances of property among the adherents of unsuccessful rebellions, in order to save it from confiscation, have marked the history of all ages and countries. We are not aware that the sternest historians or the most austere moralists have ever regarded them as indicative of personal dishonor.

Joseph E. Davis obtained possession of "Hurricane" and "Brierfield" in July, 1867 ; but in June preceding he had consulted Mrs. Jefferson Davis about selling "Brierfield" to Montgomery and sons, giving as a reason that her husband would never be released from prison, and that she could not occupy it, in the changed relations of things, without him. She opposed the sale, but said that the Federal authorities had promised to allow her to visit her husband in a short time, and that she would consult him on the subject. It appears by subsequent developments that she did consult him, and received his assent to the sale. In November following, the sale of the two places jointly was made, the bond and notes in controversy were taken, payable to Joseph E. Davis, who

executed a deed in his own name to both places, and received
a mortgage back to protect the payments. · Either at the time
of the sale, or sometime afterwards (Montgomery makes two
statements as to the time), Joseph E. Davis stipulated with
the vendees that if Jefferson should ever be released, and
should desire to reoccupy ·"Brierfield," the sale as to it should
be rescinded.

Mrs. Mary Stamps, who had married a nephew of the two
brothers, obtained permission, a few weeks after the sale, to
visit her imprisoned uncle. Joseph E. Davis met her in the
city of Jackson; he charged her (in her own language) "to
tell Jefferson that, as the duration of his then imprisonment
was uncertain, he had acted for him, in the sale of 'Brier-
field,' for what he considered his best interest; that the sale
was made subject to his [Jefferson's] approval; and he ex-
pressed an earnest desire that his brother should communicate
with him on the subject."

Mrs. Stamps delivered the message to Jefferson Davis, and
brought out and handed to Joseph E. an unsigned written
memorandum from Jefferson. In this, after alluding to the
fact that all correspondence was prohibited, he states that he
had already sent word, by his wife, "that any arrangement
which you [he] made with Ben [Montgomery] would be agree-
able to me" [him]. He alludes to the malignity of his· ene-
mies, and suggests that the sale "be closed soon, and tightly."
He expresses the opinion that Montgomery will never be able
to pay, and that the land will revert. "Then," says he, "it
may be that a better state of affairs will render the·property
valuable to your heirs."·

It is insisted that the words "valuable to *your heirs*" show
a disclaimer of any interest in himself. The circumstances
under which they were written seem to suggest a sufficient
reply.

. Extracts from two letters written by Jefferson after his re-
lease are contained in the record, in both of which he reiter-

ates the belief that Montgomery will never complete his pay-
ments. In one of them he suggests that, in this event, "some
man of capital could be found to take the lands and secure to
you [Joseph] a revenue free from vexatious attention on your
[his] part." This sentence is immediately preceded by one
which says, "I have thought of it [the high price of cotton]
as bearing on your prospects *at the 'Hurricane.'*" No special
reference is made to "Brierfield." The other letter, written
in 1868, seems to have been in response to one communicating
the fact that Montgomery desired to abandon his entire con-
tract, a proposition which Jefferson styles "preposterous, after
having enjoyed so long all of its advantages without having
met its obligations." In this letter occurs this expression :
"It is also within his [Montgomery's] ability to see that he
had better retire with the means he has acquired by the pos-
session of your property, and engage in small trade."

It is insisted that the expression "your property" shows
that the writer claimed nothing for himself. We cannot see
that he was called upon to assert a claim which had been so
uniformly recognized by his brother. The letter seems to be
a reply to one which communicated Montgomery's wish to
abandon the contract, and this would imply that he was regu-
larly advised and consulted in relation to the matter. The
bill distinctly charges, and the answer admits in implied, if
not express, terms, that year by year, as long as Joseph E.
Davis lived, Jefferson's proportion of the annual payments
made by Montgomery was regularly remitted by his brother.
In the face of facts like this we cannot regard this isolated ex-
pression in the letter as important. Indeed, the letters show,
as does every other fact proven, that from the time when
Montgomery first proposed to purchase, in June, 1866, up to
Joseph's death, in 1870, no step was taken, no proposition
submitted, in reference to "Brierfield" which was not promptly
communicated to Jefferson. It is impossible to see how his
rights could have been more clearly recognized.

Our opinion is that Jefferson Davis held "Brierfield" as owner, and that there is no competent legal evidence in the record showing that Joseph E. ever questioned or impugned his title as such up to 1865. From that time until his death, to the world at large, he asserted the outstanding record-title that was in him; but to his brother Jefferson, by seeking his consent to the sale in advance, by promptly communicating information of it when made and asking his approval, and by regularly remitting his proportion of the annual payments received, he continued to recognize his brother's rights up to the making of his will, in 1869. This brings us to the question of estoppel.

Has Jefferson Davis' conduct been such as to estop him from a prosecution of this suit?

Joseph E. Davis died in the summer of 1870, Jefferson Davis being at the time a resident of Tennessee. In his last will and testament, executed the year previous, he makes no allusion to any right of Jefferson in the Montgomery notes, but bequeaths something less than a fourth of them to Jefferson's children, and the balance, as we assume, to his own grandchildren, Mrs. Hamer and J. D. Mitchell.

There was much other property, real and personal, devised to various other persons. Of this will, Jefferson Davis, J. H. D. Bowmar, and Joseph D. Smith were appointed executors.

When Jefferson Davis was made aware of the terms of his brother's will, he expressed to his co-executor Bowmar his dissatisfaction, and, upon something being said about the generous bequest to his own children, remarked that it was a generosity at his expense. From that time to the bringing of this suit he gave no further token of dissatisfaction, and during the three years and a half that intervened his conduct was in every respect antagonistic to his present position. He qualified and gave bond as executor; he united in an inventory in which the Montgomery notes were returned as assets of the estate; he took part in spreading upon a journal kept by the executors a memorandum recognizing those notes as

the property of the legatees ; and he assisted in taking from Montgomery a further mortgage to secure them. In every way possible he recognized that the testator had disposed of them without regard to any claim of right on his part. Is he thereby estopped from asserting such claim? Estoppel is a preclusion to show the truth. It is of the essence of the doctrine that the conduct relied on as an estoppel should have induced some *action*, on the part of the person pleading it, which will be injurious to him if the party guilty of the conduct is permitted to show the truth. As expressed in *Patterson* v. *Lytle*, 11 Pa. St. 53, "The principle runs through the whole doctrine of estoppel that a man is only prevented from alleging the truth when his assertion of a falsehood, or his silence, has been the inducement to *action*, by the other party, which would result in loss if the opponent was permitted to gainsay what he had before asserted, or by his acts induced the others to believe."

As expressed by Cooley, J., in *Meister* v. *Birney*, 24 Mich. 435, "There can be no estoppel unless the plaintiff was induced to take *some action* in reliance upon the statement, which he was not legally bound to take, which otherwise he would not have taken, and which will result to his detriment if the statement upon which he relied is allowed to be disproved."

The same doctrine has been quite as strongly announced by us in two recent cases, where the facts seemed earnestly to call for the application of an estoppel, but in both of which we refused to apply it because it was not shown that the other party had been entrapped into any affirmative action. *Staten* v. *Bryant, ante,* 261.

Save a circumstance to be presently noticed, there is no pretense that the legatees of Joseph E. Davis have been induced to take any action whatever, in reliance upon Jefferson Davis' admissions that they were the exclusive owners of the fund in controversy. No such action on their part has been suggested in argument, except that one of the female legatees

has contracted a marriage which perhaps she would not have contracted but for an impression that she was wealthier than she will be if this bill is maintained. This is the mere suggestion of counsel, without allegation or proof on the subject in the record. We cannot accept it as the kind of action contemplated by the authorities.

One act of Jefferson Davis requires closer scrutiny. He held a probated claim against his brother's estate for $10,000, with accumulations of interest which would have more than doubled it. It was resisted, as being barred by the statute of limitations. On December 21, 1872, the residuary legatees, by a written contract with him, agreed to pay the principal, without interest. It was agreed that it should be paid out of the residuum of the estate, and the Montgomery notes were specially alluded to as constituting a portion of that residuum, out of which the payment was to be made. It was agreed, however, that, as to the notes, payment should come wholly out of the residuary portion of them, and should not diminish the special legacies charged on them by the will; in other words, the residuary, and not the special, legatees should pay it. It was further agreed that it should be subordinate, so far as money arising from the Montgomery notes was concerned, to all taxes and expenses of administration. In short, the residuary legatees agreed to pay the face of the claim out of their residuary portion of the estate, but declined to bind the specific legacies coming to them. Jefferson Davis agreed, upon his part, to accept the face of his claim; to look alone for payment to the residuum of the estate, without interfering with special legacies, and, even as to the residuum, to postpone his debt to taxes and costs of administration. To borrow a phrase from another branch of the law, it was a " demonstrative" contract, which fixed its own terms and pointed out the source and manner of payment. One of the sources pointed to was the Montgomery notes. It is shown that Jefferson Davis has never received anything on this debt, either before or since the making of this contract. Does the making of the

contract estop him now from claiming that, in point of fact, a portion of the Montgomery notes belong to him? Misled by the arguments of counsel, we treated this contract, in our former opinion, as limiting the payment of the debt to the residuum of the Montgomery notes, the whole of said notes, it being borne in mind, not being specifically devised. We consequently held that the contract constituted no estoppel, because it is only the residuum of those notes that Jefferson Davis claims, and he could not be estopped from claiming a fund by an agreement to receive payment of a debt due himself out of a fund belonging to himself. Attention is now, called to the fact that, by the terms of the contract, he may look for payment to the entire residuum of the estate, which embraces other property besides that portion of the Montgomery notes not specifically devised. How far does this operate to estop him from claiming ownership in those notes? It is manifest that, in any litigation touching the agreement itself, all of its stipulations are binding on the parties ; so that in all controversies arising upon it Jefferson Davis would be compelled to treat the Montgomery notes as the property of the legatees. If, for instance, he should succeed in this proceeding, and thereby obtain a portion of the notes as his own, he would, nevertheless, in any future suit brought to compel payment of his $10,000 debt, be compelled to credit said debt with the recovery obtained here, and, if sufficient, the one would extinguish the other. Having agreed to receive payment of his debt out of that fund, he must treat any money coming to him from that source as a payment. But he now claims an ownership in the notes by a wholly different title. Whether the contract will debar him from prosecuting this claim depends upon whether the recognition contained in it, that the notes belonged to the legatees, formed a part of the consideration, or was a mere admission and recital of a fact the truth of which was taken for granted, and about which there was, at the time, no controversy. A mere statement or admission in one contract, not forming a part of the consid-

eration of it, will not be binding in another matter with which it has no connection.

If, for instance, in a negotiation with my neighbor about the location of a house or a fence, I recognize and treat the land upon which he is then living as his property, this will not debar me from suing for the same land upon a claim then existing in my favor, unless the recognition by me that the land is his formed the inducement with him to enter into the contract. This identical case is presented in *Carpenter* v. *Buhler*, 8 Mee. & W. 209, where, in a contract about building a shaft leading to a mine, the land through which it was to run was treated as, and recited to be, the property of one of the contracting parties; but yet it was held that this did not estop the other party from subsequently recovering the land by an older title. The reason was that the recital as to ownership of the land was no part of the inducement to, or consideration of, the contract. Such recitals are said to be always admissible in evidence, as showing an admission by the party making them; but they are not estoppels. So, the taking by a creditor of a mortgage, to protect a disputed debt, upon land in the possession of his debtor, though it would be an admission of title in the debtor, would not estop the creditor from recovering the land as his own by a prior and better title. The principle is that no mere recital or assumption of a fact in one matter can operate as an estoppel in another. It is receivable in evidence as an admission, but not as an estoppel. Herman on Estop., secs. 246, 324; *Southeastern Ry. Co.* v. *Warton*, 6 H. & N. 520; *Reed* v. *McCourt*, 41 N. Y. 439; *Lanison* v. *Tremeve*, 1 Ad. & E. 792.

If, then, the recognition in the contract of 1872, that the Montgomery notes belonged wholly to the legatees, can be regarded as forming any portion of the inducement to the legatees for undertaking to pay to Mr. Davis his probated claim, this would forever estop him from claiming any ownership in those notes. If the record left this point doubtful, we would feel bound to give the legatees the benefit of the doubt, and

to hold him estopped.   But it is unmistakably shown that the contract of 1872 had no connection whatever with the ownership of those notes.   The legatees, in setting up the contract in their answer as an estoppel, say, under oath, " that they had, at the time it was made, no notice or suspicion that Jefferson Davis had, or claimed to have, any interest in ' Brierfield ' or its proceeds."   It is quite manifest that, at the time this contract was made, Jefferson Davis had no intention of bringing this suit.   It is impossible, therefore, that the ownership of the Montgomery notes could have entered into the mind of either party, or that the designation of them as one of the sources from which Mr. Davis was to receive payment of his debt could have formed any part of the consideration of the contract.   Indeed, the paper shows upon its face that the notes were merely pointed out as forming a portion of the estate, and certain limitations were thrown around Mr. Davis' right to subject them to his demand.   Thus, it was stipulated that his debt should not diminish that portion of the notes devised specifically by name to the residuary legatees, but only to that portion coming to them under the residuary clauses of the will.   It was, therefore, a mere statement or recital, and not a part of the consideration of the contract.   It must be respected in all controversies arising upon the contract itself, but is not binding in other matters unconnected with it.   It is an admission by Jefferson Davis of title in the legatees, and, therefore, receivable in evidence against him.   It is not an estoppel.

The record plainly shows that, after Jefferson Davis' first expression of dissatisfaction on learning the contents of his brother's will, he resolved to submit in silence to what he considered the injustice done him, and that he remained of this mind until the bringing of this suit.   If we could see that his long acquiescence had harmed anybody, or induced any party in interest to take any steps which it would be prejudicial to retrace, we would assuredly estop a further prosecution of this litigation.   A careful and anxious scanning of the record fails

to disclose any such steps taken. We can neither inquire into the motives which induced his long silence nor into those which prompted him at last to sue. It is sufficient for us that no statute of limitation bars his claim, and no one, by his silence or admissions, has been led to take any action which renders it inequitable for him now to assert his rights.

The only remaining question is whether Jefferson Davis' position as executor precludes the maintenance of this suit.

Upon this question we are content with the exposition of the law in our former opinion. That our views may not be misunderstood, we desire to say that we would maintain with the utmost strictness the rule which deprives a trustee of any advantage gained by his fiduciary position, and which forbids him from laying claim to any portion of the trust property which has come into his possession. He can acquire no subsequent interest after entering on the trust. If he takes and holds possession of the property, this is, of itself, a renunciation of any previous interest. But we do not understand that qualification alone, or any subsequent act, without possession taken, defeats a prior independent right in the trustee. It might do so where the adverse right extended to the whole subject-matter of the trust, because then nothing would remain for the trust to operate on. But where, as in this case, it is a vast estate, and the claim is of a fractional interest in one chose in action alone, which has never come into the actual possession of the executor, the whole spirit and reason of the rule ceases; and to enforce its letter (if, indeed, there be such letter) would operate an injustice more intolerable than that which it was designed to prevent. In such case the executor could not maintain an action at law any more than he could bring suit at law upon a debt due to himself from the estate. But as he does not lose his debt by qualification, neither should he lose his partial interest in the chose in action. If Joseph E. Davis had collected the whole of the Montgomery notes, and died without having paid to Jefferson the amount representing "Brierfield," certainly Jefferson's qualification as execu-

tor would not have precluded him from probating a claim for money had and received.  The money remaining uncollected and still represented by the notes, what course must he take? His remedy is to ask the Chancery Court, which has jurisdiction and cognizance of the subject-matter, to pass upon his claim.  This is the very point decided in *Saunders' Heirs* v. *Saunders' Executors*, 2 Litt. 315, and tacitly assumed in *McWillie* v. *Van Vueter and Wife*, 35 Miss. 428.

We are well aware that numerous *dicta* in text-books and reported cases seem to inculcate a harsher doctrine, but neither our own researches nor the exhaustive labors of counsel have produced a case where a result in accordance with those *dicta* has been practically reached.  In all the cases examined, and their number is very great, there has been the element of after-acquired right, or of possession taken.  In the case at bar, Jefferson Davis' right long antedates the execution of his testator's will.  It is affirmatively shown that the notes and bonds in which he claims an interest have never been in his possession, except in that technical sense which the law imputes to him as executor.  He has, therefore, impleaded his co-executors and the legatees in the court in which the estate is being administered, and there propounded his claim.  Having established it, as we think, by undoubted proof, no sound principle demands a denial of relief.

If Joseph E. Davis, by his will, made, in fact, no disposition of so much of the Montgomery notes as represented the value of "Brierfield," and asserted no claim of ownership to that much of them, then, of course, Jefferson's right of recovery is indisputable.  Speaking for myself only, I must say that I regard it as quite doubtful whether he did so.  He specifically devised $230,000 of the $300,000 due, making careful provision how each legatee's share should diminish if less than $230,000 should be collected.  He makes no disposition whatever of the remaining $70,000.  The estimated value of "Brierfield" at the time of the sale was about $70,000.  It is this omitted $70,000 that Jefferson claims.  It is said that

it passed, and was intended to pass, by the residuary clause
of the will, by which "all the rest and residue of the estate"
was devised to Mr. Mitchell and Mrs. Hamer.    This, it seems
to me, is assuming the very point at issue, namely, did the
testator regard it as a part of his estate?    He had regularly
remitted the interest on it, up to his death, to his brother.    In
parceling out the bulk of the sum due on the notes among
his legatees, he carefully refrained from trenching on this
amount.    Under these circumstances it seems scarcely fair to
assume that he intended to embrace it in the words " rest and
residue of my estate."

Jefferson Davis, however, thought that he did, and uni-
formly acted on that construction.    We have, therefore, felt
bound so to regard and treat it.

The decree of reversal heretofore entered in this court will
stand.


SIMRALL, C. J., dissenting.

When the opinions of the majority of the court were read,
I announced that my impressions were adverse to the conclu-
sions of my associates, and that, so soon as my health would
admit, I would carefully consider the case and put in writing
my views.    That duty I have performed.

For convenience of the investigation, the subjects involved
may be divided into these propositions :

1. Was Jefferson Davis the owner of the Brierfield planta-
tion?

2. Did Joseph E. Davis, in the sale of it to the Montgom-
erys, act on behalf of, and as agent of, Jefferson (as averred
in the bill), or did he dispose of it in his own right?

3. Has Jefferson Davis, by his acts and conduct, waived
whatever right he may have had to the property or its pro-
ceeds?

Since I do not concur with the majority of the court as to
the legal value of the facts in evidence bearing on these several

propositions, or in the principles of law applied to them, I will state my separate views.

1. In 1835 Joseph E. Davis was the absolute owner of a large body of land in Warren County, of which what is known as "Brierfield" constituted a part. In that year, or the year following, Jefferson Davis, without visible means (except one slave derived from his father), with the permission of his brother, went into possession of part of the land, and, with his brother's assistance, gradually subdued the forests to cultivated fields, established a plantation, and stocked it with labor.

Joseph E. Davis purposely retained in himself the legal title, and never did convey it to his brother, but on one occasion resisted the earnest importunities and entreaties of his wife so to do. I say *purposely* "retained," because Joseph E. Davis was a lawyer of experience, systematic in business; besides, he was endowed with rare mental force, assiduously cultivated, so that he became a marked character for intelligence, sound judgment, and energy of will.

Under a possession thus begun, Jefferson Davis enjoyed the property and its fruits until it became unproductive, during the late war. In the inception of it did Joseph E. intend more than to permit Jefferson (towards whom "he felt in the relation of a father") to have the usufruct, reserving the title and ultimate disposition to himself? or did he mean that Jefferson should hold as absolute owner? The answers to these questions must be furnished by the subsequent acts and conduct of the parties.

To the public, Jefferson appeared to be the owner of "Brierfield;" he was in the occupancy, planted and gathered crops, and controlled the revenues. Joseph E., as remarked, was a lawyer of more than usual attainments, and did not convey to his brother, from *design*, as we might suppose, if there were no testimony to the point. It is shown in evidence that he assisted his collateral relatives by giving them the use of land, but that he uniformly withheld the

deeds.   The testimony strongly conduces to show that he
paid in part for the dwelling-house erected on " Brierfield,"
by a conveyance of a tract of land in Madison Parish, Louis-
iana.   One of the mechanics so states, and a deed was put in
evidence in corroboration.   It is in proof that the mansion-
house was intended in part for the residence of Mrs. Bradford,
a widowed sister of Joseph E., and was so constructed as to
afford separate apartments and culinary accommodations for
the two families.

About the time this dwelling-house was being built, Joseph
E. Davis exhibited a sworn bill in chancery, predicated on his
ownership of " Hurricane " *and* "*Brierfield.*"   Several years
afterwards an amended bill — in 1851 or 1852 — was filed
under oath, with the same assertion of right.   It is barely
*possible* that Jefferson Davis may not have been aware of
these judicial proceedings.

In 1865 Joseph E. Davis preferred a claim to the United
States authorities for restoration of the possession of " Hur-
ricane " and " Brierfield," on the distinct allegation that he
was the owner of both.   To Dr. Bowmar, who, in common
with the public, supposed that Jefferson owned " Brierfield,"
and who had been deputed as agent to urge his suit at Wash-
ington, he stated " that the legal title was in himself."   And
in aid of his application he filed with it the certificate of the
clerk, or register of deeds, that no conveyance of " Brier-
field " or " Hurricane " to any person was on record.

In the same year (1865), whilst temporarily resident in
Alabama, he prepared and formally executed a last will and
testament, in which he devised " Brierfield" to the children
of his brother Jefferson.

In the following year (1866) he sold and conveyed " Brier-
field " and " Hurricane " to the Montgomerys.

A little more than two years afterwards (March 18, 1869)
he made another last will and testament (which was probated),
by which he specifically disposed of the bond and interest

notes, or the larger part, given by the Montgomerys for these plantations.

One of two interpretations must be put on these solemn and formal acts of Joseph E. : either that he verily believed that the title, with the *jus disponendi*, was in himself, or that he willfully and deliberately asserted rights to property which he had given to his brother, and to which he had no real claim.

The theory of the bill is disclosed in the second paragraph, where it is alleged that Joseph E., " in making the sale, acted in his own behalf in respect of his own plantation, known as ' Hurricane,' *and in behalf of complainant in respect of* ' *Brierfield.*' " "*At the same time*, Benj. T. Montgomery was well aware that complainant was owner of ' Brierfield ; ' and the sale of ' Brierfield ' was upon the express condition that the same should be subject to complainant's election to ratify or annul," etc. The averment, in substance, is that Joseph E. sold " Brierfield," as agent, conditionally on the ratification and approval of Jefferson.

The only rational explanation of the acts and conduct of Joseph E. Davis is that he honestly believed that the legal title was in himself, and that he could transfer it by sale.

Is the theory of the bill sustained by the subsequent conduct of the parties? The sale was consummated on November 19, 1866. Two years and four months afterwards Joseph E. made his last will and testament, in which he, with particularity, refers to the sale, the bond, interest notes, and mortgage taken for the purchase-money, and bequeaths the entire amount as part of his estate. There is not a word or expression in the will which gives the slightest countenance to the idea that the testator did not esteem this fund as completely a part of his estate as any property which he disposed of.

This last solemn assertion of right, occuring within a year of his death, is the highest possible affirmation that he sold both plantations in his own right, and disposed of the proceeds as his *own*, and negatives the averment of the bill that

he had " acted " in the sale, as respects " Brierfield," on be-half of his brother.

It is natural to expect that a man of the probity and intelligence of the testator, if he held the bond, interest notes, and mortgage in part as agent and trustee of his brother, should have so declared in his will. Not being alluded to there, it is difficult to understand, if such was the reality, that no. paper, letter, or document has been found explanatory of it.

But did Jefferson Davis regard the sale. of " Brierfield " as made on his " behalf? " In reply to a communication from Joseph E., advising him of what he had done, he wrote to him, from Fortress Monroe, on December 17, 1866, about a month after the sale, to this effect : " It will, no doubt, occur to you that, the proceeding [the sale] having been made public, it will be advisable to close it soon, and tightly. * * * The active malignity towards you, as my brother, might prompt to some congressional movement to interfere with it." After expressing doubt of the ability of the negroes to carry out the purchase, he adds : " Then it may be that a better state of affairs will render the *property valuable to your heirs.*" I have no doubt that Mrs. Stamps narrates the message with which she was charged by Joseph E. Davis to his brother, and the interview with Jefferson, according to her best recollection. This occurred about ten years before her deposition was taken. Jefferson made a written memorandum, from which I have quoted, and which bears on its face internal evidence of being an unreserved answer to his brother's message.

After release from imprisonment he had personal intercourse with Joseph E., and yet we have no information that he objected to the sale, or claimed any part of the proceeds. In a letter under date of December 26, 1868, speaking in reference to the application of Benjamin Montgomery to rescind, after expressing the opinion that he must ultimately fail, he says : " It is also within his [Benjamin Montgomery's] ability to see that he had better retire with the means he has acquired by possession of *your property*, and engage in small trade."

Again, under date of April 5, 1869, London, he writes: "If Montgomery- and sons can not, or will not, comply with the contract, could not some one with capital be found to take *the lands and secure to you* a revenue, free from any vexatious attention on your part?"

This correspondence refers to the lands as "*your* lands," and the income as "*your revenue*," and does not, in the remotest degree, hint at a *right*, or *ownership*, in the writer.

In 1870, in a conversation with his niece, Mrs. White, in New Orleans, she urged him to apply to Joseph E. for a deed to "Brierfield." He declined to do so, out of motives of delicacy. After his brother's death he wrote to Mrs. White, regretting that he had not taken her advice. If Joseph E. had sold "Brierfield" for "his behalf," and held the bond for the price as his trustee, the natural response to Mrs. White would have been, "My brother has sold the property for me, and will pay over the price;" and there could have been no ground of regret that he did not follow her advice.

There is testimony in the record of conversations, especially with Joseph E. Davis, to the effect that he regarded Jefferson Davis as the owner of "Brierfield." But the principle is common to all systems of jurisprudence to give a decided preference to written memorials over verbal representations founded on the imperfect recollection of witnesses. Writings are higher in the scale of evidence, and ought not to be controlled by the weaker. Herman on Estop., sec. 210.

The defense of the statute of limitations was most relied upon, at the oral argument, to perfect the complainant's right to "Brierfield."

That a just appreciation of possession, as working the effect of defeating the title, may be had, I stop for a moment to consider the authorities. *Alexander* v. *Polk*, 39 Miss. 755: "The possession which is relied on to defeat a conveyance (the paper title) by the real owner must be adverse — that is, it must be openly and notoriously in defiance of the actual title — and to effect which nothing short of ouster or disseizin will

serve ;" citing *Zellers* v. *Eckert*, 4 How. 289. "Adverse possession implies that it commenced in wrong and is maintained against right. The party relying upon possession must prove it to be *adverse* to the title set up ;" citing *Jackson* v. *Sharp*, 9 Johns. 163. Such possession, if open and notorious, under claim and color of right, by lapse of time may ripen into a good legal title. *Huntington* v. *Allen*, 44 Miss.; *Gladney* v. *Barton*, 51 Miss. 219, 220. In *Dixon* v. *Cook*, 47 Miss. 226, it is said that two facts must exist: first, "there must be an entry under color of right, claiming title hostile to the true owner ; second, continuous occupancy for the statutory period." In *Magee* v. *Magee*, 37 Miss. 152, the court says that the clearest and most comprehensive definition of "disseizin and adverse holding" is by Mr. Angell, in his work on Limitations, page 410, section 11 : "It is an actual * * * appropriation of land, commenced and continued under claim of right, either under an openly-avowed claim, or under a constructive claim arising from the acts and circumstances attending the appropriation, to hold the land against him who was seized." It is further said "that the principle on which the statute of limitations rests is, not that the party has set up an adverse claim for the period prescribed, but that such an adverse claim is accompanied by such invasion of the rights of the opposite party as to give him a cause of action, which, having failed to prosecute within the time limited by law, he is supposed to have extinguished or surrendered ;" citing *Abell* v. *Harris*, 11 Gill & J. 371. "The intention of the possessor must be considered in determining its character."

Where the entry is without claim or color of title, the law adjudges the possession as subordinate to the legal owner, and no length of possession will render such holding adverse. But if there be an entry without claim of title, and no privity exists between the enterer and real owner, and a subsequent acquisition of title which the enterer believes good, from that moment his possession becomes adverse. *Jackson* v. *Thomas*,

16 Johns. 293 ; *Jackson* v. *Johnson*, 5 Cow. 74 ; *Howard* v. *Howard*, 17 Barb. 666.

I am constrained to these conclusions :

1. That Joseph E. Davis intentionally and purposely retained the title to " Brierfield," and that the several acts done by him (referred to) were positive affirmations of his right over the title and the *jus disponendi.*

2. That the allegations of the complainant that Joseph E. sold " Brierfield " on " his behalf," and held the fund therefrom arising as trustee, are not sustained by the evidence, but are inconsistent with the acts and assertions of both parties since the sale.

3. In view of the testimony it is a matter of most grave and serious doubt whether the *permissive* entry of Jefferson at any time assumed an adversary form, and whether he could recover " Brierfield," or its price, if he had done none of the acts and things — presently to be considered — which were pleaded in bar and preclusion of his claim.

4. It is quite certain that Joseph E. believed that he had the title, with the right to sell and convey, and the further right to dispose of the proceeds by last will and testament.

5. Jefferson Davis knew of these assumptions of ownership by his brother, and may have thought that his brother was mistaken.   In such circumstances it was plainly his duty promptly to have made up his mind to abide by the will and execute its trusts, or to have stood aloof, avowed his adversary claims, and have asserted them ; for every fact necessary or important to be considered in making the election was as well known to him when the will was propounded for probate as when he filed his bill.

Has Jefferson Davis acquiesced in the sale of " Brierfield," and the disposition made by the testator of its proceeds? or have his acts and conduct precluded him from asserting the claim set up in the bill?

1. Joseph E. Davis lived four years after the sale.  Jefferson was made aware of it within a month after its date.  He had

personal intercourse and correspondence with his brother in relation to the property and sale, yet at no time in these years did he claim " Brierfield," or its price. We *know* that it was the subject of correspondence, and must *believe* that it was a topic of conversation.

After the sale — how long after we are not informed — it was verbally agreed between Joseph E. Davis and Benjamin Montgomery that, if Jefferson Davis should desire to take up his residence there, the contract must be rescinded — not that Montgomery should convey to Jefferson. But the intention was to make such arrangements as would be agreeable and deemed necessary by Joseph E., if Jefferson desired to live at " Brierfield." Jefferson did not prefer to take up his abode there, and hence Joseph E. made no change in the disposition of that property.

2. Very promptly after the death of Joseph E. Davis, and after the will had been proved and established by Dr. Bowmar, one of the executors, Jefferson voluntarily gave bond, when none was required by the will, and took the oath prescribed by law as one of the executors.

3. He took an active and leading part in the consultations and proceedings of the executors (a record of which was kept, which he and the other executors signed). At the meeting in December, 1870 (the first one), the choses in action due the testator were carefully examined, a schedule of them — including the bond of the Montgomerys for $300,000 and the interest notes of $18,000 each — were recorded in the journal, and Dr. Bowmar was directed to include them in the inventory as assets of the estate ; and that without hint or intimation from Jefferson Davis that he claimed part of the fund in his separate right. At this meeting the several provisions of the will were discussed *seriatim*. Among other things it was decided that the direction to invest the portion of the $300,000 (the price of " Hurricane " and " Brierfield ") for the grandchildren applied to the principal sum given them, and not the

interest ; and that, after satisfying the legatees, the residue
of that sum would be available for creditors and legatees.

4. In 1871 Mr. Davis participated with the executors in ·
taking cumulative mortgage security from the Montgomerys.

5. Other meetings of the executors were held, down to and
including those of December 26 and 27, 1873, which Jef-
ferson Davis attended, the chief business at which was the
discussion of the indebtedness of the Montgomerys and the
means and probabilities of payment.

6. During these years the interest notes of the Montgomerys
were collected, and a distribution of the money made to the
legatees, to pay intesest on their bequests. *Jefferson Davis
on each occasion received the share of his children.*

That the effect of these acts and others hereinafter mentioned
may be better appreciated, I quote several clauses of the will :.

" First. I give and bequeath to my grandchildren, Joseph
D. Mitchell and Mary Elizabeth Mitchell, all the estate, real,.
personal, and mixed, as well as all right and credits with
which I may die seized and possessed, subject to the legacies
and bequests hereinafter mentioned, to be controlled by my
executors in the manner hereinafter directed."

The same provision, in effect, is repeated in another clause.
The fifth article is :

" It is my will and desire, and I so direct my executors, out
of the money due from the sale of Hurricane and Brierfield
plantations, amounting to $300,000, secured by the joint obli-
gations of B. T. and Wm. T. and Isaiah Montgomery, payable
1st January, 1876, bearing date the 19th November, 1866,
secured by mortgage on the land sold, and also their obliga-
tions for interest, on the maturity of said bond for $300,000,
it is my will and desire that my *executors* set apart and secure
to my granddaughter, Mary Elizabeth Mitchell, $100,000 ; to
my grandson, Jos. D. Mitchell, $50,000 ; to Margaret, Jeffer-
son, William, and Varina Davis, children of my brother,
Jefferson Davis, $20,000 each ; and until the said sums

become due they shall be entitled to receive interest at 6 per cent per annum, as secured by said interest obligations."

The other clause relates to investments to be made for Mary E. and Joseph D. Mitchell.    Interest to be paid to the children of Jefferson Davis until they severally become of age, when the principal shall be paid them.    "The legacies herein directed to be paid from the proceeds of said sale shall be a lien on, and held by, such legatees, with all the rights and privileges of the mortgagee."

Two observations are obvious in respect of these articles: One is that the testator did not intend to die intestate as to any property of whatever kind, whether tangible or choses in action; and the words accomplish that intention.    Second, that the pecuniary legacies to the two grandchildren, and his nephews and nieces, were to be paid out of the proceeds of the sale of the Hurricane and Brierfield plantations; and that whatever surplus of that fund there might be would pass, under the residuary clause, to the grandchildren, Mary E. and Joseph D. Mitchell.

That such is the legal effect of the clauses quoted is too plain for argument.

Such was the construction put on the will by the executors at their first consultation, as recorded in their journal.

The burden of debts would fall upon so much of the estate as would constitute the residuum — what would remain after satisfying the specific legacies.    To the extent of the debts would be diminished what would otherwise go to the grand-children as residuary legatees.

It appears that Jefferson Davis had a debt of long standing against his brother, Joseph E.    The executors had refused to pay it; nor could it have been recovered from them.

On December 21, 1872, Jefferson Davis entered into a con-tract, under seal, with Mary E. and Joseph D. Mitchell, described as "legatees under the last will and testament of Joseph E. Davis, dec'd," by which they agreed to pay $10,000

in satisfaction of the claim, out of the "residuary fund." There is the further stipulation that the interest due annually from the Montgomerys shall be used as follows : first, "to pay taxes, general debts, and necessary expenses in the administration of the estate ; to pay interest on the respective legacies made chargeable by the will on the revenues derived from the Hurricane and Brierfield plantations ; to pay the debt due to Jefferson Davis, as per this agreement, out of any surplus which may remain after discharging the above preferred obligations."

The legal effect of this agreement is that Joseph D. and Mary E. Mitchell obligated themselves to pay Jefferson Davis $10,000 out of the residuary fund, in " compromise and satisfaction of his claim against the estate ; " and to that extent they agree to subtract from what may come to them as residuary legatees. They further agree that payment may be made out of the interest notes, if there shall be an excess after discharging prior enumerated claims upon it.

The contract is signed and sealed by the three parties. It contains the distinct recital and admission that Joseph D. and Mary E. Mitchell are legatees " of the residuary fund mentioned in the will of the testator." Part of that fund is the excess of the $300,000 (Montgomerys' bond) over the legacies charged upon it.

It further recites that the interest notes are part of the assets of the estate, and shall be used for certain purposes — in part, to pay this debt.

In this writing, in effect, Mr. Davis says to these legatees : " You are the owners of the fund that must pay this debt if it is ever paid. The executors do not feel authorized to pay it. If you will agree to assume it, by way of compromise I will fix the amount at $10,000." The will devotes the notes to keep down the interest on the specific legacies. But the parties covenant that they shall first be applied " to *pay the taxes, general debts,* and *expenses* of administration." In

this particular the concession is all on the side of the legatees, since Mr. Davis was personally a recipient of commissions, which are part of the " expenses of administration."

The further covenant is that the executors shall pay the debt, from time to time, out of the " fund named, but not so as to impair the full amount of the several legacies charged on the proceeds to be derived from the Hurricane and Brierfield plantations "— that is to say, these residuary legatees are in no event to subtract from their specific pecuniary legacies derived from the land sale, but that whatever remains after paying them is pledged.

This is an affirmation and assertion, in the form of a contract, that Joseph E. Davis had rightfully disposed of the proceeds of " Brierfield " by his will. And Jefferson Davis covenants, with the largest donees of that fund, that so much of it as shall not be needed for specific bequests shall be applied to pay him a large sum, as creditor of the estate.

Let us now attend to the principles of law, and their effect on the claim of a party to trust property, set up in the face of such acts as those we have been considering.

A trustee is, ordinarily, the owner of the legal title, and the nature and quality of the estate generally depend on the limitations in the instrument under which he takes. The executor takes the legal title to the chose in action. His *acceptance* of the trust is the *investiture* of the title. There is a repugnancy and inconsistency in entering upon the office and dealing with the choses in action as assets, and, at the same time, cherishing an adversary claim to the effects. The position is one of confidence, and implies that the executor will discharge it with fidelity.

There is nothing harsh in the rule which requires the executor, when in full possession of knowledge as respects his own claim to any part of the assets, to make up his mind whether he will discharge the trusts imposed by the testator, or whether he will assert his own claim. If we may say that the act of giving bond and taking the oath will not conclude him, to

these we may add the inventory. But there must, in reason, arrive a time when the executor has done so many things in execution of the will as that he should be conclusively held as having waived or abandoned his own pretensions. The doctrine of estoppel, as expounded by modern jurists, is founded in wisdom and justice and the purest morality. The essence of it is responsibility for one's deliberate acts and conduct. In the leading case of *Pickard* v. *Sears*, 6 Ad. & E. 469, Lord Denman said : " The rule of law is clear that where one, by words or conduct, causes another to believe a certain state of facts, and induces him to act on that belief, so as to alter his previous position, the former is concluded from averring against the latter a different state of things as existing at the time." For illustration : where a party became "receptor" for goods levied on by an officer, he was precluded from setting up a title in *himself at the time of the levy;* because such claim would be inconsistent with his duty to restore the goods, and the creditor and officer may have been influenced to forbear taking other measures to make the debt. *Dezell* v. *Odell*, 3 Hill, 215. Speaking of the effect of it, the court says : "It is a·clear case of an admission by the defendant, intended to influence the conduct of a man with whom he was dealing, and actually leading him into a line of conduct which must be prejudicial to his interests unless the defendant be cut off from the power of retraction." "Before the defendant can show adverse title, he must prove that he was drawn into the admission by *fraud*, or some gross mistake of fact." The same, in principle, are the cases of *Presbyterian Congregation of Salem* v. *Williams*, 9 Wend. 147 ; *Stephens* v. *Baird*, 9 Cow. 274 ; *Stonard* v. *Dunkin*, 2 Camp. 344.

In *Saunders' Heirs* v. *Saunders' Executors*, 2 Litt. 321, Gatewood (one of the executors) refused to hold the slave as executor, but promptly set up a title (undoubtedly good) in right of his wife. That title was proved in a friendly suit against the other executors. It does not appear that the slave was ever inventoried, or treated by the executors as the prop-

erty of the testator.   Gatewood referred his possession to his wife's title.

The character of trustee, in any of its relations, imposes special duties and disabilities.

In *Henderson* v. *Segars et al.*, 28 Ala. 358, a party assumed the position of trustee in a deed *fraudulent* as to creditors, *and so known to him*.   The court held that, pending the obligation which he had assumed to carry out the trust, it was *not competent* for him to set up *his own claim* as *creditor*, or as *surety* for White (the *fraudulent* grantor), antagonistic to the trust; for the reason " that he was effectually estopped, by reason of the relation he voluntarily assumed."   " The deed being valid as to him, all the duties and disabilities which attach to ordinary trustees at once were devolved on him."   If he had been permitted to aver that he was a creditor, or a surety of the grantor, so as to reach the property, he would have broken up the trust which he had consented to execute.   He was, therefore, conclusively esteemed as having waived his claim as creditor.

In *Stone* v. *Godfrey*, 5 De G. M. & G. 94 (54 Eng. Ch.), Lord Justice Turner, in the course of his judgment, declared " that it is impossible for a person who has acquired possession of an estate upon trust for the benefit of another, to be permitted to set up that possession as adverse to another.   It was the father's duty, if he meant to claim adversely to his daughter, to have given up possession, and then to have set up his claim after he had redelivered possession."   In that case Stone, the father, was clearly entitled to the estate by the curtesy.   He was advised by counsel that he had no such estate.   So believing, he accepted the trust for his daughter, and continued in its performance for many years.

There is one important difference between that case and the one before us:   Jefferson Davis did not accept the trust under a mistake of law, or incorrect advice of counsel.   He did not continue to discharge the trust as many years as Stone, but he

did as many acts of unequivocal loyalty to the testator and *cestuis que trust* as did Stone.

In *Duncan* v. *Bryan*, 11 Ga. 66, it was said by Lumpkin, C. J., that, "Duncan having consented to act as Mrs. Wallace's trustee, he shall be forever afterwards precluded from contesting the fact in any suit between themselves." "The law forces no one to accept the gift of an estate, whether made in trust or not; but, having once *accepted the trust* and got *possession of the property*, he cannot throw off the duties and responsibilities thus voluntarily incurred." See, also, *Manigault* v. *Deas*, 1 Bailey Eq. 289.

In *Benjamin* v. *Gill*, 45 Ga. 112, the executor set up title in himself against the estate. The pretension was met by the allegation that it came too late — that the executor was concluded by his acts. And the learned judge adds: "Some distinctions have been drawn as to what state of the proceedings, what time in the history of the executorship, this estoppel commences;" and answers: "There is not one [case] where the trustee has been fully clothed with the trust in which he is not bound by *his acceptance.*"

That is a deliberate act, by which the executor is clothed with the legal title to the personal effects and credits — or, at least, such title as may be necessary to uphold the trusts and enable him to execute them. If the executor, however, is misled by counsel as to his rights, or had not then full knowledge of them, it might well be concluded that he accepted in mistake or ignorance; and if, on discovery of the truth, he retraced his steps, he might be relieved if he had done no acts which he could not gainsay or recall.

But when is the point reached beyond which the executor cannot go without being met with an estoppel? The argument for the appellant is, and the opinion of a majority of the court is, that the point is not reached until the executor has done some act to undo which would prejudice the *cestui que trust.* If these executors had received from Montgomery, in 1872, one-half the purchase-money of "Hurricane" and "Brier-

field,'' and had paid it over to, or invested it for, Mary E. and Joseph D. Mitchell, and to the guardian of the children of Jefferson Davis, it would not be pretended that such act would not have been conclusive.' Unless the collection and distribution of a part of that fund to the legatees is different in principle from the collection and like distribution of the whole, *Jefferson Davis is estopped*.

In 1870, 1871, and 1872 — for three years — he participated in the collection of the interest on the debt for the purchase-money of the plantations, and paid over to the legatees the interest on their respective legacies, and retained, as guardian of his children, their portion of it. Is there any case to be found which holds that an executor who has accepted the trust, collected the debts, and paid off the legatees, can be permitted to recover back the fund from them, on a title which he had when he entered on the trust, and about which he *then had full knowledge?* Is there any distinction, in principle or reason, between that case and the one of *partial* payment to the legatees? The one is just as potent an estoppel as the other. *Mc Williams* v. *Ramsey*, 23 Ala. 813.

Wherever the principle of estoppel subserves right and justice, it has application, as a party cannot stand by and culpably or negligently allow another to contract on the faith and understanding of a fact which he can contradict; if he does, he cannot dispute that fact in an action against a person whom he has assisted in deceiving. Where one so conducts himself — whether intentionally or not — that a reasonable person would infer a certain state of things to exist, and acts on that inference, he shall afterwards be estopped to deny it. *Freeman* v. *Cook*, 2 Ex. 654. Nor is it necessary that there should have been a design to mislead. *Bank* v. *Hazard*, 30 N. Y. 226.

Surely if a man is estopped by his culpable or negligent silence (whether intended to mislead or not); whereby another believes a certain fact and makes a contract — certainly the principle applies with the more vigor *where he is a party to the contract* into which another has thus been induced to enter.

Nor is an express recital or affirmation of a fact necessary where it is evident, from the terms of the deed, that it was the intention of the parties that a certain state of facts should be affirmed, as the inducement to the deed. *Van Rensselaer* v. *Kearney*, 11 How. 297.

Where facts are recited, those facts become conclusive evidence, and the party is not permitted to deny the truth of the statement. Herman on Estop., secs. 211, 212.

Where a written contract is entered into without fraud, imposition, or mistake, the parties to it are conclusively presumed to assent to its terms and legal effect. If a statement or recital is the inducement or basis of the contract, none of the parties can gainsay it. *Stringhill* v. *Buck*, 14 Q. B. 781; *Bowman* v. *Taylor*, 2 Ad. & E. 278.

Where the recital is a statement which all the parties have agreed to admit as true, it is an estoppel on all. *Carpenter* v. *Bullen*, 8 Mee. & W. 209.

The matter need not be specifically stated; it may be by express terms or necessary implication, and it binds the party because it must necessarily have influenced the other party. The doctrine is founded, when properly applied, on the principles of morality, and commends itself to the reason. Although it may shut out the truth in the particular case, and is sometimes called " odious," it should be remembered that it debars it only in cases where the utterance or affirmation would be the denial of a previous affirmation, upon the faith of which parties had changed their position, or dealt, or pledged credit. *Per* Nelson, J., in *Van Rensselaer* v. *Kearney*, 11 How. 325, 326.

Upon what principle is the creditor who accepts a trust which implies the property to the payment of all the grantor's debts *pari passu*, precluded from asserting a *prior lien* under a judgment in his favor? Plainly, as said in one of the cases, to do so would be " inconsistent with the terms of the trust." The necessary result would be, either altogether or partially, to defeat the trust. When the creditor who had that advan-

tage over others *deliberately* consented to perform the trust, accepted the confidence of the grantor, he was conclusively held as having waived his lien and consented to accept a *pro-rata* share under the deed.

That doctrine has been announced in too many cases, and is too well supported by authority, to be doubted at this day. The principle as fully, in reason and analogy, applies to an executor as to a trustee constituted by deed.

Courts of equity have never regarded the form of the trust as the material matter. If it arises out of the nature of the transaction and the relation of the parties, without written memorial, the consequence is the same. Thus, the auctioneer who has received goods for his customer will not be tolerated to deny the customer's right to the *proceeds* by reason of his *own right* to the property. *Osgood* v. *Nichols*, 5 Gray, 420. The case of *Dezell* v. *Odell*, 3 Hill, 215, *supra*, is another apt illustration.

Devise is one of the common-law modes of assurance of title. Estates, trusts, and settlements can be as well created by will as by deed. Undoubtedly, a strict legal title to the bond and notes of the purchasers of "Hurricane" and "Brierfield" vested in the executors, with a right in their own names, as such, to the appropriate remedies at law and in equity for their collection. But more than that: the executors are charged with an express trust in respect of these funds of long duration — that is, the executors shall invest, for Mary Elizabeth and Joseph D. Mitchell, so much of their portion of the fund, "in some safe stocks, as in the opinion of the executors shall be advisable, but not less than half; *to be held in trust* for them by the executors, the interest only to be paid to them, for twenty years." They may change the investment, and reinvest, if safer and more productive. So, a trust is impressed as to that part given to the testator's nieces and nephews. The executors shall make interest for them until they severally attain majority, when the capital shall be paid to them.

This is not the case of an ordinary will, where the whole duty of the executors is to gather in the assets, pay the debts, and deliver over the residue to legatees. But it is a case where a large fund is vested, as to legal title, in the confidential friends of the testator, on trusts which require judgment and prudence. These friends are called, in the will, "executors;" but it is enjoined upon them to *hold in trust*, for a long term of years, the fund, and pay over to the beneficiaries only the interest. Now, it would not be controverted that if Jefferson Davis and his associates had accepted just such a trust declared by deed, had taken possession of the bond and notes, and had dealt with them as directed, making collections and disbursements, and taking additional securities, that each one of them would be concluded from setting up any pretensions of adverse personal claim to the trust property. Precluded for the reason founded in the necessities of society — that where property is thus confided to another, who, without surprise or fraud, or ignorance of his own claims, but deliberately, accepts the title or power over the property, and enters upon the discharge of duties in respect of it, he has made his election, and has, by his conduct, abandoned rights incompatible and repugnant to the duty thus voluntarily assumed.

The doctrine is essential to the safe transaction of the business of life. When a proposition is made, whether by deed or will, to confide to another property the control of which goes along with the acceptance of the fiduciary relation, it is due to candor, and the confidence thus implied, that the offer shall be declined if the party to whom it is made has rights or pretensions to the property which he proposes to assert. And it is because the creator of the trust acts on the assumption that it will be faithfully executed if accepted, that the obligation is imposed on the other party to decline if his interests are in conflict; if he does not, he is esteemed as waiving his adverse rights.

In order to bind the trustee by an acceptance, we do not look so much to the form of the instrument, or the nature of

the transaction out of which the trust springs, as to his conduct. Whenever that is marked by deliberation, and is characterized by unmistakable acts of performance of the trust, so that there is no doubt about acceptance and an intent to perform, then the decisive step has been taken, which cannot be retraced.

If, as has been suggested, it be necessary that the executor, or other trustee, should obtain possession of the property, before by his acts, he can manifest a waiver or abandonment of adversary claims in himself to it, such condition has been fully met in this case.

The testator required the concurrence of a majority of the executors *who qualified* in the performance of the duties enjoined. In a more than usually formal manner the executors gave evidence of compliance with this direction of the will. But three qualified, including Jefferson Davis. At their first meeting, when all were present, the papers of their testator were carefully examined; the notes, bonds, and other evidences of indebtedness to the deceased were scrutinized, and a schedule of them written down in their journal, including the debt of the Montgomerys. It was thus declared that these constituted part of the assets, and Dr. Bowmar was instructed, by resolution entered on the journal, to return to the Chancery Court an inventory of these credits, as assets. These proceedings made the inventory the act of the three, and the possession of these evidences of debt was a *joint possession*. At the same meeting a conclusion was reached as to the disposition made by the testator of these credits, and that the will, in respect of them, should be carried out according to the construction put upon it by the executors, as recorded in the journal. Afterwards Dr. Bowmar and Jefferson Davis visited the plantations sold to the Montgomerys, in order to make some arrangement for the better security of the indebtedness. They obtained a cumulative security, in the form of a mortgage, on real estate *not included in the sale*, which conveyance was to the grantees in their capacity *as executors*.

Afterwards Mr. Davis participated in a release of this secu-
rity. When collections of this fund were made, he received
part as compensation for services, and other portions as
guardian of his children. And it is fairly inferable that he quali-
fied himself as guardian of his children that he might receive
for them ; for the will directed the payments received for inter-
ests on their legacies to be made by the executors to their
legal guardian. And it does not appear that they had any
property or income other than from this source.

It seems, therefore, to me to be very plain that Jefferson
Davis had possession of the trust estate, jointly with his co-
executors, *technically* and *completely;* and, by reason of such
possession and dominion, *acquired by virtue of his office of
executor*, he, with his associates, exercised complete ownership
and dominion, according to the effect and tenor of the will.
Such possession and ownership is of the same virtue and effect
in law to bind him as if he had been sole executor, and had
done the acts enumerated as sole executor.

Dr. Bowmar, in his deposition, speaking of the Montgomery
notes, says : " Seven notes, of $18,000 each, came into *our
hands*. On the note due January 1, 1869, there was a credit
of $13,860 paid to the testator. Four of these notes have been
collected, together with the balance due on that of 1869,
except the balance remitted. Mr. Jefferson Davis received for
his children their distributive share, except for the last year,
which has not been paid in full. He has received his share of
the commissions as executor for two years, on the first and
second annual accounts, in April, 1873, and January, 1874."

The language of the court in *Anderson* v. *Smoot*, Spears
Eq. 312, is fully applicable : " If Smoot took possession of
the property in right of the complainants, as their agent or
voluntary trustee, he would be concluded to deny their title
by setting up title in himself or any one else." *   *   *  In
that case the possession had been acquired as administrator.

In substance, the same judicial declaration is made in *Ben-
jamin* v. *Gill*, 45 Ga. 110 (cited above) : " The executor got

possession of the land by virtue of his office as executor." His possession was the possession of the estate. "He cannot [therefore] meet the action of ejectment by a claim of title adverse to the estate."

I think, after a careful examination of the authorities, that the rule laid down in Lewin on Trusts, page 325, and Perry on Trusts, section 433, is fully sustained ; and, further, that it is just and reasonable, viz. : "That a trustee is under no circumstances allowed to set up a title adverse to his *cestui que trust;* but, though he may not claim against his *cestui que trust*, he is not bound to deliver over the property to his *cestui que trust*, if he cannot safely do so, by reason of notice of title in another, which is paramount to the trust."

The conduct of Jefferson Davis during the last four years of his brother's life, and especially since his death, covering a period of about eight years in all, was a continuous affirmation, by successive acts and declarations, that Joseph E. Davis had title to "Brierfield," with a right to dispose of its proceeds by last will and testament.

Under the influence which these acts must have produced on the minds of all who were beneficiaries of the will, he applied to the residuary legatees to agree to pay him $10,000 as the compromise of a claim against the testator, barred long before his death. He went to them as *alone the owners* of the fund out of which payment could be made to creditors, unless, indeed, the residuum would be insufficient for creditors. They covenant and agree with him, in effect, that the executors shall pay out of the residuary fund this debt. The entire scope of the agreement is a pledge by the legatees, as owners, with absolute control and power of disposition of part of their property, to pay this claim ; and yet neither pending the negotiations nor at the time the contract was sealed did he disclose that he had a right to nearly $70,000 of the fund, on the faith of their ownership of which they had agreed to pay his claim.

The contract of 1872 was signed and sealed by the parties

on the understanding, as its basis, that Joseph D. Mitchell and his sister were owners, by their title as legatees, of the entire proceeds of the sale of "Hurricane" and "Brierfield," charged *first* with the specific legacies to themselves and the children of Jefferson Davis. Jefferson Davis accepted their obligation to pay out of the surplus of that fund, as well as whatever else remained after discharging the smaller legacies. That conceded ownership referred to in the contract, and arising upon it by necessary implication as clearly as if recited in express words, was the predicate on which the legatees entered into it.

It is evident, as laid down in the authorities cited, that if the parties to the contract assumed as true *that condition of fact* as the predicate of the obligatory stipulation, his claim as creditor is absolutely inconsistent and repugnant to the claim set up in the bill.

The legatees would not for a moment have entertained the proposition to pay this debt if Mr. Davis had disclosed a purpose at some future time to set up an adverse claim to a large part of the very fund out of which they had engaged to pay him. This transaction operates against Mr. Davis both as an affirmation by conduct and by acquiescence.

Acquiescence of a party is often very strong admission, and may also be conclusive ; but to have such effect it must exhibit some act of the mind, and amount to voluntary demeanor or conduct of the party. The circumstances must be, not only such as afforded him an opportunity to speak or act, but such as would naturally call for acts or reply from men similarly situated. 1 Greenl. on Ev., sec. 197.

This negotiation assumed that the grandchildren owned the fund out of which payment was to be made. It is a very "strong admission" of the fact. If Jefferson Davis cherished an unavowed claim to the fund, "an opportunity to speak was afforded ; " and the *duty* arose before the nephew and niece committed themselves by the contract.

If Jefferson Davis had stood *silently* by and suffered Joseph

D. Mitchell and his sister to have sold or mortgaged all that their grandfather had bequeathed and devised to them, it could not be doubted that he would be estopped to assert title in himself against the purchaser or mortgagee.

With how much greater force of reason does the principle apply when he is the beneficiary of the contract. In the former case he would be concluded, because he permitted another to be misled; in the latter the other parties are deluded and he is benefited.

Jefferson Davis, by his acquiescence and non-claim during the four years that his brother lived after the sale; by his giving bond and taking oath to execute the will; by the inventory; by his formal discussions and decisions as to the proper construction of the will; by his collections of money arising from the sale of the lands; by his payment of the interest on the legacies charged on that fund — these transactions running through a period of four years after his brother's death; and especially by his negotiations and sealed contract with Mary E. and Joseph D. Mitchell, styled, in the writing, " legatees under the last will of Joseph E. Davis," the whole tenor and effect of which is that the former is legatee of the fund derived from " Hurricane " and " Brierfield " to the extent of $100,000, and the latter of $50,000, and that they are residuaries of the balance of it — these acts of omission and commission, of silence and affirmation, conclusively estop him from asserting the claim set up in the bill.

There is no doubt that Jefferson Davis had a well-founded expectation that his brother would make ample provision for himself or family, either with " Brierfield " or its equivalent. It may be put in stronger language — he never doubted that his brother would do so. Joseph E. supposed that he had done his duty in that respect when, by his will in 1865, he devised it to Jefferson's children. Subsequently Joseph E. thought it best to give pecuniary legacies to the children, the full equivalent of " Brierfield;" and Jefferson himself made up his mind to regard it as a fulfillment of his brother's duty

to himself or his family, and had decided to abide by it. His conduct is not explicable on any other ground. That is conceded by one of my associates. But having deliberately done too many acts in that line, the *locus pœnitentiœ* was passed, and he cannot retrace.

It will not do to say that estoppel has no application because nobody has been injured. If the covenant to surrender, and a direction to the executors to pay $10,000 out of their residuary fund, is not a " prejudice " to the two legatees, or is not a change " of their former position," I am not able to conceive what fact or act would meet the requirement of the principle.

If the appellant's claim be allowed, much that has been done in execution of the will must be undone, which will materially alter the position of the *cestuis que trust*, to their serious prejudice. The interest which has been collected and paid over to Mary E. and Joseph D. Mitchell must, in part, be recalled, if that shall be needed to make good to the appellant interest on the value of " Brierfield " from the time the purchaser's notes for interest were collected, either by the testator or by the executors. And, secondly, it would annul, or render impossible of performance, the contract of 1872 with the residuary legatees; for, by it their specific legacies, charged on the proceeds of the sale of " Hurricane " and " Brierfield," are declared, in effect, to be intact, although to make them so the value of " Brierfield " were needed; and, further, the debt assumed to be paid by them to appellant is indicated and agreed to be primarily paid out of the $70,000 of that fund not included in the specific legacies, which would be impossible if the appellant succeeded.

With an observation on another point made in argument for the appellant, and adopted by one, if not both, of my associates, I will close this protracted discussion. It is said that Joseph E. Davis died intestate as to $70,000 — the supposed value of " Brierfield " — and the clause of the will on which that argument is rested is: " In case of the failure to collect

the whole amount of the funds set apart for the payment of the legacies to my grandson, Joseph D. Mitchell, my granddaughter, Mary E. Mitchell, my niece, Margaret and Varina Davis, and nephews, Jefferson and William Davis, I desire that my executors shall make a *pro-rata* deduction from their several legacies mentioned."

If just enough is collected to pay the legacies in full, then it is plain no deduction is contemplated. The meaning is, if less than enough is collected for that purpose, then the deduction shall be made. That construction is made manifest when read in connection with article 5, which directs the several amounts given to the legatees to be paid " out of " this fund, the executors to set apart and secure to the beneficiaries the several amounts given to them. "And the legacies herein directed to be paid from the proceeds of such sale shall be a lien on, and held by, such legatees, with all the rights and privileges of the mortgagee." Here the direction is to pay out of the whole fund, though it might exhaust it.

Take the whole will together, and there is no difficulty in its meaning ; and that is, the legacies charged on this fund are to be paid in full, if it yields enough. If it falls short, a proportional abatement must take place. If the fund is in excess of the legacies, then the surplus, much or little, is disposed of by the residuary bequests.

A careful consideration of the case has brought me to the conclusion that there is no error in the decree, and that it ought to be affirmed.

The foregoing was filed as my dissenting opinion on the first hearing. I still adhere to it.

### ADDENDUM.

Since the reargument was granted, counsel on both sides have filed a letter from Mrs. Davis to Joseph E. Davis, dated November 11, 1865, and agree that it may be considered as part of the record.

The following extract was in a communication from Jefferson Davis to his wife, probably of date October 20, 1865, viz. :

" Brother Joe should not, I think, return to the river place. All is changed. He will be troubled beyond his strength by the confusion that must exist. An agent will suit the new *régime* much better than the old one. If he goes back, why not take the ' Brierfield ' house?' He can claim possession as owner of the land. But my decided opinion is, in the existing condition, neither he nor Lize should stay there.'"

The extract is appended as cumulative evidence tending to support the conclusion which I reached without its aid.